UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
JOHN DOE,                                     :
                                              :
                          Plaintiff,          :           23 Civ. 06395 (VSB) (GS)
                                              :
                                              :           OPINION AND ORDER
            - against -                       :
                                              :
THE FEDERAL REPUBLIC OF GERMANY, :
AND THE BUNDESKRIMINALAMT OF        :
THE FEDERAL REPUBLIC OF GERMANY, :
                                              :
                          Defendants.         :
------------------------------------------------------------x

**GARY STEIN, United States Magistrate Judge:**

Plaintiff purports to be the individual who leaked the now-famous trove of offshore financial records known as the "Panama Papers."  Using the pseudonym "John Doe" and proceeding *pro se*, Plaintiff filed this breach of contract action under the Foreign Sovereign Immunities Act against the Federal Republic of Germany ("Germany") and the Bundeskriminalamt of Germany ("BKA") on July 24, 2023.  Plaintiff claims that Defendants have failed to pay amounts due under a contract pursuant to which Defendants purchased access to the Panama Papers for use in identifying tax fraud and other financial crimes.  (*See* Dkt. No. 1 ("Complaint" or "Compl.")).

Pending before the Court are three *ex parte* motions filed by Plaintiff simultaneously with the Complaint: a motion for leave to serve Defendants via alternative means (Dkt. No. 6); a motion for leave to proceed anonymously under a

pseudonym (Dkt. No. 3);[1] and a motion for leave to participate in electronic case filing ("ECF") (Dkt. No. 5). Defendants, who have not yet been served with the Complaint, have made no appearance in the action.

For the reasons set forth below, the Court concludes that it lacks authority under the Foreign Sovereign Immunities Act to authorize alternative service in this case. Plaintiff's motion for alternative service is, therefore, DENIED. The Court further concludes that it would be inappropriate to decide whether to permit Plaintiff to proceed anonymously until Defendants have been served with the Complaint and have had an opportunity to be heard on this issue and until Plaintiff evinces a willingness to disclose Plaintiff's identity to the court under seal, as would be required if the motion were granted. Accordingly, Plaintiff's motion to proceed anonymously under a pseudonym is DENIED without prejudice. Finally, Plaintiff's motion for ECF privileges is DENIED with leave to renew.

## BACKGROUND

### A. The Complaint's Allegations

Plaintiff alleges that he[2] is the "original source" of the Panama Papers (Compl. ¶ 3), a database of confidential, encrypted documents that have been

---

[1] Plaintiff's motion to proceed anonymously is entitled "*Ex Parte* Sealed Motion for Leave to Proceed Anonymously Under a Pseudonym" (Dkt. No. 3) and is accompanied by a supporting declaration entitled "Sealed Declaration of John Doe" (Dkt. No. 4). Despite their designation as "sealed," Plaintiff did not seek permission to file these documents under seal and they are not under seal.

[2] Plaintiff's papers use gender-neutral pronouns ("they," "their," etc.) to refer to Plaintiff. The Court uses male pronouns throughout this Opinion for ease of reference, but in so doing does not intend to suggest anything about Plaintiff's gender, as to which the Court has no knowledge.

described as a "cache of 11.5 million records show[ing] how a global industry of law firms and big banks sell financial secrecy to politicians, fraudsters and drug traffickers as well as billionaires, celebrities, and sports stars." (*Id.* ¶ 22; citation omitted). The leaked files came from the Panamanian law firm, Mossack Fonseca. (*Id.* ¶ 24). Plaintiff alleges that, at all times relevant to the Complaint, he was a citizen of the United States. (*Id.* ¶ 17).

In early 2015, Plaintiff alleges he began transferring the Panama Papers to journalists Bastian Obermayer and Frederik Obermaier of the German newspaper *Süddeutsche Zeitung*. (*Id.* ¶ 20). Working in collaboration with the two journalists, the International Consortium of Investigative Journalists (the "ICIJ") published a series of stories and analyses derived from the Panama Papers beginning in April 2016. (*Id.* ¶¶ 21-23).

"[A]n earthquake" followed. (*Id.* ¶ 2; citation omitted). According to the ICIJ, the Panama Papers "reveal[ed] how associates of Russian President Vladimir Putin secretly shuffled as much as $2 billion through banks and shadow companies" and "expose[d] offshore companies controlled by" the highest-ranking officials of numerous other nations. (*Id.* ¶ 24; citation omitted). The leaked documents also contained the names of "29 billionaires featured in Forbes Magazine's list of the world's 500 richest people," as well as "at least 33 people and companies blacklisted by the U.S. government because of evidence of wrongdoing, such as doing business with Mexican drug lords, terrorist organizations like Hezbollah or rogue nations like North Korea and Iran." (*Id.*; citation omitted). In 2021, the ICIJ reported that

the Panama Papers had sparked inquiries that enabled countries to recoup more than $1.36 billion in unpaid taxes and fines; served as a catalyst for anti-money laundering legislation in the United States and United Kingdom, among other countries; and led to the resignation or removal from office of the prime ministers of Iceland and Pakistan. (*Id.* ¶ 25).

Although Plaintiff received no payment from the ICIJ or its partners, he alleges that the leak put his life in danger and, as a result, he needed money to protect himself; he also believed he deserved a portion of the tax proceeds that some governments would recoup from using the Panama Papers. (*Id.* ¶¶ 27-29). Consequently, in late 2016, Plaintiff decided to respond to an inquiry from German law enforcement because he knew that "the German government had paid in the past for data similar to the Panama Papers." (*Id.* ¶ 30).

