**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOHN DOE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. 1:23-cv-06395-VSB-GS |
| | ) |
| THE FEDERAL REPUBLIC OF GERMANY, | ) |
| AND THE BUNDESKRIMINALAMT OF | ) |
| THE FEDERAL REPUBLIC OF GERMANY, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## PLAINTIFF'S *EX PARTE* MOTION FOR THE ISSUANCE OF THE REQUEST FOR SERVICE PURSUANT TO THE HAGUE CONVENTION

Pursuant to the Court's Order at ECF No. 15 and the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters developed at the Tenth Session of the Hague Conference on Private International Law on 15 November, 1965 (the "Hague Convention"), Plaintiff John Doe hereby moves this Court to issue the attached Requests for Service directed to the appropriate Hague Convention Central Authorities in Germany, and, if necessary, to appoint an international process server to transmit such Requests for Service to the appropriate Central Authorities.

Given that the Federal Republic of Germany has designated a different Central Authority for each German state, and given that the Bundeskriminalamt is based in Wiesbaden and not Berlin, Plaintiff has prepared two separate USM-94 forms addressed to the respective Central Authority for each Defendant.  Each Request for Service asks the authorities in Germany to serve each Defendant with the Summons and Complaint in this matter.

In support of this Motion, Plaintiff avers as follows:

1.      On July 24, 2023, Plaintiff filed their Complaint in this action asserting causes of action against Defendants The Federal Republic of Germany and The Bundeskriminalamt of the

Federal Republic of Germany for breach of contract and breach of the implied covenant of good faith and fair dealing.

2.      These claims arise out of conduct by Defendants to (1) deny Plaintiff his share of proceeds from collections that have a causal relationship to the Panama Papers and to (2) obfuscate evidence of such denial—all in breach of a binding, written contract between Plaintiff and Defendants.

3.      Plaintiff seeks monetary damages, penalties and interest, as well as an Order declaring that Plaintiff is entitled to their share of proceeds from collections as described in the contract as well as the annual accounting described in the contract.

4.      Having filed the Complaint, Plaintiff seeks to serve Defendants with the Summons and Complaint in Germany.

5.      The Defendants are the German government and one of its agencies, which are beyond the jurisdiction of this Court and any U.S. District Court, except as proscribed by the Foreign Sovereign Immunities Act ("FSIA").

6.      The German Central Authorities require that the documents being served must be translated into German.

7.      The Requests for Service must be signed by an attorney or a court official with a wet ink signature accompanied by the Court's seal.

8.      Plaintiff is not at present represented by an attorney in this action, leaving the signature of a court official as the only option.

9.      If Plaintiff is an attorney, Plaintiff cannot use their own name and signature without compromising their anonymity.  Plaintiff furthermore cannot themselves transmit the signed documents to the Central Authorities in Germany by mail without compromising their anonymity.

10.     The English-language Summonses must be signed by a court official with a wet ink signature accompanied by the Court's seal.

11.     The issuance of such Request for Service is proper.  *See, e.g.*, Fed. R. Civ. P. 4(f); 22 U.S.C. §§ 4215 and 4221; 20 UST 361 (The Hague Convention on the Service Abroad of Judicial and Extra Judicial Documents in Civil and Commercial Matters).

12.     In the past, this Court has appointed an international process server to handle the effectuation of service on the German government.  *See, e.g.*, *Rukoro v. Federal Republic of Germany*, No. 1:17-cv-00062 (S.D.N.Y. April 7, 2017).

WHEREFORE, Plaintiff John Doe respectfully requests that this Court authorize the issuance of the attached Requests for Service directed at the appropriate Central Authorities in Germany to serve the Summons and Complaint on Defendants, and transmit the Requests for Service to those Central Authorities on its own or through an international process server as appropriate.

Dated: October 23, 2023                     Respectfully submitted,


                                            /s/John Doe
                                            John Doe
                                            doevgermanylitigation@protonmail.com

**Exhibit 1**
Unsigned Form USM-94: Federal Republic of Germany

# ANTRAG AUF ZUSTELLUNG EINES GERICHTLICHEN ODER AUSSERGERICHTLICHEN SCHRIFTSTÜCKS IM AUSLAND

REQUEST FOR SERVICE ABROAD OF JUDICIAL OR EXTRAJUDICIAL DOCUMENTS

*DEMANDE AUX FINS DE SIGNIFICATION OU DE NOTIFICATION A L'ÉTRANGER D'UN ACTE JUDICIAIRE OU EXTRAJUDICIAIRE*

**Übereinkommen über die Zustellung gerichtlicher und außergerichtlicher Schriftstücke im Ausland in Zivil- oder Handelssachen, unterzeichnet in Den Haag am 15. November 1965.**

Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, signed at The Hague, the 15th of November 1965.

*Convention relative à la signification et à la notification à l'étranger des actes judiciaires ou extrajudiciaires en matière civile ou commerciale, signée à La Haye le 15 novembre 1965.*

| **Bezeichnung und Anschrift der ersuchenden Stelle** | **Anschrift der Bestimmungsbehörde** |
|---|---|
| Identity and address of the applicant | Address of receiving authority |
| *Identité et adresse du requérant* | *Adresse de l'autorité destinaire* |
| United States District Court for the Southern District of New York<br>500 Pearl Street<br>New York, NY 10007-1312<br>UNITED STATES OF AMERICA | Senatsverwaltungs für Justiz und Verbraucherschutz<br>Salzburger Strasse 21-25<br>10825 Berlin<br>GERMANY |

**Die ersuchende Stelle beehrt sich, der Bestimmungsbehörde - in zwei Stücken - die unten angegebenen Schriftstücke mit der Bitte zu übersenden, davon nach Artikel 5 des Übereinkommens ein Stück unverzüglich dem Empfänger zustellen zu lassen, nämlich:**

The undersigned applicant has the honour to transmit – in duplicate – the documents listed below and, in conformity with Article 5 of the above-mentioned Convention, requests prompt service of one copy thereof on the addressee, *i.e.*:

*Le requérant soussigné a l'honneur de faire parvenir – en double exemplaire – à l'autorité destinataire les documents ci-dessous énumérés, en la priant, conformément à l'article 5 de la Convention précitée, d'en faire remettre sans retard un exemplaire au destinataire, à savoir :*

**(Name und Anschrift)**
(identity and address) / *(identité et adresse)*

FEDERAL REPUBLIC OF GERMANY
c/o Bundesministerium der Justiz und für Verbraucherschutz
Mohrenstraße 37
10117 Berlin
GERMANY

| | | |
|---|---|---|
| ⦿ | *a)* | **in einer der gesetzlichen Formen (Artikel 5 Absatz 1 Buchstabe *a)*)\*** |
| | | in accordance with the provisions of sub-paragraph *a)* of the first paragraph of Article 5 of the Convention\*<br>*selon les formes légales (article 5, alinéa premier, lettre a)\** |
| ○ | *b)* | **in der folgenden besonderen Form (Artikel 5 Absatz 1 Buchstabe *b)*)\*):** |
| | | in accordance with the following particular method (sub-paragraph *b)* of the first paragraph of Article 5)\*:<br>*selon la forme particulière suivante (article 5, alinéa premier, lettre b)\*:* |
| ○ | *c)* | **gegebenenfalls durch einfache Übergabe (Artikel 5 Absatz 2)\*.** |
| | | by delivery to the addressee, if he accepts it voluntarily (second paragraph of Article 5)\*<br>*le cas échéant, par remise simple (article 5, alinéa 2)\** |

**Die Behörde wird gebeten, der ersuchenden Stelle ein Stück des Schriftstücks - und seiner Anlagen\* - mit dem Zustellungszeugnis auf der Rückseite zurückzusenden oder zurücksenden zu lassen.**

The authority is requested to return or to have returned to the applicant a copy of the documents - and of the annexes\* - with the attached certificate

*Cette autorité est priée de renvoyer ou de faire renvoyer au requérant un exemplaire de l'acte - et de ses annexes\*- avec l'attestation ci-jointe.*

*Verzeichnis der Schriftstücke*
List of documents / *Énumération des pièces*

1) Complaint
2) Summons

\* Wenn zutreffend.
if appropriate / *s'il y a lieu*

| **Ausgefertigt in** New York, NY | **Unterschrift und / oder Stempel** |
|---|---|
| Done at / *Fait à* | Signature and/or stamp / *Signature et / ou cachet* |
| **am** | |
| the / *le*    October    , 2023 | |

# ZUSTELLUNGSZEUGNIS
## CERTIFICATE
### *ATTESTATION*

**Die unterzeichnete Behörde beehrt sich, nach Artikel 6 des Übereinkommens zu bescheinigen,**
The undersigned authority has the honour to certify, in conformity with Article 6 of the Convention,
*L'autorité soussignée a l'honneur d'attester conformément à l'article 6 de ladite Convention,*

○ **1. dass der Antrag erledigt worden ist\***
that the document has been served\*
*que la demande a été exécutée\**

| **– am (Datum):**<br>the (date) / *le (date)* : | |
| --- | --- |
| **– in (Ort, Straße, Nummer):**<br>at (place, street, number) / *à (localité, rue, numéro)* : | |

| **– in einer der folgenden Formen nach Artikel 5:**<br>in one of the following methods authorised by Article 5:<br>*dans une des formes suivantes prévues à l'article 5 :* | |
| --- | --- |
| ○ | *a)* **in einer der gesetzlichen Formen (Artikel 5 Absatz 1 Buchstabe *a)* \*)**<br>in accordance with the provisions of sub-paragraph *a)* of the first paragraph of Article 5 of the Convention\*<br>*selon les formes légales (article 5, alinéa premier, lettre a)\** |
| ○ | *b)* **in der folgenden besonderen Form\*:**<br>in accordance with the following particular method\*:<br>*selon la forme particulière suivante\* :* |
| ○ | *c)* **durch einfache Übergabe\***<br>by delivery to the addressee, if he accepts it voluntarily\*<br>*par remise simple\** |

**Die in dem Antrag erwähnten Schriftstücke sind übergeben worden an:**
The documents referred to in the request have been delivered to:
*Les documents mentionnés dans la demande ont été remis à :*

| **Name und Stellung der Person:**<br>Identity and description of person :<br>*Identité et qualité de la personne :* | |
| --- | --- |
| **Verwandtschafts-, Arbeits- oder sonstiges Verhältnis zum Zustellungsempfänger:**<br>Relationship to the addressee (family, business or other):<br>*Liens de parenté, de subordination ou autres, avec le destinataire de l'acte :* | |

○ **2. dass der Antrag aus folgenden Gründen nicht erledigt werden konnte\*:**
that the document has not been served, by reason of the following facts\*:
*que la demande n'a pas été exécutée, en raison des faits suivants\* :*

| |
| --- |
| |

☐ **Nach Artikel 12 Absatz 2 des Übereinkommens wird die ersuchende Stelle gebeten, die Auslagen, die in der beiliegenden Aufstellung im einzelnen angegeben sind, zu zahlen oder zu erstatten\*.**
In conformity with the second paragraph of Article 12 of the Convention, the applicant is requested to pay or reimburse the expenses detailed in the attached statement\*.
*Conformément à l'article 12, alinéa 2, de ladite Convention, le requérant est prié de payer ou de rembourser les frais dont le détail figure au mémoire ci-joint\*.*

*Anlagen*
Annexes / *Annexes*

| **Zurückgesandte Schriftstücke:**<br>Documents returned:<br>*Pièces renvoyées :* | |
| --- | --- |
| **Gegebenenfalls Erledigungsstücke:**<br>In appropriate cases, documents establishing the service:<br>*Le cas échéant, les documents justificatifs de l'exécution :* | |

**\*** Wenn zutreffend
*if appropriate / s'il y a lieu*

| **Ausgefertigt in**<br>Done at / *Fait à*<br><br>**am**<br>the / *le* | **Unterschrift und/oder Stempel**<br>Signature and/or stamp / *Signature et / ou cachet* |
| --- | --- |

# ACHTUNG
## WARNING
### *AVERTISSEMENT*

**Name und Anschrift des Empfängers**
Identity and address of the addressee
*Identité et adresse du destinataire*

FEDERAL REPUBLIC OF GERMANY
c/o Bundesministerium der Justiz und für Verbraucherschutz
Mohrenstraße 37
10117 Berlin
GERMANY

## WICHTIGER HINWEIS

**DAS ANLIEGENDE SCHRIFTSTÜCK IST EIN RECHTSDOKUMENT UND KANN IHRE RECHTE UND PFLICHTEN BERÜHREN. DIE „ANGABEN ÜBER DEN WESENTLICHEN INHALT DES ZUZUSTELLENDEN SCHRIFTSTÜCKS" ENTHALTEN HINWEISE ZU DER ART UND DEM ZWECK DES SCHRIFTSTÜCKS. SIE SOLLTEN DAS SCHRIFTSTÜCK AUF JEDEN FALL AUFMERKSAM DURCHLESEN UND GEGEBENENFALLS RECHTSRAT EINHOLEN.**

**WENN SIE NICHT ÜBER AUSREICHENDE FINANZIELLE MITTEL VERFÜGEN, SOLLTEN SIE SICH ERKUNDIGEN, OB DIE MÖGLICHKEIT BESTEHT, IN IHREM LAND ODER IN DEM LAND, IN DEM DAS SCHRIFTSTÜCK AUSGESTELLT WURDE, PROZESSKOSTENHILFE ODER BERATUNGSHILFE ZU ERHALTEN.**

**ANFRAGEN ZUR GEWÄHRUNG VON PROZESSKOSTENHILFE ODER BERATUNGSHILFE IN DEM LAND, IN DEM DAS SCHRIFTSTÜCK AUSGESTELLT WURDE, KÖNNEN AN FOLGENDE STELLE GERICHTET WERDEN:**

### IMPORTANT

THE ENCLOSED DOCUMENT IS OF A LEGAL NATURE AND MAY AFFECT YOUR RIGHTS AND OBLIGATIONS. THE 'SUMMARY OF THE DOCUMENT TO BE SERVED' WILL GIVE YOU SOME INFORMATION ABOUT ITS NATURE AND PURPOSE. YOU SHOULD HOWEVER READ THE DOCUMENT ITSELF CAREFULLY. IT MAY BE NECESSARY TO SEEK LEGAL ADVICE.

IF YOUR FINANCIAL RESOURCES ARE INSUFFICIENT YOU SHOULD SEEK INFORMATION ON THE POSSIBILITY OF OBTAINING LEGAL AID OR ADVICE EITHER IN THE COUNTRY WHERE YOU LIVE OR IN THE COUNTRY WHERE THE DOCUMENT WAS ISSUED.

