UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
JOHN DOE,                                    :
                                             :
                          Plaintiff,         :          23 Civ. 6395 (VSB) (GS)
                                             :
                                             :          OPINION & ORDER
          - against -                        :
                                             :
THE FEDERAL REPUBLIC OF GERMANY :
AND THE BUNDESKRIMINALAMT OF         :
THE FEDERAL REPUBLIC OF GERMANY, :
                                             :
                          Defendants.        :
-------------------------------------------------------------x

**GARY STEIN, United States Magistrate Judge:**

On December 12, 2023, *pro se* Plaintiff John Doe submitted a letter "in response to" the Court's Orders dated October 13, 2023 and November 21, 2023. (Dkt. No. 20 ("Motion" or "Mot.")).  Plaintiff asks the Court to revisit its prior determinations regarding service of process under 28 U.S.C. § 1608 and the need for Plaintiff to disclose his identity to the Court.  Plaintiff also requests that, to the extent the Court adheres to its prior rulings, the Court facilitate service of Defendants through other means under 28 U.S.C. § 1608(a).

Plaintiff invites the Court to construe his filing as a letter motion.  (Mot. at 1).  The Court does so, and, for the reasons set forth below, **DENIES** the Motion in its entirety.

## BACKGROUND

The Court assumes familiarity with the facts set forth in the Complaint, which are discussed in detail in this Court's October 13, 2023 Order.  (*See* Dkt. No.

1

15 ("October Order" or "Oct. Ord.")).  In brief, Plaintiff, the individual[1] who allegedly leaked the "Panama Papers," claims that Defendants, the Federal Republic of Germany ("Germany") and the Bundeskriminalamt of Germany ("BKA"), failed to pay sums due under a contract whereby Plaintiff provided them with access to the Panama Papers for use in identifying tax fraud and other financial offenses.  (Dkt. No. 1 ("Complaint" or "Compl.")).

In addition to allegations regarding Defendants' purported breach of contract, Plaintiff, in his Complaint and other filings, raises concerns for his safety if his identity were to become public.  (*See, e.g.*, Compl. ¶¶ 11-14).  Plaintiff avers that should his identity become known, his "life would be in immediate peril" and he "would likely be killed."  (Dkt. No. 4 ¶ 3; *see also* Compl. ¶ 11).  Plaintiff specifically references a 2017 docudrama aired by Russian news channel RT, which he calls "an explicit and credible death threat" against him.  (Compl. ¶ 12; Dkt. No. 4 ¶¶ 4-5).

In a motion filed simultaneously with the Complaint, Plaintiff explains that the Russian Federation, Chinese Communist Party, and Saudi government—the leaders of which were implicated by the Panama Papers leak—"are known for their repressive regimes," including "extralegal murders and kidnappings."  (Dkt. No. 3 at 3-4).  Plaintiff references several instances of alleged extralegal violence undertaken by Russia, China, and Saudi Arabia on foreign soil (none of which were

---

[1] Plaintiff's papers use gender-neutral pronouns ("they," "their," etc.) to refer to Plaintiff. The Court uses male pronouns throughout this Opinion for ease of reference, but in so doing does not intend to suggest anything about Plaintiff's gender, as to which the Court has no knowledge.

connected to the Panama Papers), as well as the murders of a Maltese and a Slovak journalist who exposed official corruption in their countries (who allegedly did make use of the Panama Papers). (*Id.* at 4-6). From these assertions, Plaintiff concludes that "[i]t is likely [he] would be treated in similar fashion by such state actors." (*Id.* at 4-5). He avers, based on the Russian docudrama, that "President Putin wants [him] dead." (*Id.* at 5). Plaintiff further maintains that "identification of [his] true identity would immediately expose dozens of individuals to likely physical harm." (*Id.*).

Based on these safety concerns, Plaintiff filed motions for leave to serve Defendants via alternative means (Dkt. No. 6) and for leave to proceed under a pseudonym (Dkt. No. 3). These motions were addressed in the October Order. Relevant here, the Court analyzed Section 1608 of the Foreign Sovereign Immunities Act ("FSIA" or the "Act"), which outlines specific methods of service on foreign-government defendants. (Oct. Ord. at 12-13). The Court concluded that both Germany and the BKA were a "foreign state" or a "political subdivision" thereof (as opposed to "an agency or instrumentality" of a foreign state) and were accordingly subject to service pursuant to 28 U.S.C. § 1608(a). (*Id.* at 13-17). Consequently, the Court determined it lacked authority under the FSIA to authorize service via alternative means. (*Id.* at 17).