Plaintiff engaged directly with agents of the BKA, which is Germany's federal criminal police agency. (*Id.* ¶¶ 6-7, 31). On December 10, 2016, while in the United States, Plaintiff began corresponding with an agent from the BKA's money laundering unit. (*Id.* ¶ 31). Protracted negotiations ensued, including several in-person, and often contentious, meetings between Plaintiff and BKA agents in Germany. (*See id.* ¶¶ 32-72).

In June 2017, Plaintiff alleges, the parties finally reached an agreement whereby Germany agreed to: (i) make a €5 million initial payment to Plaintiff, (ii) pay him 10% of Germany's collections based on the Panama Papers over €50 million, and (iii) provide him with an annual accounting of collections upon request.

(*Id.* ¶ 73).  Plaintiff further alleges that the BKA furnished him with a letter, dated June 23, 2017 and signed by BKA Vice President Peter Henzler (the "June 2017 Agreement"), reflecting these terms except for the €5 million initial payment, which was omitted "because that was to be paid before Plaintiff provided the BKA with a password to access the Panama Papers."  (*Id.* ¶¶ 73-74 and Exhibit 1).

After the €5 million was paid into an account held under a fictitious name at a local bank, Plaintiff proceeded to provide the BKA with an encrypted hard drive containing the Panama Papers as well as a password.  (*Id.* ¶¶ 51, 61, 75-77).  On July 4, 2017, Germany publicly announced that it had purchased the Panama Papers.  (*Id.* ¶ 78).  After considerable delays that Plaintiff blames on the BKA (*see id.* ¶¶ 82-97), eventually the full €5 million was wired to one of Plaintiff's bank accounts in the United States (*id.* ¶ 98).

Plaintiff, however, maintains that Defendants deprived him of the other parts of his bargain.  Specifically, Plaintiff claims that even though Germany has collected in excess of €50 million derived from criminal and civil enforcement actions causally related to the Panama Papers, BKA has failed to pay him 10% (or any percentage) of those funds, in breach of the June 2017 Agreement.  (*Id.* ¶¶ 115, 122).  In support of that claim, Plaintiff cites a public statement issued in February 2021 by the finance minister for a German state indicating that German authorities had recovered at least €72 million in collections attributable to the Panama Papers (*id.* ¶ 104), and an April 2021 report by the ICIJ alleging that "Germany had

5

reclaimed $195.65 million in back taxes and penalties as a result of the Panama Papers" (*id.* ¶ 107).

Plaintiff also claims that the BKA has breached its obligation under the June 2017 Agreement to provide him with a detailed annual accounting of Germany's collections resulting from the Panama Papers. (*Id.* ¶¶ 106, 123). No list of collections was provided to Plaintiff until he received a "partial list" on April 9, 2021. (*Id.* ¶ 106). The April 9, 2021 list, according to the Complaint, was "highly redacted" and inaccurately listed only €13.5 million as the amount recovered. (*Id.* ¶¶ 106, 123). Plaintiff further avers that BKA agents have told him that the list only includes recoveries based "exclusively" on the Panama Papers; this limitation, Plaintiff contends, violates the June 2017 Agreement, which does not include the word "exclusively" and requires only "'a causal relationship between the documents and the confiscation.'" (*Id.* ¶¶ 108, 112-13; quoting June 2017 Agreement).

The Complaint asserts claims against both Defendants for breach of contract and violation of the implied covenant of good faith and fair dealing. (*Id.* ¶¶ 117-28). Plaintiff seeks, among other things, at least $14.5 million in compensatory damages as well as declaratory relief requiring Defendants to provide an annual accounting and pay him 10% of Germany's future collections causally related to the Panama Papers. (*Id.* at pp. 30-31).

## B.  Procedural History

### 1.  The D.D.C. Action

Before filing the instant Complaint, Plaintiff filed a nearly identical complaint in the U.S. District Court for the District of Columbia on June 20, 2023. *Doe v. Fed. Republic of Ger.*, Civil Action No. 23-1782 (JEB), Dkt. No. 1 ("D.D.C. Action").  The D.D.C. Action named the same parties and advanced identical claims, which were supported by nearly identical allegations as those set forth in the instant action.  (*Compare* D.D.C. Action, Dkt. No. 1, *with* Dkt. No. 1).  Likewise, Plaintiff filed in the D.D.C. Action—as he later did here—motions to proceed under a pseudonym, for alternative service, and to obtain ECF credentials.  (D.D.C. Action, Dkt. Nos. 2, 4, 5).

In a Memorandum Opinion and Order issued on July 3, 2023, Chief District Judge James E. Boasberg granted in part, and denied in part, Plaintiff's motion to proceed pseudonymously.  *Doe v. Fed. Republic of Ger.*, Civil Action No. 23-1782 (JEB), 2023 WL 4744154 (D.D.C. June 30, 2023).[3]  Applying the relevant test under governing D.C. Circuit precedent, the court found that Plaintiff "met 'the weighty burden' of 'demonstrating a concrete need' for pseudonymity."  *Id.* at *3 (quoting *In re Sealed Case*, 971 F.3d 324, 326 (D.C. Cir. 2020)).  In particular, the court found that Plaintiff had made a sufficiently specific showing that revealing his identity

---

[3] Under a Local Civil Rule, it is the duty of the Chief Judge in the District of Columbia to hear and determine a motion to file a pseudonymous complaint in cases not already assigned to a district judge.  *See id.* at *1 (citing LCvR 40.7(f)).

posed a "'risk of retaliatory physical or mental harm,'" especially in light of "publicly documented acts of retaliation against individuals involved in reporting on the Panama Papers." *Id.* at *2-3 (quoting *In re Sealed Case*, 971 F.3d at 326). The court thus granted Plaintiff's request to proceed under a pseudonym in his public filings. *Id.* at *5.