ENQUIRIES ABOUT THE AVAILABILITY OF LEGAL AID OR ADVICE IN THE COUNTRY WHERE THE DOCUMENT WAS ISSUED MAY BE DIRECTED TO:

### *TRÈS IMPORTANT*

*LE DOCUMENT CI-JOINT EST DE NATURE JURIDIQUE ET PEUT AFFECTER VOS DROITS ET OBLIGATIONS. LES « ÉLÉMENTS ESSENTIELS DE L'ACTE » VOUS DONNENT QUELQUES INFORMATIONS SUR SA NATURE ET SON OBJET. IL EST TOUTEFOIS INDISPENSABLE DE LIRE ATTENTIVEMENT LE TEXTE MÊME DU DOCUMENT. IL PEUT ÊTRE NÉCESSAIRE DE DEMANDER UN AVIS JURIDIQUE.*

*SI VOS RESSOURCES SONT INSUFFISANTES, RENSEIGNEZ-VOUS SUR LA POSSIBILITÉ D'OBTENIR L'ASSISTANCE JUDICIAIRE ET LA CONSULTATION JURIDIQUE SOIT DANS VOTRE PAYS SOIT DANS LE PAYS D'ORIGINE DU DOCUMENT.*

*LES DEMANDES DE RENSEIGNEMENTS SUR LES POSSIBILITÉS D'OBTENIR L'ASSISTANCE JUDICIAIRE OU LA CONSULTATION JURIDIQUE DANS LE PAYS D'ORIGINE DU DOCUMENT PEUVENT ÊTRE ADRESSÉES À :*

Legal Services NYC, 1 West 125th Street, 2nd Floor, New York, NY 10027, Phone: +1 646 442 3100

**Es wird empfohlen, die in der Mitteilung vorgedruckten Teile in englischer und französischer Sprache und gegebenenfalls auch in der Amtssprache oder einer der Amtssprachen des Ursprungsstaates abzufassen. Die Eintragungen können in der Sprache des Empfängerstaates oder in englischer oder französischer Sprache gemacht werden.**

It is recommended that the standard terms in the notice be written in English and French and where appropriate also in the official language, or in one of the official languages of the State in which the document originated. The blanks could be completed either in the language of the State to which the document is to be sent, or in English or French.

*Il est recommandé que les mentions imprimées dans cette note soient rédigées en langue française et en langue anglaise et le cas échéant, en outre, dans la langue ou l'une des langues officielles de l'État d'origine de l'acte. Les blancs pourraient être remplis soit dans la langue de l'État où le document doit être adressé, soit en langue française, soit en langue anglaise.*

# ANGABEN ÜBER DEN WESENTLICHEN INHALT DES ZUZUSTELLENDEN SCHRIFTSTÜCKS

SUMMARY OF THE DOCUMENT TO BE SERVED

*ÉLÉMENTS ESSENTIELS DE L'ACTE*

**Übereinkommen über die Zustellung gerichtlicher und außergerichtlicher Schriftstücke im Ausland in Zivil- oder Handelssachen, unterzeichnet in Den Haag am 15. November 1965. (Artikel 5 Absatz 4).**

Convention on the Service Abroad of Judicial and Extradjudicial Documents in Civil or Commercial Matters, signed at The Hague, the 15th of November 1965 (Article 5, fourth paragraph).

*Convention relative à la signification et à la notification à l'étranger des actes judiciaires ou extrajudiciaires en matière civile ou commerciale, signée à La Haye le 15 novembre 1965 (article 5, alinéa 4).*

| | |
|---|---|
| **Bezeichnung und Anschrift der ersuchenden Stelle:**<br>Name and address of the requesting authority:<br>*Nom et adresse de l'autorité requérante :* | United States District Court for the Southern District of New York<br>500 Pearl Street<br>New York, NY 10007-1312<br>UNITED STATES OF AMERICA |
| **Bezeichnung der Parteien*:**<br>Particulars of the parties*:<br>*Identité des parties* :* | The Plaintiff is John Doe (pseudonym) and the Defendants are The Federal Republic of Germany and the Bundeskriminalamt of the Federal Republic of Germany |

\* Gegebenenfalls Name und Anschrift der an der Übersendung des Schriftstücks interessierten Person.

if appropriate, identity and address of the person interested in the transmission of the document

*s'il y a lieu, identité et adresse de la personne intéressée à la transmission de l'acte*

⦿ **GERICHTLICHES SCHRIFTSTÜCK \*\***

JUDICIAL DOCUMENT\*\*

*ACTE JUDICIAIRE\*\**

| | |
|---|---|
| **Art und Gegenstand des Schriftstücks:**<br>Nature and purpose of the document:<br>*Nature et objet de l'acte :* | Notice of a lawsuit in which the Federal Republic of Germany is a defendant. |
| **Art und Gegenstand des Verfahrens, gegebenenfalls Betrag der geltend gemachten Forderung:**<br>Nature and purpose of the proceedings and, when appropriate,<br>the amount in dispute:<br>*Nature et objet de l'instance, le cas échéant, le montant du litige :* | This is a lawsuit for breach of contract and breach of the implied convenant of good faith and fair dealing. |
| **Termin und Ort für die Einlassung auf das Verfahren \*\*:**<br>Date and Place for entering appearance\*\*:<br>*Date et lieu de la comparution\*\* :* | 60 days from receipt;<br>United States District Court for the Southern District of New York<br>500 Pearl Street New York, NY 10007-1312 UNITED STATES OF AMERICA |
| **Gericht, das die Entscheidung erlassen hat \*\*:**<br>Court which has given judgment\*\*:<br>*Juridiction qui a rendu la décision\*\* :* | Not applicable |
| **Datum der Entscheidung \*\*:**<br>Date of judgment\*\*:<br>*Date de la décision\*\* :* | Not applicable |
| **Im Schriftstück vermerkte Fristen \*\*:**<br>Time limits stated in the document\*\*:<br>*Indication de délais figurant dans l'acte\*\* :* | 60 days from service of the summons |

\*\* Wenn zutreffend

if appropriate / *s'il y a lieu*

○ **AUSSERGERICHTLICHES SCHRIFTSTÜCK \*\***

EXTRAJUDICIAL DOCUMENT\*\*

*ACTE EXTRAJUDICIAIRE\*\**

| | |
|---|---|
| **Art und Gegenstand des Schriftstücks:**<br>Nature and purpose of the document:<br>*Nature et objet de l'acte :* | |
| **Im Schriftstück vermerkte Fristen \*\*:**<br>Time-limits stated in the document\*\*:<br>*Indication des délais figurant dans l'acte\*\* :* | |

\*\* Wenn zutreffend

if appropriate / *s'il y a lieu*

# ANGABEN ÜBER DEN WESENTLICHEN INHALT DES ZUZUSTELLENDEN SCHRIFTSTÜCKS

SUMMARY OF THE DOCUMENT TO BE SERVED
*ÉLÉMENTS ESSENTIELS DE L'ACTE*

**Übereinkommen über die Zustellung gerichtlicher und außergerichtlicher Schriftstücke im Ausland in Zivil- oder Handelssachen, unterzeichnet in Den Haag am 15. November 1965. (Artikel 5 Absatz 4).**

Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, signed at The Hague, the 15th of November 1965
(Article 5, fourth paragraph).

*Convention relative à la signification et à la notification à l'étranger des actes judiciaires ou extrajudiciaires en matière civile ou commerciale, signée à La Haye le 15 novembre 1965 (article 5, alinéa 4).*

| | |
|---|---|
| **Bezeichnung und Anschrift der ersuchenden Stelle:** <br> Name and address of the requesting authority: <br> *Nom et adresse de l'autorité requérante :* | United States District Court for the Southern District of New York <br> 500 Pearl Street <br> New York, NY 10007-1312 <br> UNITED STATES OF AMERICA |
| **Bezeichnung der Parteien\*:** <br> Particulars of the parties\*: <br> *Identité des parties\* :* | Der Kläger ist John Doe (Pseudonym) und die Beklagten sind die Bundesrepublik Deutschland und die Bundeskriminalamt der Bundesrepublik Deutschland |

\* Gegebenenfalls Name und Anschrift der an der Übersendung des Schriftstücks interessierten Person.
if appropriate, identity and address of the person interested in the transmission of the document
*s'il y a lieu, identité et adresse de la personne intéressée à la transmission de l'acte*

 **GERICHTLICHES SCHRIFTSTÜCK \*\***
JUDICIAL DOCUMENT\*\*
*ACTE JUDICIAIRE\*\**

| | |
|---|---|
| **Art und Gegenstand des Schriftstücks:** <br> Nature and purpose of the document: <br> *Nature et objet de l'acte :* | Bekanntmachung einer Klage, in der die Bundesrepublik Deutschland ein Beklagter ist. |
| **Art und Gegenstand des Verfahrens, gegebenenfalls Betrag der geltend gemachten Forderung:** <br> Nature and purpose of the proceedings and, when appropriate, the amount in dispute: <br> *Nature et objet de l'instance, le cas échéant, le montant du litige :* | Dies ist eine Klage wegen Vertragsverletzung und Verstoßes gegen den implizierten Bund des guten Glaubens und des fairen Umgangs. |
| **Termin und Ort für die Einlassung auf das Verfahren \*\*:** <br> Date and Place for entering appearance\*\*: <br> *Date et lieu de la comparution\*\* :* | 60 Tage nach Erhalt; <br> Bezirksgericht der Vereinigten Staaten für den südlichen Bezirk von New York <br> 500 Pearl Street New York, NY 10007-1312 Vereinigte Staaten von Amerika |
| **Gericht, das die Entscheidung erlassen hat \*\*:** <br> Court which has given judgment\*\*: <br> *Juridiction qui a rendu la décision\*\* :* | Unzutreffend |
| **Datum der Entscheidung \*\*:** <br> Date of judgment\*\*: <br> *Date de la décision\*\* :* | Unzutreffend |
| **Im Schriftstück vermerkte Fristen \*\*:** <br> Time limits stated in the document\*\*: <br> *Indication des délais figurant dans l'acte\*\* :* | 60 Tage nach dem Dienst der Vorladung |

\*\* Wenn zutreffend
if appropriate / *s'il y a lieu*

○ **AUSSERGERICHTLICHES SCHRIFTSTÜCK \*\***
EXTRAJUDICIAL DOCUMENT\*\*
*ACTE EXTRAJUDICIAIRE\*\**

| | |
|---|---|
| **Art und Gegenstand des Schriftstücks:** <br> Nature and purpose of the document: <br> *Nature et objet de l'acte :* | |
| **Im Schriftstück vermerkte Fristen \*\*:** <br> Time-limits stated in the document\*\*: <br> *Indication des délais figurant dans l'acte\*\* :* | |

\*\* Wenn zutreffend
if appropriate / *s'il y a lieu*

**Exhibit 2**
Unsigned Form USM-94: Bundeskriminalamt

# ANTRAG AUF ZUSTELLUNG EINES GERICHTLICHEN ODER AUSSERGERICHTLICHEN SCHRIFTSTÜCKS IM AUSLAND

## REQUEST FOR SERVICE ABROAD OF JUDICIAL OR EXTRAJUDICIAL DOCUMENTS

*DEMANDE AUX FINS DE SIGNIFICATION OU DE NOTIFICATION A L'ÉTRANGER D'UN ACTE JUDICIAIRE OU EXTRAJUDICIAIRE*

**Übereinkommen über die Zustellung gerichtlicher und außergerichtlicher Schriftstücke im Ausland in Zivil- oder Handelssachen, unterzeichnet in Den Haag am 15. November 1965.**

Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, signed at The Hague, the 15th of November 1965.

*Convention relative à la signification et à la notification à l'étranger des actes judiciaires ou extrajudiciaires en matière civile ou commerciale, signée à La Haye le 15 novembre 1965.*

| | |
|---|---|
| **Bezeichnung und Anschrift der ersuchenden Stelle**<br>Identity and address of the applicant<br>*Identité et adresse du requérant*<br><br>United States District Court for the Southern District of New York<br>500 Pearl Street<br>New York, NY 10007-1312<br>UNITED STATES OF AMERICA | **Anschrift der Bestimmungsbehörde**<br>Address of receiving authority<br>*Adresse de l'autorité destinataire*<br><br>Der Präsident des Oberlandesgerichts Frankfurt am Main<br>Zeil 42<br>Postfach 10 01 01<br>60313 Frankfurt am Main<br>GERMANY |

**Die ersuchende Stelle beehrt sich, der Bestimmungsbehörde - in zwei Stücken - die unten angegebenen Schriftstücke mit der Bitte zu übersenden, davon nach Artikel 5 des Übereinkommens ein Stück unverzüglich dem Empfänger zustellen zu lassen, nämlich:**

The undersigned applicant has the honour to transmit – in duplicate – the documents listed below and, in conformity with Article 5 of the above-mentioned Convention, requests prompt service of one copy thereof on the addressee, *i.e.:*

*Le requérant soussigné a l'honneur de faire parvenir – en double exemplaire – à l'autorité destinataire les documents ci-dessous énumérés, en la priant, conformément à l'article 5 de la Convention précitée, d'en faire remettre sans retard un exemplaire au destinataire, à savoir :*

**(Name und Anschrift)**
(identity and address) / *(identité et adresse)*

BUNDESKRIMINALAMT
Bundeskriminalamt
65173 Wiesbaden
GERMANY

| | | |
|---|---|---|
| ◉ | **a)** | **in einer der gesetzlichen Formen (Artikel 5 Absatz 1 Buchstabe a)\*)**<br>in accordance with the provisions of sub-paragraph a) of the first paragraph of Article 5 of the Convention*<br>*selon les formes légales (article 5, alinéa premier, lettre a)\** |
| ○ | **b)** | **in der folgenden besonderen Form (Artikel 5 Absatz 1 Buchstabe b)\*):**<br>in accordance with the following particular method (sub-paragraph b) of the first paragraph of Article 5)*:<br>*selon la forme particulière suivante (article 5, alinéa premier, lettre b)\*:* |
| ○ | **c)** | **gegebenenfalls durch einfache Übergabe (Artikel 5 Absatz 2)\*.**<br>by delivery to the addressee, if he accepts it voluntarily (second paragraph of Article 5)*<br>*le cas échéant, par remise simple (article 5, alinéa 2)\** |

**Die Behörde wird gebeten, der ersuchenden Stelle ein Stück des Schriftstücks - und seiner Anlagen\* - mit dem Zustellungszeugnis auf der Rückseite zurückzusenden oder zurücksenden zu lassen.**

The authority is requested to return or to have returned to the applicant a copy of the documents - and of the annexes* - with the attached certificate

*Cette autorité est priée de renvoyer ou de faire renvoyer au requérant un exemplaire de l'acte - et de ses annexes*- avec l'attestation ci-jointe.*

*Verzeichnis der Schriftstücke*
List of documents / *Énumération des pièces*

1) Complaint
2) Summons

\* Wenn zutreffend.
if appropriate / *s'il y a lieu*

| | |
|---|---|
| **Ausgefertigt in** New York, NY<br>Done at / *Fait à*<br><br>**am**<br>the / *le*   October   , 2023 | **Unterschrift und / oder Stempel**<br>Signature and/or stamp / *Signature et / ou cachet* |

# ZUSTELLUNGSZEUGNIS
## CERTIFICATE
### *ATTESTATION*

**Die unterzeichnete Behörde beehrt sich, nach Artikel 6 des Übereinkommens zu bescheinigen,**
The undersigned authority has the honour to certify, in conformity with Article 6 of the Convention,
*L'autorité soussignée a l'honneur d'attester conformément à l'article 6 de ladite Convention,*

○ **1. dass der Antrag erledigt worden ist\***
that the document has been served\*
*que la demande a été exécutée\**

| – **am (Datum):** <br> the (date) / *le (date)* : | |
|---|---|
| – **in (Ort, Straße, Nummer):** <br> at (place, street, number) / *à (localité, rue, numéro)* : | |

| – **in einer der folgenden Formen nach Artikel 5:** <br> in one of the following methods authorised by Article 5: <br> *dans une des formes suivantes prévues à l'article 5 :* | |
|---|---|
| ○ | **a)** **in einer der gesetzlichen Formen (Artikel 5 Absatz 1 Buchstabe *a)* \*)** <br> in accordance with the provisions of sub-paragraph *a)* of the first paragraph of Article 5 of the Convention\* <br> *selon les formes légales (article 5, alinéa premier, lettre a)\** |
| ○ | **b)** **in der folgenden besonderen Form\*:** <br> in accordance with the following particular method\*: <br> *selon la forme particulière suivante\* :* |
| ○ | **c)** **durch einfache Übergabe\*** <br> by delivery to the addressee, if he accepts it voluntarily\* <br> *par remise simple\** |