In his motion for alternative service, Plaintiff argued that he was entitled to service via alternative means "[p]ursuant to 28 U.S.C. § 1608(a)(1)," which allows for service pursuant to a "special arrangement" between the parties. (Dkt. No. 6 at

3

1).  Thus, after concluding that both Defendants were subject to service pursuant to 28 U.S.C. § 1608(a), the Court addressed Plaintiff's citation to 28 U.S.C. § 1608(a)(1).  The Court determined that, under governing authorities, Plaintiff failed to adequately allege that an agreement as to service was reached between Plaintiff and the BKA agents with whom he negotiated the alleged contract.  (*Id.* at 18-19).

The Court also denied, with leave to renew, Plaintiff's motion to proceed pseudonymously.  The October Order noted that Plaintiff filed this action after failing to comply with an order entered by Chief Judge Boasberg in a substantially identical action filed by Plaintiff in federal court in the District of Columbia (the "D.C. Action") directing him to provide his identity under seal to the court.  (*Id.* at 24).[2]  The Court declined to rule on Plaintiff's motion for pseudonymity until (1) Defendants had been served and given an opportunity to be heard on the issue and (2) Plaintiff made clear his position as to whether he would reveal his identity to this Court.  (*Id.* at 25-27).  The Court concluded that, under the Second Circuit's decision in *Publicola v. Lomenzo*, 54 F.4th 108 (2d Cir. 2022), as well as other authorities, any litigant seeking to avail themselves of this forum must provide identifying information to the court, even if they are granted leave to proceed pseudonymously.  (Oct. Ord. at 25-27).

---

[2] *See Doe v. Fed. Republic of Ger.*, Civil Action No. 23-1782 (JEB), 2023 WL 4744154 (D.D.C. June 30, 2023); *see also Doe v. Fed. Republic of Ger.*, Civil Action No. 23-1782 (JEB), 2023 WL 4744175 (D.D.C. July 21, 2023) (denying motion for reconsideration).

Thereafter, on October 23, 2023, Plaintiff—still proceeding under a pseudonym and without indicating whether he would identify himself to the Court—moved the Court to authorize the issuance and transmission of Requests for Service to German Central Authorities, either "on its own or through an international process server." (Dkt. No. 18). The Court concluded on November 21, 2023 that Plaintiff was not entitled to the Court's assistance in transmitting his Requests for Service to Germany. (Dkt No. 19 ("November Order" or "Nov. Ord.") at 6-10). The Court also made clear that "so long as Plaintiff is unwilling to provide his identity to the Court, as required, he is not entitled to judicial relief in this action." (*Id.* at 10). At the same time, the Court reiterated its sensitivity to Plaintiff's safety concerns, and indicated its willingness to order a sealing procedure that protects Plaintiff's confidentiality as much as possible, for instance by allowing sealed documents to be filed and maintained in hard-copy, as opposed to electronic, form. (Nov. Ord. at 10; *see also* Oct. Ord. at 27).

Plaintiff still has not provided his identity to the Court or indicated his willingness to do so. Nonetheless, he filed the current Motion claiming that, despite the Court's prior rulings, (1) he and Defendants had a special arrangement for service under 28 U.S.C. § 1608(a)(1) and that Defendants have been properly served pursuant to that arrangement; (2) the BKA is an "agency or instrumentality" of Germany under the FSIA and hence subject to service under 28 U.S.C. § 1608(b), rather than § 1608(a); and (3) Plaintiff should be relieved of the requirement to provide his identity under seal to the Court.

5

## LEGAL STANDARDS

Motions for reconsideration are governed by Local Civil Rule 6.3, which states that: "[u]nless otherwise provided by the Court or by statute or rule . . . a motion for reconsideration or reargument of a court order determining a motion shall be served within fourteen (14) days after the entry of the Court's determination of the original motion. . . ." Local Rule 6.3 also requires that a party moving for reconsideration set forth "the matters or controlling decisions which [the party] believes the Court has overlooked." *Id.*; *see Sigmon v. Goldman Sachs Mortg. Co.*, 229 F. Supp. 3d 254, 257 (S.D.N.Y. 2017) (cleaned up) (a motion for reconsideration may be granted where the moving party can point to controlling decisions or data that the court overlooked—"matters, in other words, that might be reasonably expected to alter the conclusion reached by the Court").

The decision whether to grant or deny a motion for reconsideration is committed to the sound discretion of the district court. *Sigmon*, 229 F. Supp. 3d at 257 (citation omitted). Nevertheless, "[t]he governing standard is strict, and [a reconsideration] motion should be denied where the moving party merely seeks to relitigate an issue that was previously decided." *Hernandez v. Loans*, No. 16 Civ. 3755 (GBD) (HBP), 2016 WL 6561415, at *1 (S.D.N.Y. Oct. 24, 2016) (citation omitted).