At the same time, the court denied an additional, "unusual request" made by Plaintiff as part of his motion: namely, that he be permitted to shield his identity *from the court*. *Id.* at *4-5. The court found that this request conflicted with Fed. R. Civ. P. 10(a), which requires that "[t]he title of the complaint must name all the parties"; with Fed. R. Civ. P. 11(a)'s requirement that every pleading and other paper "must be signed by at least one attorney . . . or by a party personally if the party is unrepresented"; and with a Local Civil Rule requiring all plaintiffs to file with the court a full name and residential address and, in the case of *pro se* plaintiffs, a telephone number. *Id.* at *4. While courts have exempted pseudonymous litigants from these requirements for purposes of their public filings, Chief Judge Boasberg reasoned, such parties are still required to "identify themselves for the court and for the record." *Id.* The court found no support for Plaintiff's request for a "more sweeping exemption," noting that courts "routinely require[] . . . even pseudonymous filers facing grave and specific threats to their safety [to] file their identifying information [with the court] under seal." *Id.* at *4-5. Accordingly, the court directed Plaintiff to file a declaration containing his true

name, residential address, and phone number *ex parte* and under seal within 21 days of the court's ruling, *i.e.*, by July 24, 2023.  *Id.* at *5.

Plaintiff moved for reconsideration, arguing that, "[i]n the interest of avoiding any loss of life or physical harm," he should be allowed to withhold divulging his name and contact information to the court "until such time as doing so can be shown to be absolutely necessary."  (D.D.C. Action, Dkt. No. 8 at 10).  Chief Judge Boasberg denied the motion for reconsideration on July 21, 2023.  *Doe v. Fed. Republic of Ger.*, Civil Action No. 23-1782 (JEB), 2023 WL 4744175 (D.D.C. July 21, 2023).  Plaintiff did not submit the declaration required by the court.  The D.D.C Action was dismissed without prejudice for want of prosecution on September 20, 2023.

### 2.  The S.D.N.Y. Actions

On July 24, 2023—the same day by which Plaintiff was required to submit a declaration under seal disclosing his identity in the D.D.C. Action—Plaintiff commenced the instant action and filed the three motions addressed in this Opinion and Order.  Plaintiff's Complaint is in substance identical to the complaint filed in the D.D.C. Action, except that certain events that in the D.D.C. Action were alleged to have taken place in "the United States" are now described as having taken place in "New York."  (*Compare* D.D.C. Action, Dkt. No. 1 ¶¶ 16, 18, 41, 63, *with* Compl. ¶¶ 16, 18, 41, 63).  The only contact information that Plaintiff has provided in the Complaint or any of his other filings with the Court is an e-mail address created for purposes of this litigation ("doevgermanylitigation@protonmail.com").

9

Plaintiff did not pay the required filing fees together with his Complaint, which he filed using a court e-mail address established for *pro se* litigants during the COVID-19 pandemic.  When 21 days elapsed and the fees remained unpaid, the Honorable Vernon S. Broderick, the assigned district judge, issued an Order on August 22, 2023 directing Plaintiff to either pay the required filing fees or submit an application to proceed *in forma pauperis* ("IFP").  (Dkt. No. 9).

On that same day, Plaintiff filed yet another complaint in this Court, identical to the instant Complaint, along with an IFP application.  *Doe v. Fed. Republic of Germany*, 23-cv-07497-LTS (the "Aug. 22 Action"), Dkt. Nos. 1, 5. Plaintiff's IFP application contained none of the required financial information demonstrating Plaintiff's inability to pay the filing fees.  To the contrary, Plaintiff acknowledged in his application that "I am capable of paying the filing fee."  (Aug. 22 Action, Dkt. No. 5).  But he asserted that doing so "would create a traceable transaction, even if paid in cash," and requested a waiver of the fee "because paying the fee in any manner would put my life in danger."  (*Id.*).

Chief Judge Swain dismissed the August 22 Action as duplicative of the instant action (Aug. 22 Action, Dkt. No. 10), and at Judge Broderick's direction, the Clerk docketed Plaintiff's IFP application in this action.  (Dkt. Nos. 10, 11).  Judge Broderick then denied Plaintiff's request to proceed IFP on August 29, 2023.  (Dkt. No. 12).  On September 6, 2023, according to the docket, the filing fees were paid, in cash.  (*See* Dkt. Entry dated Sept. 6, 2023).

On September 7, 2023, Judge Broderick referred this case for general pretrial supervision, including non-dispositive motions, to the then-designated Magistrate Judge.  (Dkt. No. 13).  The referral was reassigned to the undersigned on September 19, 2023.

## DISCUSSION

### A.  Plaintiff's Motion for Alternative Service Is Denied

Plaintiff requests permission to serve Defendants "via alternative means," specifically, by "the same secure electronic means that Plaintiff has already employed to communicate with Defendants in the past as described in the Complaint, as well as via e-mail to Defendants' known counsel in this matter." (Dkt. No. 6).  Plaintiff argues that "[c]onventional service of process would potentially expose a route for others to identify Plaintiff" and thereby jeopardize Plaintiff's safety and security.  (*Id.*).

Because Plaintiff, as he must,[4] relies solely on the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.*, as the basis for this Court's jurisdiction (*see* Compl. ¶ 15), his motion for alternative service must be analyzed under the applicable provisions of the FSIA.  As explained below, the FSIA contains its own service of process provisions, which delineate the exclusive means of service in an FSIA case.  Plaintiff's proposed methods of service do not conform with those

---

[4] The FSIA provides "the sole basis for obtaining jurisdiction over a foreign state in federal court." *Samantar v. Yousuf*, 560 U.S. 305, 314 (2010) (citation omitted); *Fontana v. Republic of Arg.*, 962 F.3d 667, 672 (2d Cir. 2020) (citation omitted).