**Die in dem Antrag erwähnten Schriftstücke sind übergeben worden an:**
The documents referred to in the request have been delivered to:
*Les documents mentionnés dans la demande ont été remis à :*

| **Name und Stellung der Person:** <br> Identity and description of person : <br> *Identité et qualité de la personne :* | |
|---|---|
| **Verwandtschafts-, Arbeits- oder sonstiges Verhältnis zum Zustellungsempfänger:** <br> Relationship to the addressee (family, business or other): <br> *Liens de parenté, de subordination ou autres, avec le destinataire de l'acte :* | |

○ **2. dass der Antrag aus folgenden Gründen nicht erledigt werden konnte\*:**
that the document has not been served, by reason of the following facts\*:
*que la demande n'a pas été exécutée, en raison des faits suivants\* :*

| |
|---|

☐ **Nach Artikel 12 Absatz 2 des Übereinkommens wird die ersuchende Stelle gebeten, die Auslagen, die in der beiliegenden Aufstellung im einzelnen angegeben sind, zu zahlen oder zu erstatten\*.**
In conformity with the second paragraph of Article 12 of the Convention, the applicant is requested to pay or reimburse the expenses detailed in the attached statement\*.
*Conformément à l'article 12, alinéa 2, de ladite Convention, le requérant est prié de payer ou de rembourser les frais dont le détail figure au mémoire ci-joint\*.*

*Anlagen*
Annexes / *Annexes*

| **Zurückgesandte Schriftstücke:** <br> Documents returned: <br> *Pièces renvoyées :* | |
|---|---|
| **Gegebenenfalls Erledigungsstücke:** <br> In appropriate cases, documents establishing the service: <br> *Le cas échéant, les documents justificatifs de l'exécution :* | |

\* Wenn zutreffend
if appropriate / *s'il y a lieu*

| **Ausgefertigt in** <br> Done at / *Fait à* <br><br> **am** <br> the / *le* | **Unterschrift und/oder Stempel** <br> Signature and/or stamp / *Signature et / ou cachet* |
|---|---|

# ACHTUNG
## WARNING
### *AVERTISSEMENT*

**Name und Anschrift des Empfängers**
Identity and address of the addressee
*Identité et adresse du destinataire*

BUNDESKRIMINALAMT
Bundeskriminalamt
65173 Wiesbaden
GERMANY

### WICHTIGER HINWEIS

**DAS ANLIEGENDE SCHRIFTSTÜCK IST EIN RECHTSDOKUMENT UND KANN IHRE RECHTE UND PFLICHTEN BERÜHREN. DIE „ANGABEN ÜBER DEN WESENTLICHEN INHALT DES ZUZUSTELLENDEN SCHRIFTSTÜCKS" ENTHALTEN HINWEISE ZU DER ART UND DEM ZWECK DES SCHRIFTSTÜCKS. SIE SOLLTEN DAS SCHRIFTSTÜCK AUF JEDEN FALL AUFMERKSAM DURCHLESEN UND GEGEBENENFALLS RECHTSRAT EINHOLEN.**

**WENN SIE NICHT ÜBER AUSREICHENDE FINANZIELLE MITTEL VERFÜGEN, SOLLTEN SIE SICH ERKUNDIGEN, OB DIE MÖGLICHKEIT BESTEHT, IN IHREM LAND ODER IN DEM LAND, IN DEM DAS SCHRIFTSTÜCK AUSGESTELLT WURDE, PROZESSKOSTENHILFE ODER BERATUNGSHILFE ZU ERHALTEN.**

**ANFRAGEN ZUR GEWÄHRUNG VON PROZESSKOSTENHILFE ODER BERATUNGSHILFE IN DEM LAND, IN DEM DAS SCHRIFTSTÜCK AUSGESTELLT WURDE, KÖNNEN AN FOLGENDE STELLE GERICHTET WERDEN:**

IMPORTANT

THE ENCLOSED DOCUMENT IS OF A LEGAL NATURE AND MAY AFFECT YOUR RIGHTS AND OBLIGATIONS. THE 'SUMMARY OF THE DOCUMENT TO BE SERVED' WILL GIVE YOU SOME INFORMATION ABOUT ITS NATURE AND PURPOSE. YOU SHOULD HOWEVER READ THE DOCUMENT ITSELF CAREFULLY. IT MAY BE NECESSARY TO SEEK LEGAL ADVICE.

IF YOUR FINANCIAL RESOURCES ARE INSUFFICIENT YOU SHOULD SEEK INFORMATION ON THE POSSIBILITY OF OBTAINING LEGAL AID OR ADVICE EITHER IN THE COUNTRY WHERE YOU LIVE OR IN THE COUNTRY WHERE THE DOCUMENT WAS ISSUED.

ENQUIRIES ABOUT THE AVAILABILITY OF LEGAL AID OR ADVICE IN THE COUNTRY WHERE THE DOCUMENT WAS ISSUED MAY BE DIRECTED TO:

*TRÈS IMPORTANT*

*LE DOCUMENT CI-JOINT EST DE NATURE JURIDIQUE ET PEUT AFFECTER VOS DROITS ET OBLIGATIONS. LES « ÉLÉMENTS ESSENTIELS DE L'ACTE » VOUS DONNENT QUELQUES INFORMATIONS SUR SA NATURE ET SON OBJET. IL EST TOUTEFOIS INDISPENSABLE DE LIRE ATTENTIVEMENT LE TEXTE MÊME DU DOCUMENT. IL PEUT ÊTRE NÉCESSAIRE DE DEMANDER UN AVIS JURIDIQUE.*

*SI VOS RESSOURCES SONT INSUFFISANTES, RENSEIGNEZ-VOUS SUR LA POSSIBILITÉ D'OBTENIR L'ASSISTANCE JUDICIAIRE ET LA CONSULTATION JURIDIQUE SOIT DANS VOTRE PAYS SOIT DANS LE PAYS D'ORIGINE DU DOCUMENT.*

*LES DEMANDES DE RENSEIGNEMENTS SUR LES POSSIBILITÉS D'OBTENIR L'ASSISTANCE JUDICIAIRE OU LA CONSULTATION JURIDIQUE DANS LE PAYS D'ORIGINE DU DOCUMENT PEUVENT ÊTRE ADRESSÉES À :*

Legal Services NYC, 1 West 125th Street, 2nd Floor, New York, NY 10027, Phone: +1 646 442 3100

**Es wird empfohlen, die in der Mitteilung vorgedruckten Teile in englischer und französischer Sprache und gegebenenfalls auch in der Amtssprache oder einer der Amtssprachen des Ursprungsstaates abzufassen. Die Eintragungen können in der Sprache des Empfängerstaates oder in englischer oder französischer Sprache gemacht werden.**

It is recommended that the standard terms in the notice be written in English and French and where appropriate also in the official language, or in one of the official languages of the State in which the document originated. The blanks could be completed either in the language of the State to which the document is to be sent, or in English or French.

*Il est recommandé que les mentions imprimées dans cette note soient rédigées en langue française et en langue anglaise et le cas échéant, en outre, dans la langue ou l'une des langues officielles de l'État d'origine de l'acte. Les blancs pourraient être remplis soit dans la langue de l'État où le document doit être adressé, soit en langue française, soit en langue anglaise.*

# ANGABEN ÜBER DEN WESENTLICHEN INHALT DES ZUZUSTELLENDEN SCHRIFTSTÜCKS

SUMMARY OF THE DOCUMENT TO BE SERVED

*ÉLÉMENTS ESSENTIELS DE L'ACTE*

**Übereinkommen über die Zustellung gerichtlicher und außergerichtlicher Schriftstücke im Ausland in Zivil- oder Handelssachen, unterzeichnet in Den Haag am 15. November 1965.**
**(Artikel 5 Absatz 4).**

Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, signed at The Hague, the 15th of November 1965
(Article 5, fourth paragraph).

*Convention relative à la signification et à la notification à l'étranger des actes judiciaires ou extrajudiciaires en matière civile ou commerciale, signée à La Haye le 15 novembre 1965 (article 5, alinéa 4).*

| | |
|---|---|
| **Bezeichnung und Anschrift der ersuchenden Stelle:**<br>Name and address of the requesting authority:<br>*Nom et adresse de l'autorité requérante :* | United States District Court for the Southern District of New York<br>500 Pearl Street<br>New York, NY 10007-1312<br>UNITED STATES OF AMERICA |
| **Bezeichnung der Parteien*:**<br>Particulars of the parties*:<br>*Identité des parties* :* | The Plaintiff is John Doe (pseudonym) and the Defendants are The Federal Republic of Germany and the Bundeskriminalamt of the Federal Republic of Germany |

\* Gegebenenfalls Name und Anschrift der an der Übersendung des Schriftstücks interessierten Person.
if appropriate, identity and address of the person interested in the transmission of the document
*s'il y a lieu, identité et adresse de la personne intéressée à la transmission de l'acte*

⦿ **GERICHTLICHES SCHRIFTSTÜCK ***
JUDICIAL DOCUMENT**
*ACTE JUDICIAIRE***

| | |
|---|---|
| **Art und Gegenstand des Schriftstücks:**<br>Nature and purpose of the document:<br>*Nature et objet de l'acte :* | Notice of a lawsuit in which the Bundeskriminalamt is a defendant. |
| **Art und Gegenstand des Verfahrens, gegebenenfalls Betrag der geltend gemachten Forderung:**<br>Nature and purpose of the proceedings and, when appropriate, the amount in dispute:<br>*Nature et objet de l'instance, le cas échéant, le montant du litige :* | This is a lawsuit for breach of contract and breach of the implied convenant of good faith and fair dealing. |
| **Termin und Ort für die Einlassung auf das Verfahren **:**<br>Date and Place for entering appearance**:<br>*Date et lieu de la comparution** :* | 60 days from receipt;<br>United States District Court for the Southern District of New York<br>500 Pearl Street New York, NY 10007-1312 UNITED STATES OF AMERICA |
| **Gericht, das die Entscheidung erlassen hat **:**<br>Court which has given judgment**:<br>*Juridiction qui a rendu la décision** :* | Not applicable |
| **Datum der Entscheidung **:**<br>Date of judgment**:<br>*Date de la décision** :* | Not applicable |
| **Im Schriftstück vermerkte Fristen **:**<br>Time limits stated in the document**:<br>*Indication des délais figurant dans l'acte** :* | 60 days from service of the summons |

** Wenn zutreffend
if appropriate / *s'il y a lieu*

○ **AUSSERGERICHTLICHES SCHRIFTSTÜCK ***
EXTRAJUDICIAL DOCUMENT**
*ACTE EXTRAJUDICIAIRE***

| | |
|---|---|
| **Art und Gegenstand des Schriftstücks:**<br>Nature and purpose of the document:<br>*Nature et objet de l'acte :* | |
| **Im Schriftstück vermerkte Fristen **:**<br>Time-limits stated in the document**:<br>*Indication des délais figurant dans l'acte** :* | |

** Wenn zutreffend
if appropriate / *s'il y a lieu*

# ANGABEN ÜBER DEN WESENTLICHEN INHALT DES ZUZUSTELLENDEN SCHRIFTSTÜCKS
## SUMMARY OF THE DOCUMENT TO BE SERVED
### *ÉLÉMENTS ESSENTIELS DE L'ACTE*

**Übereinkommen über die Zustellung gerichtlicher und außergerichtlicher Schriftstücke im Ausland in Zivil- oder Handelssachen, unterzeichnet in Den Haag am 15. November 1965. (Artikel 5 Absatz 4).**

Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, signed at The Hague, the 15th of November 1965 (Article 5, fourth paragraph).

*Convention relative à la signification et à la notification à l'étranger des actes judiciaires ou extrajudiciaires en matière civile ou commerciale, signée à La Haye le 15 novembre 1965 (article 5, alinéa 4).*

| | |
|---|---|
| **Bezeichnung und Anschrift der ersuchenden Stelle:**<br>Name and address of the requesting authority:<br>*Nom et adresse de l'autorité requérante :* | United States District Court for the Southern District of New York<br>500 Pearl Street<br>New York, NY 10007-1312<br>UNITED STATES OF AMERICA |
| **Bezeichnung der Parteien*:**<br>Particulars of the parties*:<br>*Identité des parties* :* | Der Kläger ist John Doe (Pseudonym) und die Beklagten sind die Bundesrepublik Deutschland und die Bundeskriminalamt der Bundesrepublik Deutschland |

\* Gegebenenfalls Name und Anschrift der an der Übersendung des Schriftstücks interessierten Person.
if appropriate, identity and address of the person interested in the transmission of the document
*s'il y a lieu, identité et adresse de la personne intéressée à la transmission de l'acte*

 **GERICHTLICHES SCHRIFTSTÜCK \*\***
JUDICIAL DOCUMENT\*\*
*ACTE JUDICIAIRE\*\**

| | |
|---|---|
| **Art und Gegenstand des Schriftstücks:**<br>Nature and purpose of the document:<br>*Nature et objet de l'acte :* | Bekanntmachung einer Klage, in der die Bundeskriminalamt ein Beklagter ist. |
| **Art und Gegenstand des Verfahrens, gegebenenfalls Betrag der geltend gemachten Forderung:**<br>Nature and purpose of the proceedings and, when appropriate, the amount in dispute:<br>*Nature et objet de l'instance, le cas échéant, le montant du litige :* | Dies ist eine Klage wegen Vertragsverletzung und Verstoßes gegen den impliziten Bund des guten Glaubens und des fairen Umgangs. |
| **Termin und Ort für die Einlassung auf das Verfahren \*\*:**<br>Date and Place for entering appearance\*\*:<br>*Date et lieu de la comparution\*\* :* | 60 Tage nach Erhalt;<br>Bezirksgericht der Vereinigten Staaten für den südlichen Bezirk von New York<br>500 Pearl Street New York, NY 10007-1312 Vereinigte Staaten von Amerika |
| **Gericht, das die Entscheidung erlassen hat \*\*:**<br>Court which has given judgment\*\*:<br>*Juridiction qui a rendu la décision\*\* :* | Unzutreffend |
| **Datum der Entscheidung \*\*:**<br>Date of judgment\*\*:<br>*Date de la décision\*\* :* | Unzutreffend |
| **Im Schriftstück vermerkte Fristen \*\*:**<br>Time limits stated in the document\*\*:<br>*Indication de délais figurant dans l'acte\*\* :* | 60 Tage nach dem Dienst der Vorladung |

\*\* Wenn zutreffend
if appropriate / *s'il y a lieu*

〇 **AUSSERGERICHTLICHES SCHRIFTSTÜCK \*\***
EXTRAJUDICIAL DOCUMENT\*\*
*ACTE EXTRAJUDICIAIRE\*\**

| | |
|---|---|
| **Art und Gegenstand des Schriftstücks:**<br>Nature and purpose of the document:<br>*Nature et objet de l'acte :* | |
| **Im Schriftstück vermerkte Fristen \*\*:**<br>Time-limits stated in the document\*\*:<br>*Indication des délais figurant dans l'acte\*\* :* | |

\*\* Wenn zutreffend
if appropriate / *s'il y a lieu*

**Exhibit 3**
Translated Complaint

**BEZIRKSGERICHT DER VEREINIGTEN STAATEN
SÜDLICHER GERICHTSBEZIRK DES US-BUNDESSTAATES NEW YORK**

| | |
|---|---|
| JOHN DOE, | ) |
| | ) |
| Kläger, | ) |
| | ) |
| v. | ) Zivilklage Nr._____ |
| | ) |
| DIE BUNDESREPUBLIK DEUTSCHLAND, | ) |
| UND DAS BUNDESKRIMINALAMT VON | ) |
| DIE BUNDESREPUBLIK DEUTSCHLAND, | ) |
| | ) |
| Beklagten. | ) |
| | ) |

## BESCHWERDE
**(Vertragsbruch,
Verstoß gegen die stillschweigende Verpflichtung zu Treu und Glauben und fairem
Handeln)**

## EINFÜHRUNG

1.      Die Panama Papers sind möglicherweise das einflussreichste Informationsleck, das Finanzbetrug und-missbrauch in der modernen Geschichte aufdeckt.