6

## DISCUSSION

### A.  Plaintiff's Motion Is Untimely

At the outset, to the extent Plaintiff seeks reconsideration of the Court's prior Orders, the Motion is untimely.  In its October Order, the Court determined that Plaintiff had not shown a "special arrangement for service" under 28 U.S.C § 1608(a)(1), that the BKA is subject to service under § 1608(a), and that Plaintiff was required to reveal his identity to the Court.  Plaintiff did not move for reconsideration until December 12, 2023, 50 days after the October Order, and well beyond the 14-day period allowed under Local Rule 6.3.  The untimeliness of Plaintiff's motion is a sufficient reason to deny it.  *See, e.g.*, *McGraw-Hill Glob. Educ. Holdings, LLC v. Mathrani*, 293 F. Supp. 3d 394, 397 (S.D.N.Y. 2018) ("As numerous cases from this Circuit have held, the untimeliness of a motion for reconsideration is reason enough to deny the motion").

Even if Plaintiff's motion were not subject to Local Rule 6.3, his arguments also all fail on the merits.

### B.  Defendants Have Not Been Served Pursuant to FSIA Section 1608(a)(1)

Plaintiff argues that he had a "special arrangement for service" within the meaning of 28 U.S.C. § 1608(a)(1) because, at a meeting in Germany in February 2017, he was introduced to an attorney by the BKA agents—Agents "A" and "W"—discussed in the Complaint, and "[i]t was offered that any and all potential legal issues with the BKA should be handled through that attorney,"

7

to which Plaintiff agreed.  (Mot. at 4).  According to Plaintiff, "the subject of this litigation is a covert operation in which German authorities purposefully declined to put anything substantive in writing," and as such, under these "unusual" and "arguably unprecedented" circumstances, "a verbal agreement to communicate about all legal matters via a particular foreign attorney amounts to a 'special arrangement for service'" under the FSIA.  (*Id.*).

Plaintiff is incorrect.  As noted in the October Order, when determining whether a special arrangement for service exists under § 1608(a)(1), courts require a "more definite manifestation of agreement" such as "a contract provision specifying a method of service in the event of suit."  *Pablo Star Ltd. v. Welsh Gov't*, 170 F. Supp. 3d 597, 604 (S.D.N.Y. 2016).  Assuming the truth of Plaintiff's account, his conversation with the BKA Agents does not manifest an agreement between the parties that, in the event of a lawsuit between the parties, Plaintiff could serve process on the attorney to whom he was introduced.

Not only does Plaintiff fail to point to any "contract provision specifying a method of service in the event of suit," *see id.*, what he describes does not even amount to a verbal agreement to that effect.  He alleges that the conversation in question took place "shortly after" he *first* arrived in Germany in February 2017 to *begin* in-person negotiations with the BKA over a potential sale of the Panama Papers.  (Mot. 4; *see* Compl. ¶ 41).  As described in the Complaint, no agreement between the parties existed at that time as to the sale of the Panama

8

Papers; indeed, Plaintiff alleges that it took several more weeks for the BKA to even make a clear or concrete offer. (*See* Compl. ¶¶ 38, 41, 45, 48). An agreement was not reached until March 28, 2017, according to the Complaint, and it took months of continued back and forth before the BKA produced the June 23, 2017 letter agreement upon which Plaintiff predicates his contract claims. (*Id.* ¶¶ 59, 73).

In context, then, all that Plaintiff has alleged is that, at the outset of negotiations, he was introduced to an attorney as the person with whom he should discuss potential legal issues. To construe that introduction as tantamount to an "agreement" by Defendants to appoint the attorney as their agent for service of process under any future contract the parties might subsequently enter into would be entirely unreasonable and would contravene settled case law applying Section 1608(a)(1).

At most, Plaintiff alleges that a special arrangement for service should be inferred based on the course of conduct between the parties. (*See* Mot. at 4). As noted in the October Order (p. 19), this is insufficient to show an agreement concerning service of process. *See Hilt Constr. & Mgmt. Corp. v. Permanent Mission of Chad to the United Nations in N.Y.*, No. 15 Civ. 8693 (VB), 2016 WL 3351180, at *5 (S.D.N.Y. June 15, 2016) (attempted service on defendants, pursuant to § 1608(a)(1), "based on the working relationship between the parties" was insufficient, as the parties did not "manifest[]" an "agreement" for service).

9

The lone case cited by Plaintiff, *Arbitration Between Space Systems v. Yuzhnoye Design Office*, 164 F. Supp. 2d 397 (S.D.N.Y. 2001), does not support his theory. In *Yuzhnoye*, the court interpreted a *contractual provision* to be a special arrangement for service under § 1608(b)(1). *Id.* at 402-03. The provision provided that

> [a]ll notices and communications between the parties shall be in writing and shall be effective, if delivered in person to the authorized representative of the recipient party at the address listed below, or sent by express mail or Data fax.