11

permitted under the FSIA, and courts do not have authority to order an alternative method of service outside those permitted under the statute.  Consequently, Plaintiff's motion must be denied.

### 1. 28 U.S.C. § 1608 Sets Forth the Exclusive Means of Service in FSIA Cases

Although Rule 4 of the Federal Rules of Civil Procedure prescribes the manner of service in most federal cases, this case is an exception.  The FSIA contains its own service provisions, codified in 28 U.S.C. § 1608.  Section 1608 directs that in a FSIA case, service "shall be made" upon the foreign state or political subdivision, agency or instrumentality thereof in accordance with the means set forth in the statute.  28 U.S.C. §§ 1608(a), 1608(b).

Section 1608 "provides the sole means for effecting service of process on a foreign state." *Lovati v. Bolivarian Republic of Venezuela*, No. 19 Civ. 4793 (ALC), 2020 WL 6647423, at *2 (S.D.N.Y. Nov. 11, 2020); *see* H.R. Rep. No. 94-1487, at 23 (1976), as reprinted in 1976 U.S.C.C.A.N. 6604, 6622 ("Section 1608 sets forth the *exclusive procedures* with respect to service on . . . a foreign state or its political subdivisions, agencies or instrumentalities.") (emphasis added).  That proposition is reinforced in Rule 4 itself, which provides that "[a] foreign state or its political subdivision, agency, or instrumentality must be served in accordance with 28 U.S.C. § 1608."  Fed. R. Civ. P. 4(j)(1); *see* 4B Wright & Miller, *Federal Practice and Procedure* § 1111, at 57 (4th ed. 2015).  As such, "[a]ll entities covered by the FSIA must be served in accordance with the exclusive procedures for service outlined

12

therein." *Lewis & Kennedy, Inc. v. Permanent Mission of the Republic of Botswana to the United Nations*, No. 05 Civ. 2591 (HB), 2005 WL 1621342, at *3 (S.D.N.Y. July 12, 2005).

Section 1608 outlines specific methods of service on foreign government defendants, which differ based on whether the defendant in question is "a foreign state" or its "political subdivision," 28 U.S.C. § 1608(a), or "an agency or instrumentality of a foreign state," 28 U.S.C. § 1608(b).  Foreign states and their political subdivisions must be served in accordance with 28 U.S.C. § 1608(a); agencies and instrumentalities of a foreign state are served in accordance with 28 U.S.C. § 1608(b).  The Court thus must determine which prong of Section 1608 applies to the two named Defendants in this action.  *See Lewis & Kennedy, Inc.*, 2005 WL 1621342, at *3.

## 2. Both Germany and the BKA Are Subject to Service Under 28 U.S.C. § 1608(a)

The Federal Republic of Germany plainly is a "foreign state" for purposes of the FSIA.  "The term 'foreign state' on its face indicates a body politic that governs a particular territory."  *Samantar v. Yousuf*, 560 U.S. 305, 314 (2010); *see also Ol European Grp. B.V v. Bolivarian Republic of Venezuela*, 73 F.4th 157, 169 (3d Cir. 2023) (citing Black's Law Dictionary's definition of "foreign state" as a "foreign country" and observing that the definition "has remained largely unchanged since before the FSIA's passage," and stresses the "body politic," *i.e.*, "the country or nation").  Indeed, Plaintiff's Complaint acknowledges that Germany is a "foreign

13

state" under the FSIA.  (Compl. ¶ 18).  Defendant Germany is therefore subject to

service under 28 U.S.C. § 1608(a).

Defendant BKA's status under 28 U.S.C. § 1608 warrants further discussion.

The Complaint conclusorily alleges that BKA is an "agency and instrumentality" of

Germany as defined in 28 U.S.C. § 1603(b) of the FSIA.  (Compl. ¶ 19).  If that

allegation were correct, then BKA would be subject to service under Section 1608(b)

rather than Section 1608(a).  But Plaintiff's allegation is not correct.

Section 1603(b) of the FSIA defines an "agency or instrumentality of a foreign

state" as any entity—

> (1)  which is a separate legal person, corporate or otherwise,
> and
>
> (2) which is an organ of a foreign state or political subdivision
> thereof, or a majority of whose shares or other ownership
> interest is owned by a foreign state or political subdivision
> thereof, and
>
> (3) which is neither a citizen of a State of the United States . . .
> nor created under the laws of any third country.

28 U.S.C. § 1603(b).

Whether a foreign entity is part of the foreign state itself, or whether it is "'a

separate legal person' from a foreign state" and thus, an agency or instrumentality,

"depends on 'whether the core functions of the foreign entity are predominantly

governmental or commercial.'"  *Garb v. Republic of Poland*, 440 F.3d 579, 591 (2d

Cir. 2006) (quoting *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 151

(D.C. Cir. 1994)); *accord, e.g.*, *Servaas Inc. v. Republic of Iraq*, 653 F. App'x 22, 24

(2d Cir. 2011); *Schansman v. Sberbank of Russia PJSC*, No. 19 Civ. 02985 (ALC), 2022 WL 17540666, at *3 (S.D.N.Y. Dec. 6, 2022).  An entity's "core functions" are "governmental" when such functions are "closely bound up with the structure of the state" and "among the 'necessary concomitants' of sovereignty."  *Transaero*, 30 F.3d at 153 (quoting *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 318 (1936)); *see also Garb*, 440 F.3d at 595 (entity that is "an integral part" of nation's political structure is "governmental" under core-functions test).