2.      Am 3. April 2021 schrieb das Internationales Konsortium der investigativen Journalisten („ICIJ"), die Organisation, die eine umfangreiche Untersuchung der Informationen in den Panama Papers koordinierte:

> Heute vor fünf Jahren begannen das Internationale Konsortium investigativer Journalisten und mehr als 100 Medienpartner auf der ganzen Welt mit der Veröffentlichung einer Untersuchung, die zum Synonym für die Aufdeckung finanzieller Schikanen und politischer Korruption werden sollte: Die Panama Papers.

> Bürger gingen aus Protest auf die Straße. Sie warfen Bananen und Joghurt in Island und Steine in Pakistan. Regierungen fielen. Die Behörden leiteten Hunderte Steuerermittlungen und strafrechtliche Ermittlungen ein.

> „Das ist ein Erdbeben", sagte CNN-Kolumnistin Frida Ghitis damals. „Die Nachbeben werden noch Monate oder sogar Jahre andauern."

Sie hatte recht.

Ein halbes Jahrzehnt später erschüttern die Enthüllungen der Panama Papers darüber, wie das Offshore-Finanzsystem Gier und Verrat ermöglicht, weiterhin politische und wirtschaftliche Systeme weltweit.[1]

3.      Der Kläger ist die ursprüngliche Quelle der Panama Papers.

4.      Die Bundesrepublik Deutschland („die deutsche Regierung") hat die Panama Papers vom Kläger erworben, um Steuerbetrug und andere von deutschen Unternehmen und Privatpersonen begangene Finanzdelikte aufzudecken und Gelder einzutreiben, die der deutschen Regierung und ihren Verbündeten zustehen.

5.      Bundes- und Landesbehörden in Deutschland haben infolge der Panama Papers über 195 Millionen US-Dollar an Steuern und Strafen eingetrieben.

6.      Als Gegenleistung für die Panama Papers erklärte sich die deutsche Regierung über ihr Bundeskriminalamt („BKA") bereit, dem Kläger 5 Millionen Euro zuzüglich 10 % etwaiger Rückforderungen aus den Panama Papers (einschließlich fälliger Steuern und Steuern) zu zahlen Steuerschulden, Steuerstrafen, Zinsen auf geschuldete und geschuldete Steuern, Bußgelder und Einziehungen aus anderen Steuerdelikten) über 50 Millionen Euro hinaus, sofern ein „ursächlicher Zusammenhang zwischen den Unterlagen und der Einziehung" besteht.

7.      Die deutsche Regierung zahlte dem Kläger über das BKA 5 Millionen Euro nach Steuern, nachdem sie dem BKA die Panama Papers übergeben hatte.

8.      Unter Verstoß gegen den Vertrag mit der Klägerin haben sich die deutsche Regierung und das BKA jedoch geweigert, der Klägerin weitere Gelder zu zahlen. Das heißt, obwohl die deutschen Behörden infolge der Panama Papers über 195 Millionen US-Dollar an

---

[1] *Fünf Jahre später wirken sich Panama-Papiere immer noch stark aus*, Internationales Konsortium investigativer Journalisten (3. April 2021), https://www.icij.org/investigations/panama-papers/.

Steuern und Strafen eingetrieben haben und obwohl die deutsche Regierung dem Kläger 10 % des Betrags schuldet, der 50 Millionen Euro übersteigt (mindestens ungefähr so viel). 14.565.000 US-Dollar) hat es dem Kläger nichts von diesem Betrag gezahlt.

9.     Die deutsche Regierung hat über das BKA zu unterschiedlichen Zeiten in die Irre geführt, verschleiert, gedroht und sich geweigert, sich zu engagieren, als Reaktion auf Versuche des Klägers, die Regierung ohne Einschaltung von Gerichten davon zu überzeugen, ihren Vertrag einzuhalten.

10.     Dieses Verhalten steht im Einklang mit den Spielchen, die die deutsche Regierung über das BKA mit dem Kläger während der monatelangen Verhandlungen über den Verkauf der Panama Papers gespielt hat – indem sie den Kläger mit denselben Agenten verhandeln ließen, die mit dem Schutz des Klägers beauftragt waren; Weigerung, Vereinbarungen schriftlich festzuhalten (vor der Bereitstellung einer nicht unterzeichneten Vereinbarung); Verzögerung des Zugangs zu Zahlungen; Versuch, den Kläger körperlich einzuschüchtern; den Kläger tatsächlich in physische Gefahr bringen; und unaufrichtig die Bürokratie für Verzögerungen und böswillige Geschäfte verantwortlich machen. Dies war das unprofessionelle und beschämende Vorgehen des BKA während etwa fünf Monaten unnötig langwieriger Verhandlungen, die geführt wurden, während sich der Kläger in Deutschland unter der schützenden Obhut des BKA befand.

11.     Damals wie heute hat das BKA die ernsthafte Bedrohung des Lebens des Klägers durch zahlreiche mächtige und korrupte Geschäftsleute und Politiker ausgenutzt, darunter unter anderem den russischen Präsidenten Wladimir Putin, dessen Finanzgeheimnisse der Kläger bei der Klageerhebung preisgegeben hatte Veröffentlichung und anschließend durch das Nachfolgewerk des inhaftierten russischen Dissidenten Alexej Nawalny. Im Januar 2021 veröffentlichte Nawalnys Team eine zweistündige dokumentarische Enthüllung von Putins geheimem Milliardenpalast in

3

der Nähe von Gelendschik, die sich direkt auf die Panama Papers bezog. Siehe https://www.youtube.com/watch?v=ipAnwilMncI.

12.     Tatsächlich strahlte der von der russischen Regierung kontrollierte Nachrichtensender Russia Today („RT") 2017 ein zweiteiliges Panama-Papers-Dokudrama mit einer „John Doe"-Figur aus, die im Vorspann eine durch Folter verursachte Kopfverletzung erlitt, woraufhin ein Cartoon-Boot durch die Blutlache von John Doe segelte, als wäre es der Panamakanal, wie unten gezeigt:

 

13.     Unter Putins Führung hat die Russische Föderation seitdem eine völkermörderische Invasion in der Ukraine gestartet, die ganz Europa und damit auch die Vereinigten Staaten bedroht. Deutschland ist ein wichtiger NATO-Verbündeter bei den Bemühungen, die Invasion Russlands abzuwehren, und die Panama Papers enthalten zahlreiche Informationen über die Nutzung des Offshore-Systems durch Russland, das für sein Militär von entscheidender Bedeutung ist, insbesondere angesichts der Sanktionen des US-Finanzministeriums. Darüber hinaus hat der Kläger dem BKA über die Panama Papers hinausgehende Informationen angeboten. Doch anstatt den Kläger mit Respekt zu behandeln, hat die deutsche Regierung über das BKA mit ihnen gespielt, ihre Ängste ausgenutzt und ihnen letztendlich den Rücken gekehrt, indem sie die Angebote des Klägers zurückgewiesen und sie faktisch herausgefordert hat, rechtliche Schritte einzuleiten, die sehr schlimm sein könnten ihre Anonymität und damit ihre Sicherheit gefährden.

14.     Dementsprechend reicht der Kläger diese Beschwerde unter einem Pseudonym ein, um seine Sicherheit bei der Verfolgung seiner Rechte zu schützen. In dieser Klage wird auch der Plural „they/them" verwendet, um sich auf den Kläger zu beziehen, um das Geschlecht des Klägers nicht preiszugeben.

## GERICHTSBARKEIT UND GERICHTSSTAND

15.     Dieses Gericht ist gemäß dem Foreign Sovereign Immunities Act (FSIA), 28 U.S.C., für diesen Fall zuständig. §§ 1330, 1605(a)(1) und/oder 1605(a)(2). Gemäß FSIA ist das Gericht, wenn es sachlich zuständig ist, auch für die ausländischen souveränen Beklagten persönlich zuständig.

16.     Der Gerichtsstand ist gemäß 28 U.S.C. das US-Bezirksgericht für den südlichen Bezirk von New York. § 1391(f)(1).

## PARTEIEN

17.     Zu jeder Zeit, die für diese Beschwerde relevant war, war der Kläger ein Staatsbürger der Vereinigten Staaten. John Doe ist ein Pseudonym, das vom Kläger verwendet wird. Im Gegenzug mit der Einreichung dieser Beschwerde, um ihre Sicherheit zu schützen, hat der Kläger einen Ex-Part-Antrag auf Erlaubnis eingereicht, um unter einem Pseudonym in dieser Angelegenheit vorzugehen, sowie einen Ex-Part-Antrag auf alternativen Dienst.

18.     Zu jeder Zeit, die für diese Beschwerde relevant war, war die Beklagte der Bundesrepublik Deutschland ein ausländischer Staat, wie unter der FSIA, 28 U.S.C. § 1603(a), mit seiner Hauptstadt in Berlin, Deutschland und der tatsächlichen Präsenz in den Vereinigten Staaten bei 4645 Reservoir Rd. NW, Washington, D. C. 20007 und 871 Plaza der Vereinten Nationen, New York, NY 10017.

19.     Zu jeder Zeit, die für diese Beschwerde relevant war, war der Beklagte BKA eine Agentur und Instrumentalität der Beklagten der Bundesrepublik Deutschland, wie unter der FSIA, 28 U.S.C. § 1603(b).

## FAKTEN

### I.     Die Panama-Papiere

20.     Anfang 2015 kontaktierte der Kläger den Journalisten Bastian Obermayer der deutschen Zeitung Süddeutsche Zeitung und begann mit dem Prozess, zu Obermayer und seinem Kollegen Frederik Obermaier zu wechseln, was als Panama-Papiere bekannt werden sollte.[2]

21.     Um die große Menge an Daten in den Panama-Papieren zu analysieren (nach Abschluss des Projekts, die in 13 Millionen Dateien im Wert von ca. 3,26 Terabyte im Wert von terabyte im Wert von 3 Millionen) arbeiteten, arbeitete die Zusammenarbeit zwischen investigativen Journalisten weltweit zusammen, eine Organisation, die die Zusammenarbeit zwischen investigativen Journalisten erleichtert. Der ICIJ koordinierte mit über 370 Journalisten aus 76 Ländern, um Geschichten zu veröffentlichen, die die Daten in den Panama-Papieren synthetisieren. Für diese Bemühungen wurde das Zentrum für öffentliche Integrität, ICIJs damals Elternorganisation, mit dem Pulitzer-Preis 2017 in der Kategorie der Erklärungsberichterstattung ausgezeichnet.

22.     Am 3. April 2016, als der ICIJ und seine kooperierenden Journalisten begannen, Geschichten über die Panama-Papiere zu veröffentlichen, beschrieb der ICIJ die Panama-Papiere als a „Cache von 11,5 Millionen Aufzeichnungen zeigen, wie eine globale Branche von

---

[2] BASTIAN OBERMAYER & FREDERIK OBERMAIER, PANAMA PAPERS: DIE GESCHICHTE EINER WELTWEITEN ENTHÜLLUNG (30. Juni 2016).

Anwaltskanzleien und Big Banken finanzielle Geheimhaltung an Politiker, Betrüger und Drogenhändler sowie Milliardäre, Prominente und Sportstars verkauft.“[3]

23.     Wichtig ist, dass der ICIJ und seine Partner in Übereinstimmung mit seiner eigenen Politik die Panama-Papiere selbst nicht veröffentlicht haben, nur Geschichten und Analysen, die aus den Panama-Papieren stammen.

24.     Die durchgesickerten Aufzeichnungen stammten von Mossack Fonseca, einer in Panama ansässigen Anwaltskanzlei mit Zweigen in Hongkong, Miami, Zürich und mehr als 35 anderen Orten auf der ganzen Welt.[4] Jürgen Mossack, einer der beiden genannten Partner des Unternehmens, war der Sohn eines Nazi-SS-Offiziers, der nach dem Zweiten Weltkrieg in Deutschland der Gerechtigkeit entkam, indem er nach Panama ausgewandert war. Der ICIJ vermutete, dass "die durchgesickerten internen Dateien der Anwaltskanzlei Informationen zu 214.488 Offshore-Unternehmen enthalten, die mit Menschen in mehr als 200 Ländern und Territorien verbunden sind."[5] Der ICIJ betonte in seinem ersten Artikel zu diesem Thema, dass die Panama-Papiere:

a.      „enthüllte, wie Mitarbeiter des russischen Präsidenten Wladimir Putin über Banken und Schattenunternehmen heimlich bis zu 2 Milliarden US-Dollar mischten“;

b.      „Exponierte Offshore-Unternehmen, die vom Islandminister, des Königs von Saudi-Arabien und den Kindern des Aserbaidschans und des Pakistans-Premierministers kontrolliert wurden, kontrolliert“;

---

[3] *Riesiger Leck von Offshore-Finanzaufzeichnungen Globales Array von Kriminalität und Korruption*, Internationales Konsortium der Journalisten (3. April 2016), https://www.icij.org/investigations/panama-papers/20160403-panama-papers-global-overview/.
[4] *Id*.
[5] *Id*.

    c.    „Fügen Sie [d] mindestens 33 Personen und Unternehmen auf, die von der US-Regierung auf die schwarze Liste gesetzt wurden, weil sie nach Beweisen, dass sie an Fehlverhalten beteiligt waren, wie beispielsweise Geschäfte mit mexikanischen Drogenlords, terroristischen Organisationen wie Hisbollah oder Rogue-Nationen wie Nordkorea und Iran zu machen."; Und

    d.    Enthält „29 Milliardäre in der Liste der 500 reichsten Menschen der Welt in Forbes Magazine."[6]

25.    Es ist schwierig, die Auswirkungen des Lecks zu übertreiben. Am 3. April 2021, fünf Jahre nachdem die ICIJ und ihre Partner begonnen hatten, die Geheimnisse der Panama Papers zu enthüllen:

    a.    „Die Länder haben aufgrund der von den Panama-Zeitungen ausgelösten Anfragen mehr als 1,36 Milliarden US-Dollar an unbezahlten Steuern, Geldstrafen und Strafen zurückgezogen."

    b.    „In den USA haben die Panama-Papiere dazu beigetragen, den Kongress zum Schreiben und Übergeben des Corporate Transparency Act zu überreden, nach dem die Eigentümer der US-amerikanischen Unternehmen ihre Identität an die Finanzabteilung weitergeben können. Die Gesetzgebung, die größte Überarbeitung der amerikanischen Anti-Geldwäsche-Kontrollen seit dem 9/11-Patriot-Gesetz, wurde im Januar in das Gesetz unterzeichnet [2021]";

    c.    „Die Regierung von Panama. . . Unterzeichnete eine multilaterale Übereinkommen, um Informationen aus ausländischen Steuerzahler mit anderen Nationen zu teilen. Neuseeland verschärfte seine Vertrauensgesetze, um weitere Missbräuche durch

---

[6] *Id.*

8

Ausländer zu verhindern, die vom einst makellosen Ruf des Landes angezogen wurden. Seitdem ist die Anzahl der sogenannten ausländischen Trusts in Neuseeland um 75% gesunken.";

d.    „Im Vereinigten Königreich verwiesen die Parlamentsmitglieder im Jahr 2017 wiederholt auf die Panama-Papiere, die die erste Straftat des Landes für Anwälte geschaffen haben, die keine Steuerhinterziehung der Kunden melden;"

e.    „Der isländische Premierminister, Sigmundur David Gunnlaugsson, trat nach landesweiten Proteste zurück nach Enthüllungen besaßen er und seine Frau eine Firma auf den Britischen Jungferninseln"; Und

f.    „Im Jahr 2017 entfernte der Oberste Gerichtshof Pakistans aus dem Amt des am längsten amtierenden Premierministers des Landes, Nawaz Sharif, als Ergebnis der Enthüllungen der Panama Papers über die Immobilien seiner Familie in Übersee. Ein Jahr später wurde er im Fall wegen Korruptionsvorwürfen zu 10 Jahren Gefängnis verurteilt und mit einer Geldstrafe von 10,6 Millionen US-Dollar verurteilt."[7]

26.    Diese Einschätzung der Auswirkungen der Panama-Papiere war weder umfassend noch endgültig. Die Panama Papers Leck beeinflussen heute die Weltveranstaltungen weiter. Nach dem Krieg in der Ukraine beispielsweise hat Deutschland Berichten zufolge die Panama-Papiere verwendet, um Sanktionen gegen russische Oligarchen durchzusetzen.[8]

---

[7] *Fünf Jahre später wirken sich Panama-Papiere immer noch stark aus*, Internationales Konsortium der investigativen Journalisten (3. April 2021), https://www.icij.org/investigations/panama-papers/.