*Id.* at 402 (cleaned up). The court found that "[a]lthough service of process is not specifically mentioned in" the provision, service falls within the category of "'[a]ll notices and communications between the parties[.]'" *Id.* (cleaned up). This finding was supported by the fact that another provision of the agreement "plainly provided for the arbitration of disputes and for a court proceeding to enforce the arbitration award," allowing the court to reason that "service of process to begin the court proceeding is a 'notice and communication' between the parties to the [contract]." *Id.*

In reaching this conclusion, the court relied on case law similarly finding that contractual language dictating the manner of providing "notice" to one's counterparty may constitute a special arrangement for service under the FSIA. *Id.* at 402-03 (citing *Int'l Road Fed'n v. Embassy of the Democratic Republic of Congo*, 131 F. Supp. 2d 248, 251 (D.D.C. 2001) (provision setting forth method of delivery for "[a]ll notices, demands, or requests" established a

special arrangement), *Saunders Real Estate Corp. v. Consulate Gen. of Greece*, No. Civ. A 94—11951, 1995 WL 598964, at *2 (D. Mass Aug. 11, 1995) (special arrangement manifested by provision stating "notices shall be effective when delivered by hand or sent by certified mail . . ."), and *Marlowe v. Argentine Naval Comm'n*, 604 F. Supp. 703, 707-78 (D.D.C. 1985) (special arrangement was reached under FSIA by inclusion of provision that "[a]ll notices, requests, demands, or other communications . . . shall be deemed to have been given or made when deposited in the mail . . .")).

The alleged oral agreement here is not comparable to the specific written contractual provisions in *Yuzhnoye* or the cases cited therein. A statement at the outset of negotiations that a particular attorney has been designated to handle all potential legal issues cannot reasonably be construed as an agreement as to how service of process may be effected. Indeed, Plaintiff does not actually allege that he and the BKA had any agreement as to *how* service of process would be handled, in marked contrast to the written notice provisions involved in *Yuzhnoye*, *Marlowe*, *Int'l Road*, and *Saunders*, which specified a method of delivery (*e.g.*, delivery by hand, express mail, etc.).

Finally, whereas the relevant agreement in these cases was contained in a formal contract signed by a duly authorized representative of the foreign governmental entity in question, here Plaintiff alleges only a statement made by two BKA agents. There is no indication that Agents A and W had

11

authority to bind the BKA; the Complaint itself indicates that they did not. (*See, e.g.*, Compl. ¶¶ 36-37, 57, 73 (alleging that offers communicated by Agents A and W were approved by a BKA vice president and that the June 13, 2017 agreement was signed by a BKA vice president)).

Plaintiff also contends that, "[a]s of December 11, 2023," the same unnamed attorney to whom he was introduced in February 2017 "provided the BKA with the Summons and Complaint," and that this "fulfill[s] [Plaintiff's] service obligations." (Mot. at 4). This argument also fails. Absent Defendants' prior agreement that delivery of the Summons and Complaint to the attorney would constitute valid service under Section 1608(a)(1), it is of no moment that the papers were provided to the attorney or received by the BKA. *See, e.g.*, *Okolo v. Cross River State Gov't*, No. 18 Civ. 9479 (CS), 2019 WL 10248104, at *2 (S.D.N.Y. May 31, 2019) ("To the extent Plaintiff argues that actual notice is sufficient under § 1608(a), that argument is rejected, as the statute requires strict compliance."); *Finamar Inv. Inc. v. Republic of Tadjukistan*, 889 F. Supp. 114, 117-18 (S.D.N.Y. 1995) ("[w]hether or not [the foreign state] received actual notice of the suit is irrelevant when strict compliance is required").

Accordingly, Plaintiff's claim that "[p]ursuant to 28 U.S.C. § 1608(a)(1), Defendants have been served" (Mot. at 4) must be rejected.

**C. The BKA Is Subject to Service Pursuant to FSIA Section 1608(a)**

In its October Order, the Court concluded that the BKA is "a foreign state or political subdivision" thereof and, therefore, must be served pursuant to Section 1608(a) of the FSIA.  (Oct. Ord. at 14-17).  Plaintiff asks the Court to reconsider its determination that the BKA "cannot be (or at this point, has not been)" served under 28 U.S.C. § 1608(b) as an "'agency or instrumentality of a foreign state.'" (Mot. at 4).

As set forth in the October Order (pp. 14-15), the Second Circuit instructs that whether an entity is an "agency or instrumentality of a foreign state," such that service is proper under § 1608(b), hinges on whether the "core functions" of that entity are "'predominantly governmental or commercial'" in nature.  *Garb v. Republic of Poland*, 440 F.3d 579, 593-94 (2d Cir. 2006) (quoting *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 151 (D.C. Cir. 1994)).  If an entity's core functions are predominantly commercial, that entity is *not* part of the foreign state, but is instead an agency or instrumentality of the foreign state; if an entity's core functions are predominantly governmental, such an entity is part of the foreign state.  *Id.*

Applying the *Garb* test, the October Order concluded that the BKA's core functions clearly are "predominantly governmental" rather than "commercial."  The BKA is a German law enforcement agency, equivalent to the FBI, and courts treat law enforcement agencies as "'the state itself or a political subdivision of the state, rather than an agency or instrumentality, for purposes of FSIA § 1608.'"  (Oct. Ord.