Under the "core functions" test, the BKA's activities are plainly governmental.  The BKA, whose full name translates to "Federal Criminal Police Office," is Germany's "central criminal investigation agency,"[5] the "German equivalent of the Federal Bureau of Investigation," *Bakhtiar v. Islamic Republic of Iran*, 571 F. Supp. 2d 27, 32 (D.D.C. 2008); *see also* Compl. ¶ 6 (describing the BKA as the German government's "federal criminal police agency").  It is housed within Germany's Federal Ministry of the Interior and Community and is tasked with, *inter alia*, coordinating federal and state cooperation in police investigations, promoting police cooperation in Europe and worldwide, and investigating cases of international crime.[6]  It has no apparent commercial function.

---

[5] The Federal Ministry of the Interior and Community, *The Federal Criminal Police Office* (last visited Oct. 13, 2023), https://www.bmi.bund.de/EN/topics/security/federal-criminal-police-office/federal-criminal-police-office-node.

[6] The Federal Ministry of the Interior and Community, *The Federal Criminal Police Office* (last visited Oct. 13, 2023), https://www.bmi.bund.de/EN/topics/security/federal-criminal-police-office/federal-criminal-police-office-node; Bundeskriminalamt, *Our Mandate* (last visited Oct. 13, 2023), https://www.bka.de/EN/TheBKA/OurLegalMandate/ourmandate_node.html.

Courts applying the core-functions test have found "national law-enforcement agencies" to be "the state itself or a political subdivision of the state, rather than an agency or instrumentality, for purposes of FSIA § 1608." *S.K. Innovation, Inc. v. Finpol*, 854 F. Supp. 2d 99, 108 (D.D.C. 2012) (finding that Kazakhstan's Agency on Economic Crimes and Corruption and Committee on Penal Enforcement Facilities "fit comfortably" within the definition of a "foreign state"); *see also Owens v. Republic of Sudan*, 374 F. Supp. 2d 1, 25-26 (D.D.C. 2005) (finding that Sudan's Ministry of the Interior was part of the foreign state rather than an agency or instrumentality).  This is because law enforcement agencies "perform important and indispensable governmental functions."  *S.K. Innovation*, 854 F. Supp. 2d at 108 (citation omitted).  Indeed, departments of the government charged with maintaining "public order" are among the "mo[st] essential to the daily functioning and long-term survival of that government."  *Garb*, 440 F.3d at 595 n.19.

Even government agencies more closely connected to commercial activity than a law enforcement agency such as the BKA have been treated as part of the foreign state for FSIA purposes under the core-functions test.  *See, e.g.*, *Garb*, 440 F.3d at 594-97 ("core function" of Poland's Ministry of the Treasury—"to hold and administer the property of the Polish state—is indisputably governmental") (citation omitted); *Safani Gallery, Inc. v. Italian Republic*, No. 19 Civ. 10507 (VSB), 2021 WL 3292262, at *5 n.4 (S.D.N.Y. Aug. 2, 2021) (core functions of Italy's Ministry of Cultural Heritage and Activities are predominantly governmental); *Pablo Star Ltd. v. Welsh Gov't*, 170 F. Supp. 3d 597, 610 n.8 (S.D.N.Y. 2016) ("the

16

'*core function*' of Visit Wales—namely, tourism promotion—is 'predominantly governmental' and not 'commercial'").

The Court easily concludes that the BKA's core functions are "predominantly governmental" rather than "commercial." *See Garb*, 440 F.3d at 591. Thus, the BKA is part of the "foreign state" for purposes of service under the FSIA and, like Germany itself, falls within the scope of Section 1608(a), not Section 1608(b).

### 3.  Plaintiff's Proposed Alternative Means of Service Are Not Authorized Under 28 U.S.C § 1608(a)

Section 1608(a) of the FSIA sets forth four methods of serving a foreign state or political subdivision thereof:

> (1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or
>
> (2) if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or
>
> (3) if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or
>
> (4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to

17

the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

These four methods are listed "in descending order of preference." *Lovati*, 2020 WL 6647423, at *2. As such, plaintiffs must attempt each method of service, or determine it is unavailable, before moving on to other methods, "in the order in which they are laid out" in the statute. *Pablo Star Ltd.*, 170 F. Supp. 3d at 603 (citation omitted).

"Courts have been unequivocal that § 1608(a) mandates *strict adherence* to its terms, not merely substantial compliance." *Friedman v. Mission of Gabonese Republic*, No. 17 Civ. 8142 (AJN), 2019 WL 95479, at *2 (S.D.N.Y. Jan. 2, 2019) (cleaned up); *accord, e.g.*, *Pablo Star Ltd.*, 170 F. Supp. 3d at 603 ("[S]trict adherence to the terms of [§] 1608(a) is required."). As such, actual notice is insufficient to establish compliance with the statute. *Okolo v. Cross River State Gov't*, No. 18 Civ. 9479 (CS), 2019 WL 10248104, at *2 (S.D.N.Y. May 31, 2019); *Lovati*, 2020 WL 6647423, at *2.

Plaintiff's motion cites "§ 1608(a)(1)" in support of his request to effect service either through the "secure electronic means" he has used in the past to communicate with the BKA or by sending an e-mail to Defendants' counsel.[7] To the extent Plaintiff contends that either method would qualify as a "special arrangement for service" within the meaning of Section 1608(a)(1), that contention

---

[7] *See* Dkt. No. 6 ("Pursuant to 28 U.S.C. § 1608(a)(1), Plaintiff John Doe hereby requests permission to serve [Defendants] via alternative means.").

must be rejected.  Section 1608(a)(1) requires an *agreement* between the parties that service may be effected through the specified means.  *See, e.g., Pablo Star Ltd.*, 170 F. Supp. 3d at 604 ("[c]ourts require" a "definite manifestation of agreement when determining that a special arrangement has been made, such as a contract provision specifying a method of service in the event of suit") (collecting cases); *Hilt Constr. & Mgmt. Corp. v. Permanent Mission of Chad*, No. 15 Civ. 8693 (VB), 2016 WL 3351180, at *5 (S.D.N.Y. June 15, 2016) (same); H.R. Rep. No. 94-1487, at 24 (1976) ("The purpose of subsection (a)(1) is to encourage potential plaintiffs and foreign states to agree to a procedure for service.").