[8] Georg Mascolo und Jörg Schumitt, *Wie Deutschland das Vermögen der Oligarchen aufspüren will* [*How Germany wants to track down oligarch fortunes*], Süddeutsche Zeitung (11. Mar. 2022), https://www.sz.de/1.5545934/ ("Das BKA verfügt über riesige Be- stände an Unterlagen aus Steueroasen, darunter auch die 2,6 Terabyte Daten aus den 'Panama Papers', 'Offshore Leaks', 'Bahama Leaks' sowie weiteren Datensätzen. Bisher wurden sie genutzt, um nach deutschen Steuerflüchtlingen zu suchen. Jetzt, so heißt es in Regierungskreisen, gehe es um reiche Russen.").

## II.    Der Kläger beschloss, die Panama-Papiere an die deutsche Regierung zu verkaufen.

27.    Weder der ICIJ noch seine Partner bezahlten den Kläger für die Panama-Papiere. Die Klägerin stellte die ICIJ-Journalisten die Panama-Papiere zur Verfügung, um eine Vielzahl von Verbrechen aufzudecken, die von Mossack Fonseca, seinen Gründern, Mitarbeitern und Kunden begangen wurden, und sie für diese Verbrechen zur Rechenschaft zu ziehen.[9]

28.    Der Kläger erkannte jedoch die Gefahr, die in den Panama Papers genannten mächtigen Personen aufzudecken, und teilte Bastian Obermayer im Jahr 2015 mit, dass ihr Leben „in Gefahr war, wenn [ihre] Identität enthüllt wird".[10]

29.    Ende 2016, nachdem Journalisten begonnen hatten, Geschichten auf der Grundlage der Panama Papers zu veröffentlichen, erkannte der Kläger, dass der Schutz selbst Geld erfordern würde. Sie suchten auch zu Recht einen Teil des Steuererlöses, den sich einige Regierungen aufgrund der Panama-Papiere erholen würden.

30.    Zu wissen, dass ein Markt für durchgesickerte Steuerdaten vorhanden ist, und wusste, dass die deutsche Regierung in der Vergangenheit für Daten gezahlt hatte, die den Panama-Papieren ähnlich sind (obwohl sie viel geringerer Umfang und Wert haben), entschied der Kläger Ende 2016, auf eine zu reagieren Anfrage aus der BKA.

## III.    Der Kläger kontaktierte die BKA aus den Vereinigten Staaten, um mit den Verhandlungen zu beginnen.

31.     Am 10. Dezember 2016, als der Kläger in den USA mit dem Austausch von Nachrichten über eine verschlüsselte Messaging-App mit einem Agenten aus der Geldwäscheinheit der BKA („Agent A") begann. Zu Beginn schrieb der Kläger: „Ich bin bereit,

---

[9] *Siehe* John Doe, *The Revolution Will Be Digitized*, Reproduziert in *Panama Papers, bietet Regierungen Dokumente an, wobei weitere Kommen angezeigt werden*, Internationales Konsortium der investigativen Journalisten (6. Mai 2016).

[10] BASTIAN OBERMAYER & FREDERIK OBERMAIER, THE PANAMA PAPERS: DIE GESCHICHTE BRICHT, WIE DAS REICHE UND MÄCHTIGE GELD IHR GELD VERBERGEN (30. Juni 2016) [Prolog]

die gesamten Daten von Panama Papers zu verkaufen, damit sie von der BKA/NRW FV (North Rhein-Westphalia Finanzverwaltung) und anderen deutschen Regierungsbehörden und internationalen Nutzern verwendet werden können Partner, aber natürlich ist die Sicherheit von größter Bedeutung." Agent A antwortete auf Englisch: „Wenn wir zusammenarbeiten, bestätigen wir Sie [sic], dass wir Ihre Identität vertraulich halten."

32.     Kläger und Agent A haben im Dezember mehrere Nachrichten ausgetauscht, in denen Agent A die Authentizität und den Wert der Daten des Klägers verifizieren und mehrmals versuchte, den Kläger davon zu überzeugen, ihn in Deutschland zu treffen. Der Kläger überlegte ein schwerwiegendes Risiko bei der Reise nach Deutschland. Obwohl der Kläger kein Verbrechen begangen hatte, schrieb der Kläger, "Für mich ist es riskant, nach Deutschland zu gehen. Sie sind Strafverfolgungsbehörden und könnten mich an Ort und Stelle festlegen." Agent A antwortete, "Was würden Sie bevorzugen- und bitte über unser Risiko in Betracht ziehen, weil ich auch irgendwo verhaftet werden möchte 😊 " Der Kläger wurde von der Verwendung von Emojis durch die BKA überrascht.

33.     Während sich der Plan zu treffen war nicht sofort zusammenfing, stimmte der Kläger zu, begrenzte Informationen über drei Unternehmen der BKA-Auswahl zur Verfügung zu stellen, um die Verhandlung der Daten zu beweisen. Am 3. Januar 2017 stellte der Kläger die Beispieldaten zur Verfügung. An diesem Tag versuchte Agent A erneut, den Kläger davon zu überzeugen, nach Deutschland zu kommen. Der Kläger gab an, dass es keinen Unterschied machen würde, persönlich zu verhandeln, da der Kläger kein Passwort für den Zugriff auf die vollständigen Panama-Papiere geben würde "bis wir einen Vertrag haben . . . ." Fragte der Kläger, "Wie lange erwarten Sie, dass Sie einen Vertrag abschließen würden?" Agent A beantwortete die Frage nicht.

11

34.     Am nächsten Tag, dem 4. Januar 2017, begannen Kläger und Agent A über einen Preis für die Panama-Papiere. Der Kläger schlug vor, „ein Prozentsatz des Nutzens der Regierung anstelle eines flachen Betrags" und erklärt, dass das IRS-Whistleblower-System funktioniert und „Ich möchte nicht reich an dieser Arbeit werden, es sei denn, die breite Öffentlichkeit bekommt es was es verdient zurück." Der Kläger schlug jedoch vor: „Ich würde einen Mindestbetrag benötigen, damit ich zumindest sicher bleiben kann. . . [S] o Minimum von 5 Millionen Dollar." Agent A antwortete: „Wie wäre es mit der Idee, X Million + Steuereinnahmen x% zu erzielen? . . . Sollte ich die Verhandlung mit 5 Millionen US-Dollar-Beteiligung an den Steuereinnahmen mit 5 Millionen US-Dollar-X%-Namen beginnen?" „Wenn das für Sie vernünftig klingt", antwortete der Kläger, „ich denke, das ist eine faire Art zu beginnen."

35.     Am 6. Januar 2017 schrieb Agent A Kläger, dass die BKA "[f] erster Überprüfungen und Analysen" über die Beispieldaten durchgeführt habe und zu dem Schluss gekommen sei, dass die Daten „für uns wertvoll" sind. Anschließend schlug er vor, eine verschlüsselte Übertragung zu starten und die Daten in zehn separaten Transfers zu senden. Der Kläger antwortete: „Ich denke, es gibt zu viel noch offen, um die Übertragung zu beginnen. Sobald ein Vertrag unterzeichnet ist, bin ich bereit, verschlüsseltes Volumina noch weiter zu verbessern, bevor jede Zahlungsstufe die Zahlung beseitigt (weil wir einen Vertrag haben werden)." „Es besteht kein Vertrag über die Daten", antwortete Agent A, „weil wir Sie Stück für Stück bezahlen werden."

36.     Am 18. Januar 2017 schickte Agent A einen Brief in Deutsch und Englisch an den Kläger, der vom Vizepräsidenten der BKA und der Angabe unterzeichnet wurde:

> die Gesetze der Bundesrepublik Deutschland verpflichten alle Behörden, Personen vor Gefahren für ihr Leben, ihre körperliche Unversehrtheit, ihre Freiheit und ihre sonstigen persönlichen Rechtsgüter zu schützen, die die

Strafverfolgungsbehörden bei der Erfüllung ihrer Aufgaben unterstützt haben.

Vor diesem Hintergrund versichert das Bundeskriminalamt, zu Ihrer und der Sicherheit Ihrer Familie alle rechtlich und tatsächlich erforderlichen Maßnahmen zu ergreifen, wenn durch die Zusammenarbeit mit dem Bundeskriminalamt Gefahren für die oben genannten Rechtsgüter drohen. Dies schließt auch eine Unterbringung in Deutschland mit anschließenden Schutzmaßnahmen ein.

Die Gültigkeit und Reichweite dieser Zusicherung müsste überdacht werden, wenn Sie selbst Ihre Identität und Rolle in dieser Angelegenheit offenbaren, dem Bundeskriminalamt wissentlich falsche Informationen geben, Ihre Informationen anderen Behörden in Deutschland oder im Ausland zur Verfügung stellen order in der Zeit der Zusammenarbeit mit dem Bundeskriminalamt Straftaten begehen.

37.     Am 27. Januar 2017 schrieb Agent A an den Kläger, dass der Kauf der Panama-Papiere „auf höchstem Niveau der deutschen Strafverfolgungsbehörde mit dem Vizepräsidenten des BKA erörtert wurde. Die Ergebnisse sind so weit, dass Deutschland intensiv an einer Zusammenarbeit interessiert ist, in der die Daten in Besitz genommen werden. Die Nummer, die Sie uns gegeben haben, ist im Grunde genommen akzeptabel und realisierbar. Die Details über die Höhe des Geldes, die Bearbeitung der Zahlung und die formellen und administrativen Probleme sollten jedoch später erörtert werden. . . . Ein endgültiger Bund ist vor Ende der nächsten Woche nicht verfügbar.“

38.     Der Kläger antwortete: „Ich weiß nicht, auf welche Nummer Sie beziehen, dies ist akzeptabel.“ Agent A war nicht in der Lage zu klären, was genau die deutsche Regierung anbot.

**IV.     Der Kläger reiste nach Deutschland, um persönlich zu verhandeln, Ein Prozess, den die BKA fast fünf Monate lang herausgezogen hat.**

39.     Am 20. Januar 2017 wurde Donald Trump als Präsident der Vereinigten Staaten ins Amt vereidigt.

40.     Donald Trump und seine Geschäfte erscheinen in den Panama-Papieren mehrmals.

13

41.     Es war der Kläger, der das Risiko einer Reisen nach Deutschland, am 13. Februar 2017 nach dem Abflug aus New York City ein klares Angebot, geschweige denn einen Vertrag aus dem BKA, nach Deutschland zu erkennen.

42.     Der Kläger brachte die Panama-Papiere nicht nach Deutschland und ließ sie absichtlich in den Vereinigten Staaten zurück, damit sie nicht beschlagnahmt werden konnten.

43.     Nach Anweisungen lieferte die BKA über eine verschlüsselte App drei BKA-Agenten, die den Kläger begrüßten, den Kläger und ihre Habseligkeiten für Hörgeräte und anschließend den Kläger in einen schwarzen Van (nachgeschlagen von BKA-Agenten in einem Mercedes Cabrio) to gestenkt hatten) stundenlang bis zum ersten von drei verschiedenen sicheren Häusern gefahren werden.

44.     Im Van wurden die schlimmsten Befürchtungen des Klägers vor dem Besuch fast erkannt. Nachdem der Kläger die grundlegenden Unterlagen für Informanten erledigt hatte, schlug Agent A vor, dass die deutsche Regierung den Kläger mit einem erfundenen kleinen Verbrechen beschuldete, da die deutschen Gesetze in Deutschland die Auslieferung des Klägers an ein Land wie Panama oder Russland verhindern würden. Der Kläger teilte den Agenten mit, dass es eine schreckliche Idee und ein Nichtstarter sei, wegen eines Verbrechens angeklagt zu sein, das der Kläger nicht begangen habe. Die Agenten ließen die Idee erst fallen, nachdem der Kläger vorgeschlagen hatte, dass selbst ein gefälschter Strafregister sie eines Tages daran hindert, sich für ein gewähltes Amt zu bewegen.

45.     Der nächste Monat war surreal. Die beiden wichtigsten Vertreter, die zum Schutz der Klägerin- Agent A und Agent W- beauftragt wurden, machten kein konkretes Angebot, die Panama-Papiere zu kaufen, und verbrachten stattdessen die meiste Zeit mit dem Kläger, um deutsche Städte und Schlösser in der deutschen Landschaft zu besichtigen. Ein bestimmtes Ziel

14

gefährdet zweifellos die Sicherheit des Klägers, aber der Kläger hatte das Gefühl, dass er keine andere Wahl hatte, als den Vorschlägen der Agenten einzuhalten. Dennoch bestand der Kläger darauf, dass sie nie wieder ein ähnliches Ziel besuchen.

46.     Die Agenten machten zunächst die Verzögerung der langsamen deutschen Bürokratie verantwortlich und behaupteten dann, dass die BKA die Daten bewerten müsse, bevor sie einen Prozentsatz anbieten, obwohl die BKA bereits im Januar eine Stichprobe der Daten analysiert hatte.

47.     Diese Ausreden waren unaufrichtig. Wie der Kläger auf die Agenten betonte, wäre der Prozentsatz des Klägers auch wertlos, wenn die Daten wertlos wären.

48.     Die Entscheidung der BKA, ein unkompliziertes Angebot zurückzuhalten- als Kläger verschwendete Tage, die ein Schloss nach dem anderen aufnehmen oder die Stunden allein in den sicheren Häusern zählen-, war eine Verhandlungsstrategie, die den Kläger abnutzen sollte, bis der Kläger einen niedrigeren Prozentsatz von zustimmte zukünftige Steuereinnahmen.