13

at 15-17 (quoting *S.K. Innovation, Inc. v. Finpol*, 854 F. Supp. 2d 99, 108 (D.D.C. 2012)).

Without directly acknowledging *Garb* and the core-functions test, Plaintiff advances several arguments as to why the BKA should be treated as an agency or instrumentality under the FSIA.  The Court will address each argument in turn.

*First*, Plaintiff argues that the BKA "serves both governmental and commercial roles" and that the latter role has been "both crucial and dominant in this matter in particular."  (Mot. at 4).  Plaintiff avers that the BKA has "contracted in its own name (or fictitious names) as a legal entity distinct from the overall German state to rent real estate, open bank accounts, lend property, negotiate with regional governments, and purchase data."  (*Id.*).

The fact that the BKA is empowered to enter into contracts, however, does not make its functions predominately commercial under the core-functions test. Indeed, *Garb* is clear that "'any nation may well find it convenient . . . to give powers of contract . . . to entities that on any reasonable view must count as part of the state itself.'"  440 F.3d at 595 (quoting *Transaero*, 30 F.3d at 152).  Thus, "giving dispositive weight" to an entity's power to contract "would extend the definition of 'agencies or instrumentalities' 'well beyond' the 'public commercial enterprises' that Congress apparently intended to target" in § 1608(b).  *Id.* (quoting *Transaero*, 30 F.3d at 152); *see also Transaero*, 30 F.3d at 150, 152 (finding that Bolivian Air Force did not constitute an agency or instrumentality under the core-functions test even though suit arose from its alleged breach of a commercial contract).

14

*Second*, Plaintiff argues that the BKA purchased the Panama Papers "as part of its frequent participation in the 'market . . . for leaked tax data,' an inherently commercial activity." (Mot. at 4 (quoting Compl. ¶ 30)). He cites a German website, https://dserver.bundestag.de/btd/19/070/1907022.pdf, which Plaintiff describes as a "report from the BKA to the German Bundestag detailing a history of commercial data purposes."[3]  (*Id.*).

Plaintiff cites no authority to support his *ipse dixit* assertion that the BKA's ability to purchase "leaked tax data," which it does in connection with its federal mandate to prosecute criminal activity, renders its core functions *predominantly* commercial.  Indeed, per Plaintiff's own allegations, Defendants "purchased the Panama Papers from Plaintiff *to identify tax fraud and other financial offenses . . .* and *to collect funds due to the German government . . .*" (Compl. ¶ 4; emphasis added).  Thus, while the BKA's duties might "touch upon commercial activity," the BKA "does so as a [law-enforcement agency], not as a market participant or commercial entity."  *Amaplat Mauritius Ltd. v. Zimbabwe Mining Dev. Corp.*, 663 F. Supp. 3d 11, 28 (D.D.C. 2023).

---

[3] The Court notes that the report provided by Plaintiff is entirely in German.  Plaintiff does not attach, or include a link for, a copy of the report translated into English.  Absent a certified English translation, courts will not consider foreign-language documents.  *See, e.g.*, *Heredia v. Americare, Inc.*, No. 17 Civ. 06219 (RWL), 2020 WL 3961618, at *5 (S.D.N.Y. July 13, 2020) ("It is a well-established rule that a document in a foreign language is generally inadmissible unless accompanied by a certified English translation.") (citation omitted).  Accordingly, the Court is unable to consider the report.  For purposes of this analysis, however, the Court nonetheless assumes the truth of Plaintiff's allegation that the BKA has a history of purchasing commercial data.

Furthermore, as discussed in the October Order (pp. 16-17), even government entities whose activities are more closely connected to commercial activity than a law enforcement agency such as the BKA are treated as part of the foreign state for purposes of service of process under the FSIA. *See, e.g.*, *Safani Gallery, Inc. v. Italian Republic*, No. 19 Civ. 10507 (VSB), 2021 WL 3292262, at *5 n.4 (S.D.N.Y. Aug. 2, 2021) (Ministry of Cultural Heritage and Activities is part of the foreign state); *Pablo Star*, 170 F. Supp. 3d at 610 n.8 (core function of "Visit Wales"—tourism promotion—is predominately governmental); *Garb*, 440 F.3d at 594-97 (core function of Ministry of Treasury, "to hold and administer" property, is "indisputably governmental"). Thus, the BKA's ability to purchase "leaked tax data" does not change its legal status under the FSIA.