Here, Plaintiff does not allege that the BKA ever agreed to accept service of process by means of the channels through which he previously communicated with BKA agents or by means of an e-mail sent to its counsel.  The June 2017 Agreement does not contain any language to this effect, nor does Plaintiff point to anything else manifesting such an agreement between the parties.  The fact that Plaintiff and the BKA may have previously communicated through a particular method is insufficient to establish the existence of a "special arrangement for service" via that method.  *See Hilt Constr. & Mgmt. Corp.*, 2016 WL 3351180, at *5 (rejecting plaintiff's argument that attempted service "based on the working relationship between the parties" satisfied § 1608(a)(1), as no "manifestation of agreement" was present); *Smith v. Gnassingbe*, Civil No. 07–4167 ADM/JJK, 2009 WL 3300037, at *2 (D. Minn. Oct. 13, 2009) (plaintiff's "bare assertion[]" that he had a special arrangement with an individual who had authority to act on behalf of the Republic

19

of Togo, namely, the then-Togolese Ambassador to the United States, was

unsupported by the record and thus failed to satisfy § 1608(a)(1)).

Accordingly, Plaintiff's proposed methods of service do not comply with

Section 1608(a)(1).  Nor do they comply with the three other prongs of Section

1608(a).  Section 1608(a) does not contemplate any form of "electronic" or e-mail

service, absent a special arrangement between the parties.  *See Bushnell v. Islamic*

*Emirate of Afg.*, No. 22 Civ. 8901 (JSR), 2023 WL 3569776, at *2 (S.D.N.Y. May 18,

2023) (28 U.S.C. § 1608(a) "permit[s] service of foreign states by four methods,

which do not include . . . Twitter[] or email"); *Bleier v. Bundesrepublil Deutschland*,

No. 08 C 06254, 2011 WL 4626164, at *6 (N.D. Ill. Sept. 30, 2011) ("[b]ecause

service by email is not provided for under § 1608(a)," neither Germany nor its

Ministry of Finance were properly served).

Insofar as Plaintiff seeks permission to serve Defendants "via alternative

means" outside those enumerated in Section 1608(a) (Dkt. No. 6), the Court lacks

authority to grant such relief.  Nothing in the text of Section 1608(a) empowers

courts to direct service by alternative means or to depart from the "exclusive

procedures," *Lewis & Kennedy, Inc.*, 2005 WL 1621342, at *3; H.R. Rep. No. 94-

1487, at 23, Congress set forth in Section 1608(a) for serving a foreign state.  *See*

*Lovati*, 2020 WL 6647423, at *3 (concluding that alternative service under § 1608(a)

is "improper").

By contrast—and significantly—Section 1608(b) does allow courts to fashion

alternative methods for serving agencies and instrumentalities of a foreign state.  If

20

service cannot be made under the first two methods set forth in Section 1608(b),
service (if reasonably calculated to give actual notice) may be effected "as directed
by order of the court" consistent with the law of the foreign country in question.  28
U.S.C. § 1608(b)(3)(C).  This language, however, "is conspicuously absent in Section
1608(a)." *Lovati*, 2020 WL 6647423, at *3.  Because Congress "included a provision
for Court ordered service in Section 1608(b) and left that provision out of Section
1608(a)," the Court cannot "read that language into Section 1608(a)."  *Id.*; *see also
Republic of Sudan v. Harrison*, 139 S. Ct. 1048, 1058 (2019).

Nor does the Court have authority to grant Plaintiff's request under Fed. R.
Civ. P. 4(f)(3), the normal vehicle for court-ordered alternative service on foreign
defendants who cannot be served through conventional means.  Alternative service
is authorized under Rule 4(f)(3) only for an individual or corporate defendant in a
foreign country.  Fed. R. Civ. P. 4(f), 4(h)(2).  As noted above, however, Rule 4(j)
clearly establishes that the FSIA is the exclusive means of service on a "foreign
*state*." Fed. R. Civ. P. 4(j)(1) (emphasis added); *see Jian Zhang v. Baidu.com Inc.*,
293 F.R.D. 508, 516 (S.D.N.Y. 2013) ("Plaintiffs wisely do not seek authorization for
alternative service on China, as Rule 4(f)(3) does not apply to service on a foreign
state.").  Accordingly, Plaintiff's motion to serve Germany and the BKA through
"alternative means" is denied.[8]

---

[8] With respect to Plaintiff's concerns that serving Defendants in compliance with the FSIA could
potentially enable others to identify Plaintiff, the Court notes that those concerns could be
ameliorated if Plaintiff retained counsel to effect service.  Plaintiff has stated that he "understands

### B. Plaintiff's Motion to Proceed Anonymously Is Denied Without Prejudice

In a declaration supporting his motion for leave to proceed anonymously, Plaintiff states that to protect his safety, he has exclusively used the pseudonym "John Doe" in connection with the Panama Papers.  (Dkt. No. 4 ¶ 1).  He asserts his belief that "should my identity become known, my life would be in immediate peril" and "I would likely be killed."  (*Id.* ¶ 3).  Plaintiff points to a docudrama video shown in Russia in 2017 that he interprets as "an explicit and credible death threat against me by the government of the Russian Federation," and claims he faces similar threats from the governments of China and Saudi Arabia, international drug trafficking organizations, and ultra-high net worth individuals whose activities were exposed by the Panama Papers.  (Dkt. No. 4 ¶¶ 4, 7-9; *see* Compl. ¶ 12).  Plaintiff's motion argues that under the multi-factor test set forth in *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 192 (2d Cir. 2008), for evaluating requests to proceed under a pseudonym, these serious threats to the physical safety of Plaintiff as well as his family, friends, colleagues, and other individuals weigh in favor of granting him the requested relief.  (Dkt. No. 3).