49.     Am 8. März 2017 forderte die BKA den Kläger auf, die Daten in acht Teilen zu liefern, für die der Kläger zum Zeitpunkt der Lieferung jeweils 625.000 € gezahlt werden würde (für insgesamt 5 Mio. €). Die BKA bot keinen Prozentsatz der künftigen Erholungen an, aber am 15. März 2017 sagte Agent A, dass die BKA in Betracht gezogen habe, 3% anzubieten. Der Kläger sagte, dieser Prozentsatz sei inakzeptabel und stellte fest, dass das IRS-Whistleblower-Programm 15-30% für Rückgewinnung von erfolgreichen Whistleblower-Tipps zahlt, mit 30% Standard für außergewöhnlich wertvolle Tipps.

50.     Stattdessen stimmte der Kläger zu, eine erste Zahlung von €625.000 für ungefähr einen Achtel der Daten zu erhalten, um der deutschen Regierung die Möglichkeit zu geben, die Daten weiter zu prüfen und festzustellen, ob er den Rest kaufen wollte.

51.     Die BKA stellte fest, dass die €625.000 auf ein Konto gezahlt würden, das unter einem fiktiven Namen bei einer örtlichen Bank („lokales Bank-X-Konto") gehalten wird. Das BKA kontrollierte das Konto, versorgte dem Kläger jedoch schließlich eine Bank-Debitkarte, um Geld an Geldautomaten abzuheben. Die BKA verhängte eine tägliche Auszahlungsgrenze von €600, die der Kläger nie zugestimmt hatte, da der Kläger zu diesem Zeitpunkt fast drei Jahre lang tägliche Abhebungen auf die Mittel auf dem Konto auf dem Konto eingeführt hätte. Zu dieser Zeit glaubte der Kläger, dass die Mittel auf andere Mittel übertragen werden könnten.

52.     Der Kläger wurde dann die verschlüsselte Festplatte mit den Daten der Panama Papers ein und bezahlt, die von einer falschen Identität in den USA zu einer anderen von der BKA verwendeten falschen Identität an einer Adresse in Deutschland versendet werden sollen.

53.     Die BKA erhielt die Festplatte erfolgreich, sodass der Kläger mit der Vorbereitung des ersten Achtel der Daten auf die Spezifikationen der BKA beginnt.

54.     Nachdem die Daten wie angefordert erhalten wurden, beschuldigte der BKA-Kläger fälschlicherweise den Betrug, weil der Geldwäschespezialist der BKA die grundlegenden mathematischen Grundsätze, die seiner eigenen Anfrage zugrunde liegen, nicht verstanden. Nachdem die BKA die Situation dem Agenten W geduldig erklärt hatte, zog sie ihre falsche Anschuldigung zurück und stimmte zu, dass der Kläger die Vereinbarung perfekt geehrt hatte.

55.     Am 20. März 2017 besuchte der gleiche Geldwäschespezialist den Kläger im Safe House mit Agenten A und W.  Als er den Zahlungsanteil diskutierte, wurde er plötzlich verärgert, verlor die Beherrschung und schrie den Kläger auf eine einschüchterndes Weise an. Der Kläger antwortete ruhig, aber die Botschaft ging dem Kläger nicht verloren, dass die Sicherheitsgarantien der BKA bedeutungslos waren.

56.     Später am 20. März 2017 stimmte der Kläger zu, dass die anfängliche Zahlung auf das örtliche Bank X-Konto übertragen werden könnte, solange die Mittel an ein Finanzinstitut der Vereinigten Staaten übertragen werden könnten. Der dem Kläger zugewiesene zweite Vertreter, der Vertreter W, sagte, der Kläger könne die Mittel nicht direkt aus dem Konto auf die Vereinigten Staaten übertragen (ohne zu erklären, warum dies der Fall war) und ließ dieses Problem für die Zukunft behoben.

57.     In einem Restaurant am 27. März 2017-mehr als einen Monat nachdem der Kläger nach Deutschland und mehr als vier Monate nach der Verhandlung des Klägers mit der BKA angekommen war-, haben A und W verbal ein von dem Vizepräsident des BKA genehmigten Angebots vergeben. Da die BKA das Angebot für das Schreiben nicht begangen hat, hatten die Agenten Schwierigkeiten, das Angebot mit Klarheit zu vermitteln, und widerspricht sich oft, als der Kläger klärte Fragen stellte. Dennoch verstand der Kläger das Angebot, dass die BKA 5 Millionen Euro für die Panama-Papiere zahlen würde. Der Kläger würde die Papiere in acht Segmenten liefern, die mit acht separaten Zahlungen von €625.000 gekauft wurden. Darüber hinaus würde die deutsche Regierung den Kläger 5% eines beliebigen Betrags zahlen, zumindest dem ersten Datensegment, solange der gesammelte Betrag €625.000 überschritt. (Der prozentuale Anteil, der für Rückgewinnung aus den zusätzlichen Datensegmenten nicht spezifiziert wurde.) Schließlich würde die deutsche Regierung in die Berechnung des Erlöses einbeziehen, das dem Anteil des Klägers unterliegt, alle Beträge, die von anderen Ländern an die deutsche Regierung für den Zugang zu den Panama-Zeitungen gezahlt wurden.

58.     In der Nacht vom 27. März 2017, seit die BKA sich weigerte, etwas über das Schreiben des Schreibens zu begehen, machte sich der Kläger, ein Memorandum of Understanding („MoU") zu entwerfen, um zukünftige Missverständnisse zu vermeiden. Unter anderem stellte die

MoU vor, dass der Prozentsatz für die Erholung im ersten Segment 5% betragen würde, aber „Sollte die BKA beschließen, weiterhin Segmente 2 bis 8 zu erwerben, werden die Parteien zu diesem Zeitpunkt einen neuen Preis von **mehr als 5%** verhandeln, um für alle Segmente **rückwirkend** zu gelten" (Hervorhebung im Original). Die Klägerin übermittelte die MOU an die Agenten A und W elektronisch.

59.     Am nächsten Tag, dem 28. März 2017, kamen Agents A und W mit dem Abgedruckten Mou im Safehouse an. Während sie die Professionalität lobten, mit der die MoU eingezogen wurde- sie „sehr hohe Qualität, fast deutsches Niveau" anstellte-, hatte keines von der BKA das Dokument unterschrieben. Trotzdem war am Ende des Tages eine Vereinbarung getroffen worden.

60.     Am 29. März 2017 lieferte der Kläger das erste Datensegment an die BKA. Der Kläger kopierte nur die spezifischen Daten, die von der von den Vereinigten Staaten versandten Festplatte des Klägers zu einer neuen, leeren Festplatte des BKA abgestimmt waren. Auf diese Weise behielt der Kläger die Kontrolle über die verbleibenden Daten.

61.     Am 4. April 2017 erschienen €625.000 auf dem örtlichen Bank-X-Konto für das Segment.

62.     Im April bat der Kläger den Agenten A um Rat, wie die Mittel auf dem örtlichen Bank X-Konto auf die USA übertragen werden können. Agent A schlug vor, dass der Kläger ein Konto bei einer internationalen Bank eröffnet.

63.     Am 24. April 2017 informierte der Kläger Agent A, dass er beabsichtige, ein Konto bei einer bestimmten internationalen Bank zu eröffnen. Da Agent A keine Einwände erhielt, eröffnete der Kläger ein Konto bei der Internationalen Bank (das „Internationale Bank Y-Konto"), das in New York City präsent ist.

64.     Der Kläger konnte die Mittel jedoch nicht auf das örtliche Bank-X-Konto auf das internationale Bank-Y-Konto überweisen, da die BKA sich weigerte, dem Kläger die für eine solche Übertragung erforderliche Transaktionsauthentifizierungsnummer (TAN) zu geben. TANs sind einmalige Codes, die auf vielen europäischen Bankkonten Standard-Sicherheitsmaßnahmen sind.

65.     Der Kläger registrierte seine Unzufriedenheit darüber, dass die BKA den Zugang zu den Geldern des Klägers zurückgehalten hat. Der Kläger warf dann zwei Monate in sicheren Häusern auf die BKA zu, um zu entscheiden, ob er die zusätzlichen Datensegmente kaufen wollte, und damit die BKA ein ernstes Angebot für den Prozentsatz für die Rückgewinnung der verbleibenden Daten abgeben sollte.

66.     Zu einem Zeitpunkt informierte die BKA den Kläger kurzerhand darüber, dass sie die Miete für das sichere Haus, in dem sie wohnten, nicht mehr bezahlen würde. Daher musste der Kläger mit der Erstattung der BKA beginnen hatte zuvor garantiert. Die Mittel wurden vom örtlichen Bank X-Konto zurückgezogen, auf das der Kläger nur über die Debitkarte zugreifen konnte.

67.     Als der Kläger in das nächste sichere Haus zog- ein Ort, an dem die Sicherheit des Klägers aus mehreren Gründen gefährdet wurde, einschließlich, aber nicht beschränkt auf einen Mangel an funktionierenden Internetzugang-, musste auch die BKA für die Miete dieses Ortes erstatten.

68.     Während des Klägers warteten die Vertreter der verschiedenen deutschen Finanzministerien mit der BKA, um festzustellen, wie die Kosten und die Verantwortung für die Untersuchung der von den Daten von Panama Papers beschriebenen kriminellen Handlungen aufgeteilt werden sollen. Das hessische Finanzministerium, das Berichten zufolge €300.000

beigetragen hatte, wurde ausgewählt, um die Ermittlungsbemühungen der Staaten in Verbindung mit dem neu geformten „Olet"-Team der BKA zu leiten. Das Olet-Team der BKA hatte seinen Sitz in Wiesbaden, wo auch der BKA-Geldwäschespezialist arbeitete. Ein Team in Kassel im Bundesstaat Hessen übernahm die Strafverfolgungsanfragen aus Deutschland in Bezug auf die Daten. Beide sind angeblich ein technisches Know-how, das zur Beurteilung der Daten erforderlich wäre.

69.     Erst 12. Juni 2017 machte das BKA ein Angebot, die verbleibenden Daten zu kaufen: 7% aller Sammlungen basierend auf den Panama-Papieren. Der Kläger konterte bei 12% aller Sammlungen oder 10% durch eine garantierte Zahlung von 10 Mio. € (falls die deutsche Regierung nicht mehr als 100 Millionen Euro einholen konnte).

70.     Am 14. Juni 2017 trafen sich der Agent A und ein anderer BKA-Agent R mit dem Kläger, um zu vermitteln Zahlung plus 10% der zukünftigen Erholungen. Der Kläger wies darauf hin, dass es nichts schriftlich zu bestätigen habe, um die Vereinbarung zu bestätigen, wenn die deutsche Regierung nicht an den Deal „erinnert" konnte. Agent A antwortete, dass die BKA ihren Informanten nicht mit etwas unterschrieben zur Verfügung stellt, und sagte nur, dass „ich nicht auf das Vertrauen ankommt."

71.     Das war offensichtlich falsch. Die BKA erstellte signierte schriftliche Dokumente und gab sie dem Kläger zur Verfügung, bevor der Kläger überhaupt nach Deutschland ankam.

72.     Fünf Tage später, am 19. Juni 2017, gaben jedoch die Agenten A, W und R an, dass die BKA die Vereinbarung schriftlich zustimmen würde, sich jedoch nicht zur Abgabe einer unterschriebenen Vereinbarung verpflichten würde. Der Kläger teilte den Agenten mit, dass es nur dann eine Vereinbarung bestehen würde, wenn der Kläger die Mittel in den Vereinigten Staaten letztendlich erhalten könnte.

73.     Am 23. Juni 2017 trafen die Agenten A und R mit dem Kläger und sagten, dass der Vizepräsident der BKA drei Punkte zugestimmt hatte: die Erstzahlung von 5 Millionen Euro, eine Zahlung von 10% für zukünftige Sammlungen basierend auf den Panama-Papieren Über 50 Millionen Euro und ein Papier, das besagt, dass der Kläger das Recht hat, jedes Jahr eine Buchhaltung von Sammlungen zu beantragen. Die Agenten versorgten den Kläger dann mit zwei gleichwertigen Briefen auf Deutsch und Englisch, die als Ausstellung 1 auf BKA stationär Vizepräsident Peter Henzlers Name und seine Unterschrift nur für die deutsche Version beigefügt waren. In Englisch lautete der Brief:

Dear Sir,

The Bundeskriminalamt pays a share of 10 per cent *[sic]* for funds derived from criminal activities/fiscal offences which have been confiscated with final and binding effect and exceed EUR 50,000,000 (in words: fifty million EUR).
This applies if there was a causal relationship between the documents and the confiscation.

Upon your request, you will receive a list of the funds confiscated with final and binding effect once a year as from 2018.

Please treat the information contained in this letter in confidence.
In Vertretung [In representation]


Henzler
Vizepräsident [Vice-President]

74.     In dem Brief wurde die anfängliche Zahlung von 5 Millionen Euro nicht erwähnt, da dies gezahlt werden sollte, bevor der Kläger das BKA mit einem Passwort für den Zugriff auf die Panama-Papiere zur Verfügung stellte.

75.     Der Kläger stimmte den Bedingungen im Brief zu und versorgte die Agenten mit einer neuen verschlüsselten Festplatte, die die Panama-Papiere enthielt, jedoch nicht das Passwort, um auf die Daten zuzugreifen.

76.     Am 29. Juni 2017 erschienen €4.375.000 auf dem örtlichen Bank-X-Konto. Dieser Betrag war die Erstzahlung von €5 Mio. abzüglich der bereits im März für das ersten Datenabschnitt geleisteten Zahlung von €625.000.

77.     Zu diesem Zeitpunkt stellte der Kläger den Agenten das Passwort zur Entschlüsselung der Daten zur Verfügung.

78.     Am 4. Juli 2017 kündigte die deutsche Regierung an, die Panama-Papiere gekauft zu haben.[11] Jemand in der Regierung hat durchgesickert, dass es €5 Millionen bezahlt hatte.[12]

79.     Agent A Scherz mit dem Kläger, dass der Kläger der Millionen Euro in Steuern gerade gezahlt hatte, die bereits vom Bruttozahlungsbetrag abgezogen wurden, mehr Geld waren, als er jemals gesehen hatte, gab dem Kläger jedoch keinen schriftlichen Aufzeichnungen über die Transaktion.

80.     Im August 2017 kehrte der Kläger immer mehr um ihre Sicherheit besorgt nach New York City zurück.

81.     Im Jahr 2019 konnte die BKA den russischen von der Regierung unterstützten Mord an Zelimkhan Khangoshvili am helllichten Tageslicht in einem Berlin Park nicht verhindern.

**V.      Die BKA und der Kläger verabschiedeten die Übertragung der Mittel in die Vereinigten Staaten.**

82.     In den Vereinigten Staaten hatte John Doe keinen Zugang zu den Mitteln der örtlichen Bank X, die unter einem falschen Namen und unter der Kontrolle des BKA auf einem Konto blieben.

---

[11] Pressemitteilung, BUNDESKRIMINALAMT, *Auswertung der sogenannten "Panama Papers"* [*Evaluation of the so-called "Panama Papers"*], (4. Juli 2017), https://www.bka.de/DE/Presse/Listenseite_Pressemitteilungen/2017/Presse2017/170704_PanamaPapers.html?nn=67356.