*Third*, Plaintiff argues that "[a]s the result of Hitler's horrific legacy, the modern German Government is uniquely . . . decentralized" and, as such, the BKA is located approximately 350 miles from the center of government in Berlin. (Mot. at 4). This argument is a non-sequitur. The BKA's proximity (or lack thereof) to the "center" of German government has no bearing on the BKA's core functions—which is the only relevant inquiry here. *See Garb*, 440 F.3d at 593-94. Wherever the BKA may be located, the fact remains that it is a national law enforcement agency that sits within Germany's Ministry of the Interior and Community. *See, e.g.*, *Chettri v. Nepal Bangladesh Bank, Ltd.*, No. 10 Civ. 8470 (PGG), 2014 WL 4354668, at *6 (S.D.N.Y. Sept. 2, 2014) ("The DRI

16

is a department within Nepal's Ministry of Finance" and "therefore constitutes a political subdivision of the Government of Nepal" for purposes of the FSIA).

*Fourth*, Plaintiff argues that the BKA "meets the definition of an 'organ of a foreign state' pursuant to 28 U.S.C. § 1603(b)." (Mot. at 4-5). Section 1603(b) defines "agency or instrumentality" of a foreign state as any entity—

> (1) which is a separate legal person, corporate or otherwise, and
>
> (2) *which is an organ of a foreign state or political subdivision thereof*, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
>
> (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b) (emphasis added).

As the statutory text makes plain, the "organ of a foreign state" element is only one of three criteria that must be satisfied in order for a foreign entity to be considered an "agency or instrumentality." As the Second Circuit held in *Garb*, the *first* element of the definition—whether the defendant is a "separate legal person"—depends on whether its core functions are predominantly governmental or commercial. 440 F.3d at 591. Because the BKA's core functions are predominantly governmental and, therefore, the BKA is not a "separate legal person" under the

first element of the definition, it does not matter if the BKA is an "organ of a foreign state" under the second element.[4]

For these reasons, the Court adheres to its conclusion in the October Order that the BKA falls squarely within the ambit of 28 U.S.C. § 1608(a).

### D. Plaintiff Is Required to Disclose His Identity to the Court

As set forth in both the October and November Orders, Plaintiff must divulge his identity to the Court if he wishes to proceed with this litigation. (Oct. Ord. at 27; Nov. Ord. at 10).  The Second Circuit has held that parties cannot shield their identities from the court.  *See Publicola*, 54 F.4th at 111 (finding that a *pro se* appellant's "refusal to disclose his identity to the court" warranted dismissal of his case).  Furthermore, parties proceeding anonymously in this District are routinely required to reveal their true names (as well as other identifying information) to the Court *ex parte* and under seal.  (*See* Oct. Ord. at 25-26 (citing cases)).

Despite this Court's prior rulings, Plaintiff claims he should be relieved of this "vital" and "well-established requirement." *Publicola*, 54 F.4th at 111. Plaintiff principally argues that "the facts of this . . . case are not fully

---

[4] Nor does it matter that, in the English version of its website, the BKA describes itself as "a subordinate *agency* to the Federal Ministry of the Interior."  (Mot. at 5; emphasis in original).  This description does not make the BKA's core functions any less governmental and does not transform the BKA into an "agency" within the meaning of the FSIA.  *See Lee v. Taipei Econ. & Cult. Rep. Office*, Civil Action No. 4:09-cv-0024, 2010 WL 2710661, at *3 (S.D. Tex. July 6, 2010) ("although TECRO is called an 'instrumentality' of Taiwan in both the legislation establishing the office and subsequent court decisions involving the office, it does not function as an 'agency or instrumentality' as contemplated by FSIA's definition") (citations omitted).

addressed by precedent," and that the "types of risks involved with providing [Plaintiff's] identity to the Court 'under seal'" will expose Plaintiff to "substantial" risk. (Mot. at 1). But as Chief Judge Boasberg held when Plaintiff sought an exemption from this requirement in the D.C. Action, courts "routinely require that even pseudonymous filers facing grave and specific threats to their safety file their identifying information under seal." *Doe v. Fed. Republic of Ger.*, No. CV 23-1782 (JEB), 2023 WL 4744154, at *5 (D.D.C. July 3, 2023).

As an example, Chief Judge Boasberg cited *Sponsor v. Mayorkas*, Civil Action No. 23-712 (JEB), 2023 WL 2598685 (D.D.C. Mar. 22, 2023). There, the plaintiffs, members of a family of Afghan nationals hiding in Pakistan, sued U.S. government defendants for actions taken in connection with the denial of their humanitarian parole applications. *Id.* at *1. Plaintiffs moved to proceed pseudonymously, arguing that "in light of . . . one Plaintiff's extensive work on behalf of the United States" and plaintiffs' minority status, revealing their identities would increase the risks of violent attacks against them in Pakistan by terrorist groups hostile to the U.S. *Id.* One plaintiff identified "many threats" to his life made "'by fellow Afghans' on account of his work" for the U.S. government, "including 'threatening phone calls and messages at his door.'" *Id.* at 2. Notably, plaintiffs alleged that a terrorist group—the Taliban— "previously used the family's identification information to issue specific threats that drove them from their home." *Id.* Notwithstanding the foregoing, the court (after granting plaintiffs' motion to proceed pseudonymously) required plaintiffs

19

to file declarations containing their real names and residential addresses *ex parte* and under seal. *Id.* at *3. Plaintiffs complied. (*See* D.D.C., 23-cv-00712-RBW, Mar. 27, 2023, Dkt. No. 6).