As noted above, Plaintiff's showing was sufficiently compelling to persuade Chief Judge Boasberg, applying the D.C. Circuit's similar test, to allow Plaintiff to proceed under a pseudonym in the D.D.C. Action, on condition that he disclose his

---

that counsel may be needed to prosecute certain aspects of this litigation" and he appears to be able to afford counsel.  (Dkt. No. 3 at 8).

identity under seal to the court. Without indicating any disagreement with Judge
Boasberg's thoughtful analysis or conclusion, this Court finds that it would be
inappropriate to decide Plaintiff's motion in this action at this time, for several
reasons.

First, as discussed above, Defendants have not yet been served and the Court
has denied Plaintiff's motion to effect service through alternative means. Unless
and until Plaintiff serves Defendants through the prescribed methods set forth in 28
U.S.C. § 1608(a), this action will not proceed. It would be premature to decide
whether Plaintiff may proceed anonymously when it remains unclear if the action
will proceed at all.

Second, the Court believes it should resolve Plaintiff's motion with the benefit
of Defendants' views rather than on an *ex parte* basis. *See, e.g.*, *Doe v. Weinstein*,
484 F. Supp. 3d 90, 92 (S.D.N.Y. 2020) (before deciding *ex parte* motion for leave to
proceed under a pseudonym, court directed plaintiff to serve defendant with the
complaint and motion, and directed defendant to respond); *Doe v. Doe*, 20-CV-5329
(KAM)(CLP), 2020 WL 6900002, at *1 (E.D.N.Y. Nov. 24, 2020) (deferring ruling on
plaintiff's *ex parte* motion to use a pseudonym until defendant had been given an
opportunity to respond); *Doe v. Cnty. of El Dorado*, No. 2:13-CV-01433-KJM, 2013
WL 6230342, at *1 (E.D. Cal. Dec. 2, 2013) (concluding that it was error to decide *ex
parte* motion for leave to proceed under a pseudonym without giving defendant the
opportunity to oppose and noting that "'our entire jurisprudence runs counter to the
notion of court action taken before reasonable notice and an opportunity to be heard

has been granted both sides of a dispute'") (quoting *Granny Goose Foods, Inc. v. Teamsters*, 41 U.S. 423, 438-39 (1974)).

Under the *Sealed Plaintiff* analysis, the interests of the defendant is one important factor to be considered. *See Sealed Plaintiff*, 537 F.3d at 192 ("the interests of the . . . opposing party should be considered when determining whether to grant an application to proceed under a pseudonym."); *see also Doe v. Weinstein*, 484 F. Supp. 3d at 93 (in adjudicating a motion to proceed anonymously, "[t]he district court *must* [] consider the interests of the opposing party") (emphasis added); *Osrecovery, Inc. v. One Grp. Intern., Inc.*, No. 02 Civ. 8993 (LAK), 2003 WL 23313, at *2-3 (S.D.N.Y. Jan. 3, 2003) (granting plaintiffs' request to proceed pseudonymously but observing that "defendants have quite important interests to be protected," and tailoring order accordingly). Defendants are in the best position to articulate their interests in this matter; yet because Defendants have not yet appeared in the action, the Court lacks the ability to compel a response from them at this juncture.[9]

Third, it is unclear what Plaintiff's position is in this Court on the issue that ultimately stymied his effort to proceed pseudonymously in the D.D.C. Action: his willingness to provide his identity under seal to the court. Unlike in the D.D.C. Action, Plaintiff's motion papers here do not state explicitly that he refuses to

---

[9] Under the circumstances here, Defendants might choose to support Plaintiff's request to proceed anonymously, given Defendants' institutional interest in encouraging whistleblowers to come forward and Plaintiff's allegations that the BKA promised to ensure his safety and protect his confidentiality. (Compl. ¶¶ 31, 36). Or they might not. Regardless, Defendants' position should be taken into account.

24

provide his identity under seal, nor does Plaintiff discuss or, indeed, mention at all his previously filed D.D.C Action or Chief Judge Boasberg's rulings in that case.

If Plaintiff abandoned the D.D.C. Action and filed the instant action in the hope that he could avoid having to divulge his identity to this Court in some manner, he was mistaken.  In this District, too, parties proceeding anonymously must reveal their names (and other identifying information) under seal to the court. *See, e.g.*, *Roe 1 v. City of New York*, No. 20 Civ. 10188 (LLS), 2020 WL 7264563, at *1 (S.D.N.Y. Dec. 7, 2020) (directing plaintiffs seeking to proceed anonymously to "submit under seal an amended complaint with their real names, signatures, and addresses"); *Osrecovery, Inc.*, 2003 WL 23313, at *3 (requiring that "plaintiffs file with the Clerk, under seal, the names and addresses of the individual plaintiffs corresponding to each numbered Doe plaintiff"); *Doe v. City of New York*, No. 85 Civ. 4191 (JFK), 1985 WL 4401, at *1-2 (S.D.N.Y. Dec. 10, 1985) (allowing plaintiffs "to proceed anonymously . . . pursuant to the requirement that the Does file a Complaint containing their real names under seal").