[12] *Siehe z.*, *Panama Papers: Deutschland zahlt Millionen für durchgesickerte Daten aus*, BBC (5. Juli 2017), https://www.bbc.com/news/world-latin-america-40505300 (Die BKA „bestätigte die Summe nicht, aber die staatlichen Quellen teilten den deutschen Medien mit 5 Mio. Euro (4,4 Mio. GBP; 5,7 Mio. USD) gezahlt.").

83. Der Kläger könnte sich online auf das örtliche Bank X-Konto anmelden und die Mittel sehen, aber ohne Bräune konnte sie jedoch weder eine Kabelübertragung in die USA senden noch die Bankkarte, die die BKA zur Arbeit in den USA zur Verfügung stellt, senden. (Mehrere Versuche, die Karte an US-Geldautomaten zu verwenden, führten nur bei Fehlermeldungen.)

84. Ende Juli und Anfang August 2017 schlugen BKA-Agenten zahlreiche schlecht konzipierte Optionen vor, um das Geld in die Vereinigten Staaten zu verschieben, einschließlich der Strukturierung der Zahlung als Geschenk an den Kläger des damaligen Kanzlers Angela Merkel oder als Erlös des damaligen Kanzlers, Kanzlerin Angela Merkel ein Gewinnerticket in der deutschen Lotterie. Schließlich schlugen die Agenten vor, dass die BKA eine deutsche Partnerschaft schaffen, um die Mittel an ein vom Kläger kontrollierter Unternehmen zu übertragen. Anschließend zog sich die BKA jedoch von dieser Idee zurück.

85. Nutzung von den Verzögerungen der BKA, nicht verarbeitbaren Ideen und der Backtracking in letzter Minute. Am 11. August 2017 bat der Kläger Agent A, die Mittel direkt auf ein Konto zu verdrehen, das der Kläger in den USA kontrollierte.

86. Am 14. August 2017, nachdem er keine Verpflichtung von Agent A erhalten hatte, um die angeforderten Kabel zu senden, schrieb der Kläger Agent A, „Was genau hält Sie daran, an dieser Stelle eine Drahtübertragung zu senden? Sie haben die Daten, es ist mein Geld . . . .“ Agent A antwortete, dass die „Chefs“ feststellen müssten, ob es legal sei, „die Übertragung der Kabel in die USA durchzuführen“. Auf die der Kläger antwortete: „Sie wussten, dass ich im Dezember letzten Jahres Amerikaner bin. Jetzt ist es Zeit, tatsächlich durchzuhalten.“

87. Am 21. August 2017 rief der Kläger Agent A an und gab Einzelheiten zu ihrem internationalen Bank-Y-Konto an. Der Kläger forderte die BKA auf, die Mittel vom lokalen Bank

X des BKA auf das internationale Bank-Y-Konto des Klägers zu überweisen, damit der Kläger die Mittel auf das Konto des Klägers in den Vereinigten Staaten verdrehen kann.

88.     Am 25. August 2017 überwiesen ein informierter Kläger, dass die BKA die Mittel auf das internationale Bank Y-Konto des Klägers übertragen würde, da der Kläger beabsichtigt, die Mittel von der internationalen Bank Y-Konto auf ein Konto in den USA zu überweisen.

89.     Dennoch schrieb ein Kläger am 28. August 2017, der sich fragte, ob der Kläger immer noch „auf einem Drahttransfer auf dem [Internationale Bank Y]-Konto besteht". Der Kläger antwortete durch das Fußtraggen des BKA: „Wenn ich bis morgen nicht das Geld auf meinem [Internationale Bank Y]-Konto habe."

90.     Am 29. August 2017 überwiesen die BKA die Mittel (ca. €5 Mio.) vom lokalen Bank-X-Konto auf das internationale Bank-Y-Konto.

91.     Der Kläger forderte dann die internationale Bank Y auf, die erste von drei Kabelübertragungen an den Kläger in den USA zu senden.

92.     Die Anfrage verlief nicht reibungslos. Sehr früh am Morgen in den Vereinigten Staaten, aber während der Geschäftszeiten in Deutschland erhielt der Kläger eine E-Mail von einem Vertreter der internationalen Bank y, die erklärte, die Bank könne sie nicht in Bezug Bankfiliale in Deutschland. Der Kläger fand dies alarmierend, da die Bank vorhat, einen verdächtigen Aktivitätsbericht („SAR") beim US-amerikanischen Ministerium des Finanzverbrechens Durchsetzungsnetzwerk („FinCEN") einzureichen, bei dem es sich um ein Standard-Betriebsverfahren für verdächtige Transaktionen handelt wie internationale Drahttransfers.

93.     An den Kläger war die Entscheidung des BKA, den Kauf der Panama-Papiere und das spätere Leck der deutschen Regierung über den Betrag öffentlich bekannt zu geben, die

Einreichung eines SAR über das Konto der Klägerin während der Amtszeit der Trump-Regierung war ein Worst-Case-Szenario, das es hätte haben könnten direkt identifizierte sie, führte zu einer verdienstlosen strafrechtlichen Verfolgung oder denkbar- die dokumentierten Verbindungen der Trump-Regierung und die freundliche Haltung gegenüber der Russischen Föderation- zum Tod des Klägers geführt. Für den Kläger war es daher unerlässlich, dass die internationale Bank Y keine SAR einreicht.

94.     Kläger gelang es, die internationale Bank Y in Deutschland telefonisch zu erreichen. Die internationale Bank Y beantragte Unterlagen, um den Grund für die Übertragung zu belegen.

95.     Die BKA hatte den Kläger zu der Annahme veranlasst, dass ihre enge Beziehung zur internationalen Bank Y die Notwendigkeit dieser Art von Gespräch vermeiden würde, in der der Kläger in die Kompromissposition gesteckt wurde, ihr Leben entweder in Gefahr zu bringen und die Geheimhaltung eines Die Operation wurde von den höchsten Niveaus der deutschen Regierung durchgeführt und genehmigt oder beliegt ein Finanzinstitut an.

96.     Um die Einreichung eines SAR und die Schutz ihres eigenen Lebens und der Regierungsbetrieb zu vermeiden, hatte der Kläger keine andere Wahl, als die internationale Bank Y eine zuvor vom BKA vorgeschlagene Titelgeschichte zu vermitteln. Der Kläger stellte der Bank die angeforderte Dokumentation vor und spiegelte eine der besprochenen Vereinbarungen, die die BKA zu implementieren begonnen hatte, genau wider. Die Dokumentation enthielt die Unterschrift derselben falschen Identität-nicht eine echte Person-, die die jetzt verordnete Debitkarte des Klägers von der örtlichen Bank X „signiert" hatte.

97.     Die internationale Bank Y war mit der Dokumentation zufrieden. Der Kläger informierte die BKA sofort über das, was passiert war, und forderte eine Erklärung dafür, warum

die BKA die Bank nicht angewiesen hatte, die Übertragung im Voraus zu genehmigen, insbesondere nach monatelangen Diskussionen.

98.     Anfang September 2017 traf der erste von drei Kabelübertragungen auf einem der Konten des Klägers in den Vereinigten Staaten vom internationalen Bank-Y-Konto ein. Mitte September 2017 kam der zweite Drahtübertragung in den USA ein. Im Jahr 2018 trat der dritte Drahtübertragung mit dem Rest der Mittel in den USA ein.

**VI.     Die deutsche Regierung hat infolge der Panama-Papiere Steuern und Strafen in Höhe von über 195 Millionen US-Dollar erhoben, aber den Kläger keinen Prozentsatz dieser Erholungen zur Verfügung gestellt.**

99.     Ende 2018 forderte der Kläger gemäß dem Abkommen vom 23. Juni 2017 eine Liste der von der deutschen Regierung beschlagnahmten Mittel zur Verfügung, in denen ein kausaler Zusammenhang zwischen den Dokumenten und der Beschlagnahme bestand. Am 10. September 2018 antwortete Agent W: „Bisher wurden Mittel von 5,500.000 Euro gesammelt. Wenn der vereinbarte Betrag von 50.000.000 Euro erreicht werden sollte, was eine weitere Zahlung rechtfertigen würde, werden wir Sie erneut kontaktieren." Es wurde keine Liste bereitgestellt.

100.    Am 21. September 2018 gab die BKA eine Pressemitteilung heraus, in der angekündigt wurde, dass sie Panama Papers-Daten mit 17 europäischen Ländern geteilt hatte. Es kündigte auch den Erhalt von 70 Polizeianfragen aus anderen Ländern als Deutschland an.[13]

101.    Am 22. August 2019 beantragte der Kläger erneut eine Buchhaltung der von der deutschen Regierung gesammelten Mittel. Agent W antwortete am selben Tag: "Aufgrund von Straf- und/oder Steuerverfahren wurden bis heute Mittel von 9.100.000 Euro gesammelt. Wir sind

---

[13] Pressemitteilung, BUNDESKRIMINALAMT, *„Panama Papers"- BKA fördert Auswertung auf EU-Ebene* [*"Panama Papers"- BKA promotes evaluation at EU level*], (21. Sep. 2018), https://www.bka.de/DE/Presse/Listenseite_Pressemitteilungen/2018/Presse2018/180921_AuswertungPanamaPapers.html.

also noch weit von 50.000.000 Euro entfernt, was eine weitere Zahlung rechtfertigen würde. Wenn dieser Betrag erreicht ist, kontaktieren wir Sie erneut."

102.    Im Dezember 2019 gab die Deutsche Bank bekannt, dass sie sich bereit erklärt habe, €15 Mio. für die Beendigung einer Untersuchung der Staatsanwaltschaft von Frankfurt zu einer möglichen Geldwäsche und Steuerhinterziehung, an denen deutsche Kunden der Bank einzubeziehen, zu zahlen. Laut dem Wall Street Journal bestätigten „Deutsche Bank und Staatsanwälte beide. . . dass die Untersuchung mit den Panama-Papieren zusammenhängt."[14]

103.    Von ungefähr 2019 bis heute haben verschiedene deutsche Staaten vage und häufig widersprüchliche Pressemitteilungen hinsichtlich ihres Erfolgs bei der Erhebung von Steuern und Geldstrafen aufgrund der Panama-Papiere herausgegeben. In willkürlichen Abständen wurden von den Finanzministerien von Baden-Württemberg, Schleswig-Holstein und Hessen, dem führenden deutschen Staat für die Bemühungen, verschiedene Ankündigungen herausgegeben. Andere Staaten haben Millionen Euro gesammelt, aber keine öffentliche Erklärung abgelegt. Bemerkenswerterweise wurde trotz der dokumentierten Geschichte des Staates, die auf den eigenen Einkäufen von durchgesickerten Steuerdaten beruht, keine öffentliche Ankündigung aus dem Bundesstaat Nordrhein-Westalen vor, der die dokumentierte Geschichte des Staates aggressiv durchgesetzt hat.

---

[14] Jenny Strasburg, *Die Deutsche Bank verpflichtet sich, eine Geldwäsche-Untersuchung von €15 Mio. zu zahlen*, The Wall Street Journal (6. Dezember 2019), https://www.wsj.com/articles/deutsche-bank-agrees-to-pay-15-million-in-money-laundering-probe-11575652361; *see also Die Deutsche Bank zahlt €15 Mio. Geldwäscheabrechnung*, Financial Times (6. Dezember 2019), https://www.ft.com/content/eeefa806-184b-11ea-9ee4-11f260415385 („Die inzwischen ausgelöste kriminelle Stichprobe hat eine kleine BVI-Basis-Tochter von Deutsch namens Regula aufgenommen, die in den sogenannten Panama-Papieren aufmerksam gemacht wurde, ein großes Leck privater Dokumente einer panamanischen Anwaltskanzlei, die ein Netz der geheimen Offshore-Firma aufdeckt."); *Deutsche Bank-Hauptquartier im Zusammenhang mit Panama-Papieren überfallen*, Washington Post (29. November 2018), https://www.washingtonpost.com/business/2018/11/29/deutsche-bank-headquarters-raided-case-connected-panama-papers/.

104.    Am 16. Februar 2021 veröffentlichte der Finanzminister des deutschen Bundesstaates Hessen, Michael Boddenberg, eine öffentliche Erklärung, in der die Ergebnisse einer Bewertung der Auswirkungen der von der BKA und der Hessische Steuerverwaltung durchgeführten Panama-Papiere zusammengefasst sind. Laut Minister Boddenberg wurden verschiedene deutsche Behörden „gebeten, Daten über die Auswirkungen der Panama-Papiere an das zentrale Team in Kassel zu melden. Er stellte jedoch fest, dass „es nicht verpflichtet ist, die Ergebnisse dem Bewertungsteam in Kassel zu melden", und meinte, dass infolgedessen Sammlungen, die auf die Panama-Papiere zurückzuführen sind Kassel-Team. Dennoch berichtete Minister Boddenberg:

Aus den erhaltenen Antworten entsteht das folgende Bild landesweit:

- Zusätzliches Steuerergebnis: über 38,4 Millionen Euro.
- Zusätzliches Ergebnis nach Strafrecht: über 19 Millionen Euro

In derselben Pressemitteilung heißt es: „Insgesamt führt dies zu einem nachweislich zentral verzeichneten Mehrfachergebnis von rund 72 Millionen Euro."[15]

105.    Doch am 25. März 2021 schrieb Agent W Kläger, dass „die Summe, die kausal und ausschließlich auf die" Panama-Papiere „zurückzuführen ist, derzeit weit unter 20 Millionen Euro liegt".

106.    Bei der Verhandlung der Verkaufsbedingungen bestand der Kläger darauf, das Recht auf mindestens eine jährliche detaillierte Abrechnung der Fortschritte der deutschen Behörden genau zu erteilen, um das bürokratische Chaos und die Opazität zu vermeiden, die mit der Verfolgung der Arbeit jedes deutschen Staates verbunden sind.

---

[15] Pressemitteilung, Hessisches Ministerium der Finanzen, *Auswertung der Panama Papers erfolgreich abgeschlossen* [*Evaluation of the Panama Papers successfully completed*] (Feb. 16, 2021), https://hessen.de/presse/auswertung-der-panama-papers-erfolgreich-abgeschlossen (translated from the German).

107.    Am 6. April 2021 berichtete der ICIJ, dass Deutschland aufgrund der Panama-Papiere 195,65 Millionen US-Dollar an Steuern und Strafen zurückgefordert hatte.[16] In dem Bericht des ICIJ heißt es: „ICIJs Gesamt zählt nur die zurückgewonnenen Mittel, die wir durch offizielle Antworten von Regierungen überprüfen können.“[17]

108.    Am 9. April 2021 stellte der BKA zum ersten Mal einen Teil einer „Liste der beschlagnahmten Mittel“ zur Verfügung. Die Teilliste, die von demselben Geldwäschemspezialisten erstellt wurde, der beim Kläger die Beherrschung verlor, wurde stark reduziert und detaillierte einen Gesamtbetrag der Schwelle von 50 Millionen Euro detailliert, wobei nur 13,5 Millionen Euro aufgelistet wurden, wenn der Betrag zurückerobert wurde. Laut Agent W enthielt die Liste nur Wiederherstellungen „ausschließlich“ auf den Daten aus den Panama-Papieren.

109.    In der gleichen Botschaft übermittelte Agent W im starken Gegensatz zu den Jahren der Öffentlichkeit die BKA- und Deutsche staatliche Behörden, dass die BKA die Sammlungen von Panama Papers als „ziemlich enttäuschend“ betrachtete.