In a subsequent case, asylum seekers from South and Central America fleeing or hiding from serious threats of persecution brought a lawsuit challenging expedited removal policies issued by the U.S. Department of Homeland Security. *M.A. v. Mayorkas*, Civil Action No. 23-1843 (JEB), 2023 WL 5321924, at *1 (D.D.C. July 6, 2023). In accompanying declarations, the plaintiffs "put forth compelling narratives about the risks they face should gangs, paramilitary groups, or former abusers discover their whereabouts and actions." *Id.* at *2. These included accounts from plaintiffs who had "received direct death threats," who "identified specific instances of torture," and who in one instance said that "gang members tracked her down at her parents' house and continued to return there even after she fled." *Id.* Again, while allowing plaintiffs to proceed under pseudonyms, the court required them to file sealed declarations containing their real names and addresses. *Id.* at *4. And again, plaintiffs complied with this requirement. (*See* D.D.C., 23-cv-01843-TSC, July 14, 2023, Dkt. No. 26).

The threats to the life and safety of the plaintiffs in *Sponsor* and *M.A.* appear to have been at least as serious, and at least as concrete, as the concerns raised by Doe here. Doe nonetheless claims that the protections afforded to those plaintiffs are not good enough for him. Without citing any authority for

20

his position, Doe argues that his safety concerns "must supersede any related precedent." (Mot. at 2). The reasons he offers in support of this argument are entirely unpersuasive.

First, Doe argues he is entitled to special treatment because he cannot rely on the integrity and competence of the federal judiciary. He questions "the robustness of the sealing process" and "the trustworthiness of the judge and the judge's staff." (*Id.* at 1-2). He claims that this Court has already given him reason "to acutely distrust its ability to handle a matter as sensitive as [his] identity." (*Id.* at 2). He contends he was forced to file a duplicative action in this Court because of the D.C. Court's "inflexibility" and "refusal to acknowledge any shortcomings in CM/ECF." (*Id.* at 2 n.1). And he posits that, should Donald Trump—who, according to Plaintiff, "has long been an agent of the Russian Federation (and before that, the former Soviet Union)"—be re-elected as President, "[Trump] could use his malign influence to force or otherwise convince the Court to disclose [his] 'sealed' identity," noting that Trump "appointed numerous judges." (*Id.* at 2).

Suffice it to say that I disagree that this Court would be unable to protect Plaintiff's identity. Plaintiff is entitled to his own views, and to make his own judgment about whether disclosing his identity under seal to the Court would pose an inordinate risk to his personal safety. But he is not entitled, on the basis of these assertions, to special dispensation from the well-established requirements of the law.

Second, Plaintiff argues that he should not have to heed the Second Circuit's command in *Publicola* unless "it has been *conclusively established*" that providing his identity to the Court "is *absolutely necessary* to achieve reasonable judicial objectives such as those described in *Publicola*." (Mot. at 3; emphasis added). He then claims that those judicial objectives would not be advanced by disclosure of his identity here. He represents that he is willing to "certify under penalty of perjury" the absence of any potential conflict of interest within the meaning of 28 U.S.C. § 455 (without explaining how he could make such a certification pseudonymously, or how any "penalty" could be imposed or enforced unless he disclosed his identity). He further assures the Court that revealing his identity is unnecessary because "[n]o sanctionable conduct has arisen in this action," "it is likely that none ever will," and even if he did engage in sanctionable conduct, the "best and proper sanction" would be dismissal of the action with prejudice.[5] (*Id.*).

Plaintiff's argument—based on the premise that, although he cannot trust the judicial system, the judicial system should trust him—fails to show that the underlying purposes of the *Publicola* rule are not implicated here. More fundamentally, the argument misconstrues the rule itself. *Publicola* sets forth a prerequisite for a litigant to seek relief in a federal court, not a balancing

---

[5] *But see, e.g.*, *McMunn v. Mem. Sloan-Kettering Cancer Ctr.*, 191 F. Supp. 2d 440, 461-62 (S.D.N.Y. 2002) (determining that both dismissal with prejudice and a monetary penalty were appropriate sanctions against *pro se* plaintiff).

test that depends on the facts and circumstances of a particular case or the district court's assessment of the plaintiff's credibility.  The court's holding is clear and simple: "court filings must disclose the identity of the filer."  54 F.4th at 111.