The Second Circuit's recent decision in *Publicola v. Lomenzo*, 54 F.4th 108 (2d Cir. 2022), explains why this is so.  In *Publicola*, the court held that a *pro se* appellant's "refusal to disclose his identity to the court" warranted dismissal of his case.  *Id.* at 111.  This was because the appellant had "violated the well-established requirement that court filings disclose the identity of the filer," *id.* (citing Fed. R. App. P. 32(d) (requiring that every brief or other paper filed with the Court of Appeals "must be signed by the party filing the paper or, if the party is represented,

by one of the party's attorneys"); Fed. R. Civ. P. 11(a) (requiring same for "[e]very
pleading, written motion, and other paper" filed in district court); Fed. R. Civ. P.
10(a) ("the complaint must name all the parties")).

The Second Circuit articulated several "'vital purpose[s]'" served by this
"'seemingly pedestrian'" requirement.  *Publicola*, 54 F.4th at 111 (quoting *Sealed
Plaintiff*, 537 F.3d at 188).  The requirement that a party or their attorney identify
themselves to the court through their signature "'ensure[s] that a readily
identifiable attorney or party takes responsibility for every paper,' thus enabling
the Court to exercise its 'authority to sanction attorneys and parties who file papers
that contain misleading or frivolous assertions.'"  *Id.* (quoting Fed. R. App. P. 32(d),
Advisory Comm. note to 2002 amend.).[10]  Awareness of the identities of the litigants
also allows the court to fulfill its statutory obligations under 28 U.S.C. §§ 144 and
455 to check for conflicts of interest.  *Id.* at 112.  Moreover, "without knowing the
true 'identity of [the] parties' at the outset of a case," the court cannot give
preclusive effect to judgments in suits between the same parties.  *Id.* (quoting
*Taylor v. Sturgell*, 553 U.S. 880, 906 n.13 (2008)); *see also Doe v. Mass. Instit. of
Tech.*, 46 F.4th 61, 77 (1st Cir. 2022) (concluding for similar reasons that "courts

---

[10] Although the *Publicola* Court analyzed Fed. R. App. P. 32(d), Rule 11's signature requirement
serves the same purpose: to hold attorneys and/or parties accountable for their representations to the
court.  *See United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.,
AFL-CIO*, 948 F.2d 1338, 1344 (2d Cir. 1991) ("The cornerstone of Rule 11 is the certification
requirement; that is, Rule 11 sanctions must be based on the signature of an attorney or client.").
Indeed, "[t]he Advisory Committee consciously patterned the signature requirement [of Appellate
Rule 32(d)] after Federal Rule of Civil Procedure 11(a)."  16AA Wright & Miller, *Federal Practice and
Procedure* § 3978.1, at 446 (5th ed. 2020).

tasked with resolving pseudonymity motions must be afforded the anonymous party's true name under seal").

The governing rules and case law thus make clear that parties wishing to avail themselves of this forum for judicial relief must provide identifying information to the court, even if they are granted leave to proceed under a pseudonym.  Accordingly, should Plaintiff refile his motion to proceed anonymously at an appropriate time, the Court, were it inclined to grant such a motion, would nonetheless require Plaintiff to reveal his identifying information to the court under seal in some manner.  Unless and until Plaintiff indicates his willingness to do so, it is unnecessary to analyze the *Sealed Plaintiff* factors and determine whether Plaintiff has shown an entitlement to proceed anonymously.

The Court is sensitive to Plaintiff's concerns that the dangers to his physical safety, and the corresponding need to protect his identity, are unusually acute in this case.  Those concerns may support fashioning a sealing procedure that protects Plaintiff's confidentiality as much as possible (for instance, by allowing sealed documents to be filed and maintained in hard-copy form as opposed to electronic form).  They do not, however, justify dispensing altogether with the "well-established requirement," *Publicola*, 54 F.4th at 111, that court filings disclose the identity of the filer.  *See Doe v. Fed. Republic of Ger.*, 2023 WL 4744175, at *2.

### C. Plaintiff's Motion for ECF Privileges Is Denied with Leave to Renew

The Court also finds that Plaintiff cannot be granted ECF privileges at this time. Rule 2.2(a) of the S.D.N.Y. Electronic Case Filing Rules and Instructions provides, in pertinent part:

> The Court may permit or require a *pro se* party to a pending civil action to register as a Filing User in the ECF system solely for purposes of that action. Registration is in a form prescribed by the Clerk and *requires* identification of the action *as well as the name, address, telephone number* and Internet e-mail address of the party. (Emphasis added).

As discussed above, Plaintiff was unwilling to provide, even under seal, his name, address, and telephone number to the court in the D.D.C. Action. Plaintiff's Motion for Leave to File Electronically here (Dkt. No. 5) does not state that Plaintiff is willing to provide that information to this Court or to comply with the requirements of Rule 2.2 in this respect. Nor has Plaintiff submitted the form Motion for Permission for Electronic Case Filing, which is referred to in Rule 2.2 and is available at: https://www.nysd.uscourts.gov/forms/motion-permission-electronic-case-filing-pro-se-cases, or otherwise made the representations required therein.

Absent an affirmative statement of Plaintiff's willingness to comply with Rule 2.2, the Court is constrained to deny his motion. Plaintiff may renew his request upon an application demonstrating that he is prepared to provide the information required by Rule 2.2(a), at least under seal, to the court, and to otherwise fully

comply with the Southern District of New York's Electronic Case Filing rules for *pro se* litigants.

## CONCLUSION

For the reasons stated above, Plaintiff's motion for alternative service (Dkt. No. 6) is DENIED, Plaintiff's motion to proceed anonymously under a pseudonym (Dkt. No. 3) is DENIED without prejudice, and Plaintiff's motion for ECF privileges (Dkt. No. 5) is DENIED with leave to renew. **The Clerk of Court is respectfully requested to terminate the pending motions**.

**SO ORDERED.**

DATED:    New York, New York
             October 13, 2023

_____
GARY STEIN
United States Magistrate Judge

29