110.    Am 15. September 2021 teilte Agent W den Kläger darüber mit, dass er in den Ruhestand gegangen sei und eine Nummer zur Verfügung gestellt habe, bei der die BKA über verschlüsselte Messaging-App erreicht werden könne.

111.    Der Kläger versuchte, die Anzahl der von Agent W im September und November 2021 bereitgestellten Nummer zu kontaktieren, um Steuererhebungen zu erörtern, die den Panama-Papieren und zusätzlichen Beträgen, die dem Kläger geschuldet wurden kurz antwortete.

---

[16] Sean McGoey, *Panama Papers Umsatzerholung erreicht 1,36 Milliarden US-Dollar, wenn die Untersuchungen fortgesetzt werden*, Internationales Konsortium der investigativen Journalisten (6. April 2021), https://www.icij.org/investigations/panama-papers/panama-papers-revenue-recovery-reaches-1-36-billion-as-investigations-continue/.
[17] *Id.*

112.   Am 4. April 2022 erklärte in einer Nachricht an den Kläger, ein neuer Agent M., Agent M, dass die Berechnung der gesamten Erholung durch die BKA aus den Panama-Papieren nur Geld zählte, das „kausal und ausschließlich auf die Panama-Papiere zurückzuführen war."

113.   Der Kläger und die BKA haben den prozentualen Anspruch des Klägers auf zukünftige Rückgewinnung nie auf diejenigen, die „ausschließlich" aus den Panama-Papieren abgeleitet wurden, nie eingeschränkt. Die Vereinbarung vom 23. Juni 2017 erforderte ausdrücklich nur „eine kausale Beziehung zwischen den Dokumenten und der Beschlagnahme". Dies ist auf die Art von Untersuchungen zurückzuführen, an denen Offshore-Unternehmen beteiligt sind, bei denen das maskierte Eigentum an einem Unternehmen in der Regel das einzige fehlende Puzzleteil ist, das den Fall schließlich in den Kontext des größeren Rätsels löst. Die Exklusivitätsbegriff des BKA ist nicht nur so unsinnig.

114.   Der Kläger und die BKA waren sich auch einig, dass der Kläger zur Gewährleistung der Einhaltung Anspruch auf eine detaillierte jährliche Rechnungslegung von Sammlungen hatte, für die das Kassel-Team und/oder das BKA-Olet-Team zu solchen Sammlungen notwendigerweise Feedback von verschiedenen deutschen Bundes- und Landesbehörden erforderlich waren. Die Erklärung von Minister Boddenberg 2021, das Feedback optional sei, sei ein Eingeständnis, dass die deutsche Regierung ihren Vertrag mit dem Kläger verletzt hatte.

115.   Dementsprechend haben die deutsche Regierung und ihr Vertreter, die BKA, gegen ihre Vereinbarung mit dem Kläger verstoßen und den Kläger 10% der Rückgewinnung von einer deutschen Bundes- oder Landesbehörde über 50 Millionen Euro im Zusammenhang mit den Panama-Papieren zuzüglich 10% der Zahlungen von jeglichen Zahlungen von jeglichen

30

Zahlungen schuldet Ausländische Regierungen nach Deutschland, um einen Teil der Panama-Papiere bereitzustellen.

116.    In ihrem 4. April 2022 erklärte Agent M: „Bitte beachten Sie, dass Sie im Falle einer Klage möglicherweise nicht mehr möglich sind, Ihr Identitätsgeheimnis mehr zu halten. In Deutschland sind anonyme Klagen nicht möglich." Der Kläger verstand die implizite Bedrohung: Gehen Sie auf eigene Gefahr fort.


## ANSPRUCH I
### (Vertragsverletzung - alle Beklagten)

117.    Der Kläger enthält die vorstehenden Absätze durch Bezugnahme, als ob sie hier vollständig dargelegt wären.

118.    Im Jahr 2017 schlossen der Kläger und die Beklagten (über den Beklagte BKA) einen gültigen und verbindlichen Vertrag für den Verkauf von Informationen aus den Vereinigten Staaten im Austausch für Geld ab, wie oben beschrieben. Der Vertrag erforderte den Beklagten BKA, Zahlungen an den Kläger zu leisten, von dem er wusste, dass sie letztendlich die Vereinigten Staaten erreichen würden. Tatsächlich leistete der Beklagte BKA an den Kläger, dass der Beklagte BKA beabsichtigte, den Kläger in den Vereinigten Staaten zu erreichen, und dass er dazu beitrug, den Kläger in den Vereinigten Staaten zu erreichen.

119.    Die Aktionen des BKA verursachten eine physische Festplatte, die die Panama-Papiere enthielt, die auf Kosten des Klägers aus den USA nach Deutschland verschifft wurden, um eine kommerzielle Transaktion zu erleichtern.

120.    Dementsprechend verzichteten die Beklagten im Zusammenhang mit ihrer souveränen Immunität und begangene Handlungen außerhalb des Territoriums der Vereinigten

31

Staaten im Zusammenhang mit der kommerziellen Aktivität der Beklagten an anderer Stelle, die in den Vereinigten Staaten einen direkten Effekt auswirkten.

121.     Wie im 23. Juni 2017 angegeben, hatte der Beklagte BKA von seinem Vizepräsidenten an den Kläger die Pflicht, den Kläger 10% aller „Mittel, die aus kriminellen Aktivitäten/Finanzstraftaten stammen wurde mit dem endgültigen und verbindlichen Effekt beschlagnahmt und über 50.000.000 EUR (in Worten: fünfzig Millionen EUR)“, solange es zwischen den Panama-Papieren und den wiedergewonnenen Fonds eine „kausale Beziehung“ gab.

122.     Der Beklagte BKA verletzt und verletzt weiterhin seine vertragliche Pflicht, indem er den Kläger keinen Prozentsatz der Mittel aus kriminellen und zivilen Durchsetzungsmaßnahmen, die kausal mit den Panama-Papieren verbunden sind, über den ersten 50 Millionen Euro an Sammlungen, obwohl sie allein ab April 2021 Steuern und Strafen über 195 Millionen US-Dollar gesammelt haben.

123.     Wie im 23. Juni 2017 angegeben, hatte der Beklagte BKA von seinem Vizepräsidenten an den Kläger die Pflicht, auf Antrag des Klägers „eine Liste der mit endgültigen und verbindlichen Fonds bereitzustellen und weiterhin zu haben, und hat weiter Einmal im Jahr wie ab 2018 wirken.“ Am 9. April 2022 verletzte der Beklagte BKA seine vertragliche Pflicht weiter, indem er dem Kläger eine ungenaue Liste der mit dem endgültigen und verbindlichen Effekt beschlagnahmten Fonds zur Verfügung stellte.

124.     Dementsprechend schulden die Beklagten den Kläger nach Steuern zuzüglich Zinsen mindestens 14.565.000 USD.

**ANSPRUCH II**

**(Verletzung des implizierten Bundes nach gutem Glauben und fairen Handeln - alle Beklagten)**

125.    Der Kläger enthält die vorstehenden Absätze durch Bezugnahme, als ob sie hier vollständig dargelegt wären.

126.    Der Beklagte BKA verstieß gegen den implizierten Bund, dass keine Partei etwas tut, das die Auswirkung der Zerstörung oder Verletzung des Rechts der anderen Partei hat, die Früchte des Vertrags zu erhalten, wenn der Beklagte BKA in bösem Glauben und willkürlich und launisch ist:

        a.  einseitig versuchte, dem Vertrag eine Laufzeit hinzuzufügen, die den Kläger daran hindert, das von den Beklagten geschuldete Geld zu erhalten; Und

        b.  implizit bedrohte die Anonymität des Klägers, als sie seine erfundene Ausschließlichkeitszeit wiederholte, und erklärte, dass der Kläger in Deutschland keinen rechtlichen Rückgriff habe, der es dem Kläger ermöglichen würde, die Anonymität aufrechtzuerhalten.

127.    Hätte der Kläger gewusst, dass in der Auslegung der Vereinbarung durch die BKA eine Ausschließlichkeitsbegriff vorhanden war, hätte der Kläger den 10%-Zahlen in Bezug auf Sammlungen, Strafen, Bußgelder und damit verbundene Einkünfte niemals zugestimmt.

128.    Diese Handlungen entzogen sich aus dem Geist des Vertrags, machten absichtlich unvollkommene Leistung durch Beklagte und zerstörten und verletzten das Recht des Klägers, die Früchte des Vertrags zu erhalten.

**GEBET ZUR ERLEICHTERUNG**

Deshalb verlangt der Kläger das Urteil wie folgt:

A.  Ausgleichsschäden von mindestens 14.565.000 USD und zehn Prozent (10%) der früheren Sammlungen der Beklagten, die kausal mit den Panama-Papieren zu steuern und schulden, Steuern, Zinsen an fälligen Steuern und geschulden, strafrechtlichen Geldbußen und abgeleiteten Sammlungen im Zusammenhang stehen aus anderen Haushaltsverstößen zuzüglich aller Beträge, die an die deutsche Regierung oder ihre konstituierenden Staaten von anderen Ländern im Zusammenhang mit der Bereitstellung der Panama-Papiere durch die deutsche Regierung gezahlt wurden;

B.  Interesse vor dem Urteil und nach dem Urteilsvermögen;

C.  Erleichterung, dass die Beklagten eine jährliche Bilanzierung aller relevanten Sammlungen liefern werden, die kausal mit den Panama-Papieren zusammenhängen;

D.  Erleichterung, die die Beklagten in Zukunft den Kläger zehn Prozent (10%) der Beklagten kausal im Zusammenhang mit den Panama-Papieren mit fälligen Steuern und Schulden, Steuerstrafen, Zinsen für geschuldete Steuern und geschuldeten Steuern, strafrechtlichen Bestimmungen und schuldigen Steuern und Strafregelbetrachtungen zahlen müssen. Sammlungen, die aus anderen steuerlichen Straftaten abgeleitet wurden, zuzüglich aller Beträge, die der deutschen Regierung oder ihren Bestandteilen von anderen Ländern im Zusammenhang mit der Bereitstellung der Panama-Papiere durch die deutsche Regierung gezahlt haben;

E.  Strafschadenersatz; Und

F.  Weitere Erleichterung, da dieses Gericht es für gerecht und angemessen hält.

Datiert: 24. Juli 2023

Hochachtungsvoll,

/s/John Doe
John Doe
doevgermanylitigation@protonmail.com

 **Bundeskriminalamt**

POSTANSCHRIFT  Bundeskriminalamt · 65173 Wiesbaden

HAUSANSCHRIFT   Thaerstraße 11, 65193 Wiesbaden

TEL   +49 (0)611 55-0
AZ
DATUM   **23.06.2017**

████████████████████

Das Bundeskriminalamt zahlt für Gelder die aus strafbaren Handlungen / Steuerstraftaten stammen und rechtskräftig eingezogen werden konnten, eine Beteiligung in Höhe von 10 % ab einer Einziehungssumme von 50.000.000 € (in Worten: fünfzig Millionen EURO). Dieses gilt, wenn die Unterlagen kausal für die Einziehung waren.

Sie erhalten ab dem Jahre 2018, auf Ihre Anfrage hin, einmal jährlich eine Aufstellung über die rechtskräftig eingezogenen Gelder.

Der Inhalt dieses Schreibens ist vertraulich zu behandeln.

In Vertretung

Henzler
Vizepräsident





Bundeskriminalamt

POSTANSCHRIFT  Bundeskriminalamt · 65173 Wiesbaden

HAUSANSCHRIFT  Thaerstraße 11, 65193 Wiesbaden

TEL  +49 (0)611 55-0

AZ

DATUM  **23.06.2017**

Dear ████████████████████

The Bundeskriminalamt pays a share of 10 per cent for funds derived from criminal activities/ fiscal offences which have been confiscated with final and binding effect and exceed EUR 50,000,000 (in words: fifty million EUR).
This applies if there was a causal relationship between the documents and the confiscation.

Upon your request, you will receive a list of the funds confiscated with final and binding effect once a year as from 2018.

Please treat the information contained in this letter in confidence.
In Vertretung

Henzler
Vizepräsident



**Exhibit 4**
Translated Summons: Federal Republic of Germany

28 USC 1608 Summons IH 6
4/17

BEZIRKSGERICHT DER VEREINIGTEN STAATEN

für den

Südlicher Gerichtsbezirk des US-Bundesstaates New York

| | | |
|---|---|---|
| John Doe_____ | ) | |
| Kläger | ) | |
| | ) | |
| v. | ) | Zivilklage Nr.   23-CV-6395 (VSB-GS) |
| | ) | |
| Die Bundesrepublik Deutschland, et al.____ | ) | |
| Beklagte | ) | |

IN EINER ZIVILKLAGE RUFEN

Zu:    (Name und Adresse des Beklagten)

    Die Bundesrepublik Deutschland
    4645 Reservoir Rd. NW
    Washington, D.C. 20007

    Gegen Sie wurde eine Klage eingereicht.

    Innerhalb von 60 Tagen nach dem Dienst dieser Vorladung auf Sie (ohne den Tag, an dem Sie ihn erhalten haben) müssen Sie dem Kläger eine Antwort auf die beigefügte Beschwerde oder einen Antrag gemäß Regel 12 der Bundesregeln des Zivilprozesses dienen. Die Antwort oder den Antrag muss dem Kläger oder Klägeranwalt zugestellt werden, dessen Name und Adresse sind:

    John Doe
    doevgermanylitigation@
    protonmail.com

    Wenn Sie nicht antworten, kann das Urteilsverzug gegen Sie wegen der in der Beschwerde geforderten Erleichterung gegen Sie eingetragen werden. Sie müssen auch Ihre Antwort oder Ihren Antrag beim Gericht einreichen.

**SCHREIBER DES GERICHTS**

Datum: 10/18/2023_____

                                  _____
                                  Signatur des Angestellten oder des stellvertretenden Angestellten

**Exhibit 5**
Translated Summons: Bundeskriminalamt

28 USC 1608 Summons IH 6
4/17

BEZIRKSGERICHT DER VEREINIGTEN STAATEN

für den

Südlicher Gerichtsbezirk des US-Bundesstaates New York

| | | |
|---|---|---|
| John Doe | ) | |
| _Kläger_ | ) | |
| | ) | |
| v. | ) | Zivilklage Nr.   23-CV-6395 (VSB-GS) |
| | ) | |
| Die Bundesrepublik Deutschland, et al. | ) | |
| _Beklagte_ | ) | |

IN EINER ZIVILKLAGE RUFEN

Zu:      (Name und Adresse des Beklagten)

Bundeskriminalamt
4645 Reservoir Rd. NW
Washington, D.C. 20007

Gegen Sie wurde eine Klage eingereicht.

Innerhalb von 60 Tagen nach dem Dienst dieser Vorladung auf Sie (ohne den Tag, an dem Sie ihn erhalten haben) müssen Sie dem Kläger eine Antwort auf die beigefügte Beschwerde oder einen Antrag gemäß Regel 12 der Bundesregeln des Zivilprozesses dienen. Die Antwort oder den Antrag muss dem Kläger oder Klägeranwalt zugestellt werden, dessen Name und Adresse sind:

John Doe
doevgermanylitigation@
protonmail.com

Wenn Sie nicht antworten, kann das Urteilsverzug gegen Sie wegen der in der Beschwerde geforderten Erleichterung gegen Sie eingetragen werden. Sie müssen auch Ihre Antwort oder Ihren Antrag beim Gericht einreichen.

**SCHREIBER DES GERICHTS**

Datum: 10/18/2023

_____
Signatur des Angestellten oder des stellvertretenden Angestellten