Accordingly, Plaintiff (like any other litigant seeking relief in this forum) is subject to *Publicola's* requirement that he disclose his identity to the Court. The Court adheres to its prior rulings to that effect.

### E. Plaintiff's Request for Further Relief Is Denied

Plaintiff's Motion requests that, if the Court rejects (as it now has) Plaintiff's additional service arguments under 28 U.S.C. § 1608(a)(1) and § 1608(b), the Court should either (i) electronically sign and return the Requests for Service that Plaintiff submitted so that Plaintiff can attempt to effect service under 28 U.S.C. § 1608(a)(2) or (ii) proceed with service pursuant to 28 U.S.C. § 1608(a)(3).  (Mot. at 5).  The Court declines to do either.

In the October Order, the Court made clear that Plaintiff may not proceed with this litigation unless he discloses his identity to the Court.  (Oct. Ord. at 27; *see* Nov. Ord. at 10 ("As this Court and the court in the D.D.C. Action have already ruled, this case cannot proceed unless Plaintiff provides his identity to the Court under seal.")).  The Court nonetheless allowed Plaintiff to proceed with service of the Defendants without disclosing his identity to the Court.  At that time, Plaintiff had not stated that he would refuse to comply with a requirement by this Court that he disclose his identity.  When Plaintiff

23

filed his motion on October 23, 2023 seeking the Court's assistance in effecting service under the Hague Convention (Dkt. No. 18), the Court likewise ruled on his motion at a time when Plaintiff still had not indicated whether he would provide his identity to the Court if he were able to effectuate service.

Plaintiff has now made his position clear. In his current Motion, Plaintiff unequivocally "decline[s]" to disclose his identity to the Court under seal. (Mot. at 5). His Motion also confirms what could only be inferred previously: that he abandoned the D.C. Action and filed a duplicative action in this District in the hopes that he could avoid having to disclose his identity to the Court. (*See id.* at 2 n.1). Yet Plaintiff continues to seek relief from this Court while simultaneously declaring he will not comply with its rules.

The Court has been (*see* Oct. Ord. at 27; Nov. Ord. at 10), and remains, sensitive to Plaintiff's safety concerns. Those concerns may well justify allowing Plaintiff to proceed pseudonymously (as Chief Judge Boasberg found in the D.C. Action). But (as Chief Judge Boasberg also found in the D.C. Action) they do not justify waiving the "well-established" and "vital" requirement, *Publicola*, 54 F.4th at 111, that Plaintiff disclose his identity to the Court.

Plaintiff has elected to invoke the jurisdiction of this federal court, a public institution that uses public resources to adjudicate disputes in accordance with law.[6] Plaintiff is not obligated to prosecute this case. If

---

[6] The Court notes that, according to his own allegations, Plaintiff had ample reason to anticipate, when he entered into the alleged contract, that he would later have a dispute with Defendants. His

Plaintiff believes that the risk of engaging in litigation in federal court outweighs the benefit he might obtain if he prevails on his claims, it is Plaintiff's prerogative to drop this suit.  If Plaintiff wishes to proceed in this forum, however, the law requires that he provide his true name and other identifying information to the Court.

Accordingly, if Plaintiff intends to prosecute this litigation, Plaintiff is directed to submit a letter to the Court by **February 8, 2024**, indicating his willingness to submit his name and residential address under seal.  If Plaintiff submits such a letter, the Court will then provide instructions for submitting a sealed filing outside the CM/ECF process, assuming Plaintiff prefers to submit his filing in hard-copy form.  If no such letter is received by the foregoing date, I will recommend to Judge Broderick that this case be dismissed.  *See Publicola*, 54 F.4th at 110 (dismissing appeal after litigant submitted letter indicating his refusal to comply with court's order to disclose his identity).

---

Complaint is replete with allegations about how Defendants acted "disingenuously" and in "bad faith" during the negotiations leading up to the agreement.  (Compl. ¶ 10; *see also, e.g.*, *id*. ¶¶ 44-48, 54-55, 66-67, 70-71).  He nonetheless chose to enter into an agreement that included a future contingent payment (as opposed to receiving all consideration upfront).  And he did so without negotiating for a confidential arbitration process or some other dispute-resolution mechanism that might better protect his anonymity than he believes would be the case in a publicly filed court action. *See HC2, Inc. v. Delaney*, 510 F. Supp. 3d 86, 103 (S.D.N.Y. 2020) (noting that if litigant "had wanted to assure his anonymity," he "could have negotiated for a contractual provision requiring confidential arbitration of all disputes with [his counterparty]").

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion is **DENIED** in its entirety.  The Clerk of Court is respectfully requested to terminate the pending motion (Dkt. No. 20).

**SO ORDERED.**

DATED:     New York, New York
            January 22, 2024

_____
GARY STEIN
United States Magistrate Judge