**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:23-cv-06395-VSB-GS |
| | ) | |
| THE FEDERAL REPUBLIC OF GERMANY, | ) | |
| AND THE BUNDESKRIMINALAMT OF | ) | |
| THE FEDERAL REPUBLIC OF GERMANY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>PLAINTIFF'S OBJECTIONS TO MAGISTRATE JUDGE GARY STEIN'S APRIL 15, 2024 REPORT & RECOMMENDATION (ECF No. 27)</u>

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     BACKGROUND ................................................................................................. 1

        A.      The Panama Papers and America's Undeclared War With Russia ........................ 1

        B.      Procedural History ........................................................................................... 3

        C.      The April 15, 2024 Report & Recommendation .................................................. 6

III.    STANDARD OF REVIEW ................................................................................ 6

IV.     THE RECOMMENDATION OF THE MAGISTRATE JUDGE TO DISMISS THIS
        CASE SHOULD BE REJECTED ...................................................................... 7

        A.      Plaintiff Agrees With The Second Circuit That Anonymous Litigation Should Be
                Strongly Disfavored, But This Case Is Exceptional and Unprecedented .............. 7

        B.      Publius Publicola's Record of Unlicensed Operation of a Motor Vehicle and
                Other Petty Crimes Is Not The Panama Papers ................................................. 8

                1.      Not All *Pro Se* Cases Are Equivalent Or Meritless ................................... 8

                2.      No One Was Threatening To Kill Publius Publicola Over Disclosure Of
                        His Record Of Petty Crimes ...................................................................... 9

                3.      Publius Publicola Did Not Risk Attacks On Court Staff At The Hands Of
                        A State Actor With A New Secret Weapon Because Of His Underage
                        Alcohol Violation ................................................................................... 10

        C.      Other Cases Cited By Judges Stein and Boasberg Are Inapposite and Omit
                Contrary Precedent Permitting Fully Anonymous Litigation ............................. 11

                1.      For Decades, Courts, Including This Court, Have Permitted Fully
                        Anonymous Litigation In Numerous Instances ......................................... 11

                2.      Unlike The Pseudonymous Plaintiffs In *Roe 1 v. City of New York*,
                        Plaintiff Here Requested and Was Granted Permission To Proceed Under
                        A Pseudonym ......................................................................................... 13

                3.      Unlike The Thousands Of Numbered John Doe Plaintiffs In *Osrecovery,
                        Inc.*, Plaintiff Here Is A Single Person Threatened By A Malicious State
                        Actor ..................................................................................................... 14

                4.      Citations To The Taliban Are Inapposite Because The Taliban Has No
                        History Of Attacking Individual Critics Or United States Government
                        Officials On United States Soil ................................................................ 14

                5.      Citations To Violent Gangs Are Inapposite Because Gangs Have No
                        History Of Hacking CM/ECF Or Stealing Paper Court Documents ........... 15

                6.      Plaintiff Has Alleged A Specific Source Of Endangerment ..................... 15

D.   The Court Has Laid A Procedural Death Trap That No Reasonable Person Could Be Expected To Walk Into ..................................................................................... 16

1.   The Court's Traditional Protections Failed and Cannot Be Trusted ......... 17

2.   Before Magistrate Judge Stein Decided To Unlawfully Block Service of Process, He Ruled That Service On Defendants Was Necessary *First* .... 18

3.   Magistrate Judge Stein Has Persistently Misinterpreted Both Plaintiff and Relevant Law ............................................................................................ 19

    i.   Plaintiff Offered To Reveal Their Identity To The Court Provided That The Court Designate Appropriate Measures To Safeguard Highly Sensitive Information ....................................................... 20

    ii.   A Paper Envelope Is Insufficient Protection Against Putin .......... 21

E.   No One Is Prejudiced By Plaintiff Remaining Anonymous ................................ 21

1.   The Public Has No Reasonable Expectation Of Learning Plaintiff's True Identity Given The Harm That Would Result ........................................... 21

2.   Defendants Already Know Plaintiff's True Identity And Have Pledged To Keep It Secret ............................................................................................ 21

3.   The Court's Concerns Are At This Stage Purely Hypothetical ............... 22

4.   Plaintiff Can Prove That He Is Not An Impostor Without Disclosing His True Identity ............................................................................................... 22

F.   The Court Has Numerous Options Apart From Dismissal .................................. 22

1.   The Court Could Allow Service of Process To Proceed Under The FSIA and Defendants To Weigh In, As It Initially Ordered .............................. 23

2.   The Court Could Work With Plaintiff To Fashion A Reasonably Secure Alternative Sealing Process ..................................................................... 26

3.   The Court Could Stay The Action Until After The 2024 Election .......... 26

4.   Dismissal Is Inappropriate, But Any Dismissal Should Be Without Prejudice ................................................................................................... 27

V.   CONCLUSION............................................................................................................. 27

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**

*A.S. v. OpenAI et al*,
    Case No. 3:24-cv-01190-VC (N.D. Cal. 2024) ....................................................... 11

*Caldwell v. Obama*,
    No. 13-1438, ECF No. 4 at 1–2 (D.D.C. Oct. 11, 2013) ........................................ 15

*Chang v. Republic of South Sudan*,
    No. 21-cv-1821, 2021 WL 2946160 (D.D.C. July 9, 2021) ...................................... 4

*Do No Harm v. Pfizer Inc.*,
    96 F.4th 106 (2d Cir. 2024) .............................................................................. 11, 13

*Doe v. Bolton*,
    410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973) ............................................. 13

*Doe v. Cnty. of El Dorado*,
    No. 2:13-CV-01433-KJM, 2013 WL 6230342, at *1 (E.D. Cal. Dec. 2, 2013) ...................... 18

*Doe v. Deschamps*,
    64 F.R.D. 652, 653 (D. Mont. 1974) ..................................................................... 12

*Doe v. Doe*,
    20-CV-5329 (KAM)(CLP), 2020 WL 6900002, at *1 (E.D.N.Y. Nov. 24, 2020) ................. 18

*Doe v. Federal Republic of Germany*,
    No. 23-cv-1782 (D.D.C. July 3, 2023) ....................................................... 4, 7, 14, 21

*Doe v. New York University*,
    Case No. 1:23-cv-10515-VSB-SN (S.D.N.Y. 2023) ................................................ 11

*Doe v. New York University*,
    Case No. 1:23-mc-00398 (S.D.N.Y. 2023) ............................................................ 11

*Doe v. Weinstein*,
    484 F. Supp. 3d 90, 92 (S.D.N.Y. 2020) ............................................................... 18

*Fly Brazil Group, Inc. v. Government of Gabon*,
    709 F. Supp. 2d 1274, 1283 (S.D. Florida 2010) .................................................. 24

*Granny Goose Foods, Inc. v. Teamsters*,
    41 U.S. 423, 438-39 (1974) .................................................................................. 18

*Harris v. Garner*,
    216 F.3d 970, 972-73 (11th Cir. 2000) ................................................................. 24

*Iannaconne v. Law*,
    142 F.3d 553, 556 (2d Cir. 1998) ......................................................................... 12

*In re Sealed Case*,
    971 F.3d 324, 326 (D.C. Cir. 2020) ........................................................................ 7

*M.A. v. Mayorkas*,
    Civil Action No. 23-1843 (JEB), 2023 WL 5321924, at *1 (D.D.C. July 6, 2023) ............... 15

*Murphy v. Islamic Republic of Iran*,
778 F. Supp. 2d 70, 73 (D.D.C. 2011) .................................................................................. 25

*N.A.A.C.P. v. Alabama*,
357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) ........................................................... 13

*Nelson v. Smith*,
618 F. Supp. 1186, 1189 (S.D.N.Y. 1985) ............................................................................... 6

*Osrecovery, Inc.*,
2003 WL 23313, at *3 ........................................................................................................... 14

*Publicola v. Lomenzo*,
54 F.4th 108 (2d Cir. 2022) ................................................................................. 6, 8, 10, 22

*Roe 1 v. City of New York*,
No. 20 Civ. 10188 (LLS), 2020 WL 7264563, at *1 (S.D.N.Y. Dec. 7, 2020) ...................... 13

*Roe v. Borup*,
500 F. Supp. 127 (E.D. Wis. 1980) ........................................................................................ 12

*Roe v. Ingraham*,
364 F. Supp. 536 (S.D.N.Y. 1973) ........................................................................................ 12

*Roe v. Wade*,
410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) ............................................................. 13

*Rukoro v. Federal Republic of Germany*,
No. 1:17-cv-00062 (S.D.N.Y. April 7, 2017) ........................................................................ 25

*Sealed Plaintiff v. Sealed Defendant*,
537 F.3d 185, 188 (2d Cir. 2008) ............................................................................................. 8

*Sponsor v. Mayorkas*,
No. 23-712, 2023 WL 2598685, at *3 (D.D.C. Mar. 22, 2023) ............................................ 14

*T. et al v. OpenAI LP et al*,
Case No. 3:23-cv-04557-VC (N.D. Cal. 2023) ..................................................................... 11

*Taylor v. Farrier*,
910 F.2d 518, 520 (8th Cir. 1990) ........................................................................................... 6

*V.C. v. District of Columbia*,
No. 23-1139, ECF No. 5 at 1, 5 (D.D.C. Apr. 27, 2023) ....................................................... 15

**<u>Statutes</u>**

28 U.S.C. § 1391(f)(4) ................................................................................................................. 4

28 U.S.C. § 1608(a)(2) .................................................................................................. 18, 23, 25

28 U.S.C. § 1608(a)(3) .............................................................................................. 19, 23, 24, 25

28 U.S.C. § 1608(a)(4) ............................................................................................................... 25

28 U.S.C. § 1654 ........................................................................................................................ 12

28 U.S.C. § 1914(b) ................................................................................................................... 25

28 U.S.C. § 636(b)(1) ................................................................................................. 6

**Rules**

Canon 2 of the Code of Conduct for United States Judges ........................................... 5

Federal Rule of Civil Procedure 4(c)(1) ................................................................ 16, 19

Federal Rule of Civil Procedure 4(m) ...................................................................... 16

Federal Rule of Civil Procedure 72(b) ....................................................................... 6

Local Civil Rule 5.1(c)(1) ....................................................................................... 4

**Other Authorities**

12 Charles A. Wright & Arthur R. Miller,
   Federal Practice and Procedure § 3070.2 (2d ed. 2017) ....................................... 6

H.R. Rep. 94-1487, reprinted in 1976 U.S.C.C.A.N. 6604, 6609 ................................ 24

Wendy M. Rosenberger, "Anonymity in Civil Litigation: The Doe Plaintiff,"
   57 NOTRE DAME L. REV. 580 (1982) .................................................................. 12

## I.     INTRODUCTION

Plaintiff John Doe hereby formally objects to Magistrate Judge Gary Stein's April 15, 2024 Report & Recommendation ("Report") to dismiss this action.  Magistrate Judge Stein's reasoning fails to account for facts that make this case unprecedented.  In addition, Magistrate Judge Stein's legal analysis of the relevant rules, statutes and caselaw is fundamentally flawed.

## II.    BACKGROUND

### A.     The Panama Papers and America's Undeclared War With Russia

Plaintiff is the source of the Panama Papers, "the most influential leak of information exposing financial fraud and abuse in modern history."  Complaint ¶¶ 1, 3.  The Panama Papers contain detailed evidence of tens of thousands of crimes involving over 200,000 shell companies domiciled in tax havens worldwide, formed over a period of half a century.  The nominal "law firm"—really, a criminal enterprise—that the data originated from in Panama, Mossack Fonseca, was forced to shut down in the aftermath of the disclosures, and its principals and numerous employees are currently on trial there, eight years later.

From the moment the Panama Papers project began, long before it even had a name, Plaintiff used a pseudonym, "John Doe," to protect their[1] and their family's safety.  When published in April 2016, of thousands of headlines derived from the Panama Papers, the most significant related to revelations about how Russian President Vladimir Putin laundered billions of dollars of stolen funds through a classical cellist he befriended in his youth, Sergei Roldugin.  Later, dissident Alexei Navalny and his staff relied on the Panama Papers to expand on these allegations targeting Putin, highlighting where some of that stolen money went.  Expenditures of over $1 billion were directed through a maze of shell companies for the construction of a secret, opulent palace.  Complaint ¶ 11.

The Kremlin expressed its displeasure with Plaintiff by instructing its state media service Russia Today to create a false docudrama series featuring a "John Doe" character, depicted in the

---

[1] As in the Complaint, ambiguous pronouns are used here only for the sake of Plaintiff's safety.

show's disturbing introduction lying in a pool of his own blood after perishing from torture-induced head injuries.  Complaint ¶ 12.  This was an explicit death threat.  The series has since been flagged and removed by YouTube as propaganda, along with all Russia Today media.

After the election of Soviet and now Russian intelligence asset Donald J. Trump to the presidency of the United States in November 2016, without the ability to rely upon the United States Department of Justice, Plaintiff arranged to provide the Federal Republic of Germany through its federal police agency, the Bundeskriminalamt (the "BKA"), with the Panama Papers so that the data could be properly used for law enforcement purposes before various statutes of limitations began to expire.  The German government was difficult to work with for a number of reasons and ultimately prolonged negotiations over the data for five full months, during which time Plaintiff was shuttled between various German safe houses.  Plaintiff first negotiated a Memorandum of Understanding ("MOU") with the BKA, which Plaintiff drafted based on verbal discussions with BKA agents, followed by updated terms of "€5 million plus 10% of any recoveries resulting from the Panama Papers," as well as compulsory reporting by the BKA regarding recoveries.  Complaint ¶ 6.

By month six of waiting, the BKA still had not complied with the terms it agreed to, but despite significant resistance, had finally memorialized these terms in writing, signed by BKA then-Vice President Peter Henzler.  Complaint ¶ 73.  At that point, in the summer of 2017, Plaintiff finally provided the BKA with the encryption key to decrypt the Panama Papers data on a new hard drive, copied over from one that had been shipped from the United States to Germany after verbal agreement to the MOU's terms.  Complaint ¶¶ 75-77.  Fearing for their safety, but without having received the bulk of the initial payment, Plaintiff ultimately departed Germany and returned to New York City.  Complaint ¶ 80.  Only upon arriving back in the United States did Plaintiff succeed in compelling the BKA to make its promised €5 million initial payment by threatening to publicize its unfair dealing to the world.  Complaint ¶¶ 85-90.

There were additional complications.  Upon finally authorizing and transferring the delayed payment, and despite prior assurances to Plaintiff, the BKA failed to alert Plaintiff's

bank that Plaintiff's deposited funds were legitimate, ironically triggering anti-money laundering procedures. This oversight put Plaintiff's life at risk. The German government had earlier leaked information regarding the payment in tandem with the BKA's global press release about its acquisition of the data, which Plaintiff reasonably feared would be matched against any Suspicious Activity Report filed by the bank pursuant to the Bank Secrecy Act, alerting the Trump Administration in the United States. Complaint ¶¶ 92-95.

As to the remaining terms of the parties' written agreement, the BKA never complied. Today, it remains in breach of contract. Complaint ¶¶ 117-124.

Parallel to Plaintiff's dealings with the German government, the Russian government continued its assault on American democracy. In addition to interfering in the 2016 election, the Russian government successfully sponsored the hacking of numerous government systems in the United States, including but not limited to the judiciary's CM/ECF electronic filing system. *See* https://www.uscourts.gov/news/2021/01/06/judiciary-addresses-cybersecurity-breach-extra-safeguards-protect-sensitive-court. *See also* https://www.npr.org/2021/04/16/985439655/a-worst-nightmare-cyberattack-the-untold-story-of-the-solarwinds-hack. It also began attacking high-ranking United States government officials stationed all over the world, and especially those tasked with investigating Russia, with a literal secret weapon: a targeted microwave radiation gun capable of causing severe pain and lasting brain damage. *See* https://www.cbsnews.com/video/60minutes-2024-03-31/.

Beyond starting a war in Ukraine needlessly killing thousands, Vladimir Putin further dispatched targeted hit squads to kill his critics in Germany, the United Kingdom, Spain, and the United States. *See* https://www.nytimes.com/2024/03/31/world/europe/russian-defector-murder-spain.html. On February 16, 2024, Putin's most significant political rival, Alexei Navalny, was murdered in a Russian prison.

### B.    Procedural History

After hiring a respected law firm which suddenly and unexpectedly abandoned the case when negotiations with attorneys for the Federal Republic of Germany failed to advance,

Plaintiff initially filed suit against the Federal Republic of Germany and the BKA *pro se* in the District of Columbia, where cases brought under the Foreign Sovereign Immunities Act ("FSIA") may be initiated pursuant to 28 U.S.C. § 1391(f)(4).  Previously, upon request in threatening circumstances, the Chief Judge of the United States District Court for the District of Columbia had agreed to waive certain requirements of that court's Local Civil Rule 5.1(c)(1), which demands disclosure under seal of pseudonymous parties' identities.  *See Chang v. Republic of South Sudan*, No. 21-cv-1821, 2021 WL 2946160 (D.D.C. July 9, 2021).  But in April 2023, Chief Judge James E. Boasberg began his term, and unlike his predecessor, he refused.  *See Doe v. Federal Republic of Germany*, No. 23-cv-1782 (D.D.C. July 3, 2023).  While Judge Boasberg wrote that, "The Court does not take lightly Plaintiff's serious allegations that sophisticated Russian and other foreign actors may surreptitiously access even his sealed electronic filings in this case," in fact, that court did take those allegations lightly.  Judge Boasberg discounted and ultimately refused to acknowledge the judiciary's vulnerability to electronic attacks—even given the discussion on website(s) of the United States Courts of the Solarwinds breach of CM/ECF and resulting need for alternative arrangements to store "Highly Sensitive Documents ('HSDs')."  Judge Boasberg's willingness to allow Plaintiff to use the "John Doe" pseudonym in litigation, while appreciated, was of no use if the governments of the Russian Federation, China, Saudi Arabia and/or North Korea—all implicated in the Panama Papers, and all proven to be capable of hacking United States government systems—could then easily track down Plaintiff's true identity to injure or kill them and their family members.

Filing under a pseudonym, and without the ability to appear in person for a hearing, Plaintiff's ability to fully explain the exigent circumstances of the case and the technical issues involved was limited.  Judge Boasberg made clear that enforcing Local Civil Rule 5.1(c)(1) was more important to that court than Plaintiff's life.  So Plaintiff re-filed in the Southern District of New York where the District of Columbia's Local Civil Rule 5.1(c)(1) is of no effect.

In this Court, Plaintiff also met resistance, even in the absence of any rule prohibiting anonymous litigation.  The Clerk of Court refused to issue summons documents for months and

overlooked part of Plaintiff initial case filing. When asked about it, the Clerk of Court staff inexplicably filed Plaintiff's case in duplicate after mis-reading an e-mail, which it refused to admit, allowing Chief Judge Laura Taylor Swain to improperly blame Plaintiff for the mishap.

Plaintiff never consented to have this case heard by a Magistrate Judge. Nonetheless, the case was then "referred" to Magistrate Judge Gabriel W. Gorenstein. ECF No. 13. On September 19, 2023, twelve days later, and just four days after the Court's announcement of his selection by the Board of Judges for an eight-year term,[2] the case was re-designated and then re-assigned to Magistrate Judge Gary Stein. Magistrate Judge Stein is a former "white-collar defense" lawyer whose clients included hedge funds and Alan C. Greenberg, the former CEO and Chairman of the Board of failed investment bank Bear Stearns—the type of institution known for its heavy dependence on shell companies,[3] which would often be structured and incorporated by its lawyers.

Unable to rely on a specific statute or rule, Magistrate Judge Stein conjured up a variety of *post hoc* rationalizations to prevent Plaintiff's case from proceeding. In so doing, he violated federal law and violated Canon 2 of the Code of Conduct for United States Judges. Like Judge Boasberg, Judge Stein ignored Plaintiff's warning that two journalists merely reporting on—not even responsible for—the Panama Papers had already been violently murdered. ECF No. 3 at 5-6. Like Judge Boasberg, Magistrate Judge Stein insisted that the Court must be made aware of Plaintiff's true identity, credible death threats notwithstanding, in case a number of purely hypothetical situations arose. Supporting his decision, Magistrate Judge Stein cited precedent from 2021, from the appeal of a pseudonymous New York man who wanted to hide, without any legal basis for doing so, his history of criminal charges stemming from harassment, threatening

---

[2] *See* https://www.nysd.uscourts.gov/sites/default/files/2023-09/Press%20Advisory%20-%20Magistrate%20Judge%20Gary%20Stein%20-%20FINAL_0.pdf. Presumably, this case is one of the first that Judge Stein had ever been assigned to.

[3] Numerous Bear Stearns entities appear directly and repeatedly in the Paradise Papers, a 2017 International Consortium of Investigative Journalists leak that followed the Panama Papers. *See* https://offshoreleaks.icij.org/search?q=bear+stearns&c=&j=&d=. Though Greenberg passed away in 2014, Magistrate Judge Stein was surely aware of this while he was a lawyer in private practice representing one of its most important executives.

police officers, underage consumption of alcohol, and operating a motor vehicle without a license.  On appeal, this man had been ordered to disclose his identity to the court since he had never asked for permission for a waiver from the Federal Rules of Appellate Procedure.  Additionally, after requiring service of process, Magistrate Judge Stein refused to permit the Clerk of Court to assist Plaintiff with service of process, grinding the litigation to a halt.

### C.      The April 15, 2024 Report & Recommendation

On April 15, 2024, Magistrate Judge Stein issued his Report (ECF No. 27), incorporating by reference the findings of several Orders he had issued since being assigned to the case in September 2023.  Those Orders were issued on October 13, 2023 (ECF No. 15), November 21, 2023 (ECF No. 19), January 22, 2024 (ECF No. 21), and April 15, 2024 (ECF No. 26).

At the direction of District Judge Broderick, the key question addressed in the Report was "whether dismissal is appropriate under *Publicola v. Lomenzo*, 54 F.4th 108 (2d Cir. 2022), or as a possible sanction."  ECF No. 25.  Ultimately, the answer given on the basis of the aforementioned Orders was that dismissal was appropriate.  ECF No. 27.

## III.      STANDARD OF REVIEW

"[W]hen timely objection has been made to a portion or portions of a magistrate's report, the district judge must 'make a de novo determination ... of any portion of the magistrate's disposition to which specific written objection has been made....'  Rule 72(b), Fed.R.Civ.P.; see also 28 U.S.C. § 636(b)(1).  The judge may then accept, reject or modify, in whole or in part, the magistrate's proposed findings and recommendations.  28 U.S.C. § 636(b)(1)."  *Nelson v. Smith*, 618 F. Supp. 1186, 1189 (S.D.N.Y. 1985).

"De novo review of those portions of the magistrate's report and findings to which a party timely objects is mandated by statute . . . and was crucial to the constitutionality of the Federal Magistrate Act, as amended."  *Taylor v. Farrier*, 910 F.2d 518, 520 (8th Cir. 1990); *see also* 12 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 3070.2 (2d ed. 2017) (a district judge "must not . . . rubber stamp" magistrate's facts and legal conclusions when conducting de novo review).

## IV.    THE RECOMMENDATION OF THE MAGISTRATE JUDGE TO DISMISS THIS CASE SHOULD BE REJECTED

### A.    Plaintiff Agrees With The Second Circuit That Anonymous Litigation Should Be Strongly Disfavored, But This Case Is Exceptional and Unprecedented

Most lawsuits should not be filed anonymously or pseudonymously.  Transparency is the bedrock of a healthy democratic system of government, which includes the judiciary.  Nonetheless, there are exceptions, and this case, which at its root is about the most significant transparency collaboration ever conducted, is exceptional.  Magistrate Judge Stein acknowledges as much when he admits that "Chief Judge James E. Boasberg granted Plaintiff's motion to proceed pseudonymously in the D.D.C. Action."  Report at 2.  *See Doe v. Fed. Republic of Germany*, Civil Action No. 23-1782 (JEB), 2023 WL 4744154, at \*4-5 (D.D.C. July 3, 2023) ("The Court therefore finds that he has met 'the weighty burden' of 'demonstrating a concrete need' for pseudonymity in this lawsuit.  *In re Sealed Case*, 971 F.3d at 326.").[4]

The primary reason this case is exceptional is that there exists a credible death threat against Plaintiff by a malevolent state actor that has:

1) already broken into CM/ECF, rendering its protections for "sealed" information useless;

2) recently and successfully dispatched "hit squads" worldwide to kill critics of that state; and

3) targeted very high-ranking United States government officials with a devastating mobile weapon known to cause irreversible brain damage that could easily be turned on any member of the Court's staff, from a mailroom worker to the Chief Judge—or any of their loved ones—to extort information.

These circumstances, generally known to Plaintiff for years but finally acknowledged in public via impressive reporting broadcast on the CBS News program "60 Minutes" on March 31, 2024

---

[4] On page 2, the Magistrate Judge's Report erroneously cites an Order in the District of Columbia case dated June 30, 2023.  There is no such order.  Plaintiff assumes that the Report should have referenced ECF No. 7 in that case dated July 3, 2023.

and published in *The New York Times* on the same day, are truly and literally unprecedented. Accordingly, there is no precedent in the Second Circuit involving a case with these stakes.[5]

But that is only the primary reason.  Additional reasons include the threat of retaliation by numerous other state actors, *e.g.* China, Saudi Arabia, etc., and various global criminal organizations whose shell companies were exposed by the publication of Panama Papers.

### B.   Publius Publicola's Record of Unlicensed Operation of a Motor Vehicle and Other Petty Crimes Is Not The Panama Papers

The Report's purpose, as designated by the District Judge in this case, was to assess the appropriateness of dismissal pursuant to a single cited precedent: *Publicola v. Lomenzo*, 54 F.4th 108 (2d Cir. 2022).  On the surface, *Publicola* might appear to be similar to this case because both involve *pro se* representation, but the similarities end there.  *Publicola* is inapposite and has no bearing on this matter.

### 1.   Not All *Pro Se* Cases Are Equivalent Or Meritless

First, the verbose complaint in *Publicola* was drafted by a *pro se* litigant with, it appears, a limited grasp of how the First Amendment works.  The complaint in this case, ECF No. 1, was initially drafted by a well-regarded law firm with accomplished and experienced attorneys who were involved in its crafting after a period of comprehensive research.  After spending months writing the complaint, those attorneys backed out of representing Plaintiff in a sudden and unexpected manner just before the document was to be filed in court.  While they provided Plaintiff with a legal memorandum explaining that they expected litigation to be difficult against foreign government defendants, this was hardly new or unanticipated information.  A more likely explanation is that the firm worried about its name being associated with the John Doe pseudonym *in public* due to the serious associated safety risks, as well as the expense to the firm

---

[5] *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 188 (2d Cir. 2008), which offers a far more comprehensive and logical framework for evaluating requests for anonymity than *Publicola*, at least takes into account "whether identification poses a risk of retaliatory physical or mental harm to the [plaintiff] or even more critically, to innocent non-parties," although it is not clear that anyone considered in 2008 that "innocent non-parties" might refer to the Court itself.

of litigation that it had hoped to avoid.  Nonetheless, the firm would not have signed an engagement letter with Plaintiff unless it initially believed that Plaintiff had a colorable claim.[6]

Sadly, every judge has at some point come across a *pro se* litigant who is mentally unwell.  That does not mean that all *pro se* litigants are.  In a world where many lawyers are themselves criminals—the lawyers at Mossack Fonseca were no exception; millions of effectively anonymous Delaware LLCs did not incorporate themselves—it is not unreasonable to think that some individuals with credible claims may not trust the legal profession and would prefer to represent themselves despite the risks.  Plaintiff, who discovered exhaustive data revealing every lawyer and law firm that Mossack Fonseca ever worked with worldwide, has more cause to distrust the legal profession than possibly any living person.

### 2. No One Was Threatening To Kill Publius Publicola Over Disclosure Of His Record Of Petty Crimes

The pseudonymous plaintiff Publius Publicola sued a number of local government officials in Penfield, New York over various requests for and about old court records stemming from his unlicensed operation of a motor vehicle, aggression toward police officers, underage consumption of alcohol, and a fight during a fireworks display.  No law firm took the case.  There were no physical threats stemming from the disclosure of Publicola's records.  There were no foreign state actors.  There was no global press coverage of the beer bottle.  Publicola had used his real name with law enforcement authorities, and those authorities had never pledged to keep it a secret.  Publicola did not enter into a contractual relationship regarding a covert operation.  Publicola at no point had armed bodyguards.  No person had been murdered in broad daylight in Penfield just for filing a similar request.  Publicola did not reasonably fear for his safety, or reasonably fear that anyone would attempt to cause Court officials brain damage if news of his identity ever got out, which, according to the complaint filed, it already had.

---

[6] The firm's engagement letter did not contain any information regarding Plaintiff's true identity, and is written between the firm and "John Doe."  As a condition of taking on the case, the firm agreed not to record information about Plaintiff's true identity, which was provided only verbally, anywhere.  After termination, the firm represented that it destroyed all of its notes.

To compare the circumstances surrounding Plaintiff's involvement in the Panama Papers to whatever happened between Publius Publicola and the Town of Penfield, New York is to compare apples and the space shuttle. They are worlds apart. As described above, the credible threat(s) to Plaintiff put this case in a league of its own. *Publicola* cannot inform the Court in any substantive manner about a fact pattern that is completely different in every way.

> **3. Publius Publicola Did Not Risk Attacks On Court Staff At The Hands Of A State Actor With A New Secret Weapon Because Of His Underage Alcohol Violation**

Magistrate Judge Stein repeatedly discounted Plaintiff's warnings regarding the risk to the Court itself were Plaintiff to identify himself under seal. A public docket entry advertising the precise person to target in order to learn Plaintiff's true identity could prove disastrous for the judge or any Court staff member in possession of that knowledge.

It is an incontrovertible fact that the Russian Federation has attacked United States government officials, including extremely high-ranking officials. *See* https://www.cbsnews.com/news/havana-syndrome-in-vietnam-possible-russian-role-in-attack-on-americans-new-evidence-60-minutes/. It is also an incontrovertible fact that Russian intelligence operatives are expert in the art of blackmail, and would not hesitate to leverage a vulnerable family member or friend. *See* https://www.nytimes.com/2018/09/13/us/politics/russian-informants-cia-protection.html. Given that this is one of Magistrate Judge Stein's first-ever cases, it is inconceivable that he has ever presided over a case with higher stakes tied to a single piece of information, as it is likely that *most* federal judges have never had to consider the implications of being entrusted with information this important to one of America's primary adversaries.

C.     **Other Cases Cited By Judges Stein and Boasberg Are Inapposite and Omit Contrary Precedent Permitting Fully Anonymous Litigation**

1.     **For Decades, Courts, Including This Court, Have Permitted Fully Anonymous Litigation In Numerous Instances**

In *Do No Harm v. Pfizer Inc.*, 96 F.4th 106 (2d Cir. 2024), the Second Circuit cited Magistrate Judge Stein's October 13, 2023 Order approvingly for the proposition that "even when parties proceed anonymously to the public or the opposing party, their names and other identifying information must still be disclosed *to the court*" (emphasis in original).  However, the context for this citation involved whether or not "an association must name its injured members to establish Article III standing," which is clearly not at issue here.

Yet it is not so clear that federal courts "must" require the immediate disclosure of a plaintiff's true identity to the court under seal.  In this District, in proceedings also before Judge Broderick after this case was filed, a first-year law student espousing unpopular opinions and seeking to avoid mere embarrassment was permitted to proceed using a pseudonym without any indication in the record that he was required, by rule, precedent, or otherwise, to disclose his true identity to the Court or anyone under seal.  *Doe v. New York University*, Case Nos. 1:23-mc-00398 and 1:23-cv-10515-VSB-SN.  Rather, this Court noted "New York University's right to move the Court to direct Plaintiff to disclose his identity."  *Id.*, Case No. 1:23-mc-00398 (S.D.N.Y. November 21, 2023).  This Court did not insist on identification before service of process could be allowed to proceed.  The difference in treatment between that John Doe (self-described as a "white male" who is "heterosexual and identif[ies] as a man," thus fearful of retribution on account of his *non*-minority status) and this one (self-described with no identifying characteristics at all on account of targeting by Putin's regime) could not be more stark.

Furthermore, in *T. et al v. OpenAI LP et al*, Case No. 3:23-cv-04557-VC and *A.S. v. OpenAI et al*, Case No. 3:24-cv-01190-VC, two cases recently filed in the Northern District of California, the plaintiffs filed their complaints using initials and/or pseudonyms without even

filing any sort of motion for leave to do so.  At no point did that court demand that those plaintiffs file any identifying information under seal or otherwise.[7]

In fact, there is a long tradition of anonymous litigation in the United States.  *See Roe v. Borup*, 500 F. Supp. 127 (E.D. Wis. 1980) (rejecting a "highly mechanical interpretation of the Federal Rules of Civil Procedure. . . [that] would have the court elevate form over substance, without any reason for doing so.").  *See also Doe v. Deschamps*, 64 F.R.D. 652, 653 (D. Mont. 1974) (noting "a host of cases have been prosecuted under fictitious names.  Sometimes the fact of the fictitious name is noted and other times it is not, but it is clear that a practice has developed permitting individuals to sue under fictitious names where the issues involved are matters of a sensitive and highly personal nature.").

In this district, *Roe v. Ingraham*, 364 F. Supp. 536 (S.D.N.Y. 1973), perhaps represents the closest analog to the circumstances here:

> Plaintiffs in *Ingraham* were doctors who prescribed and their patients who received medication that the New York State Controlled Substances Act classified as "Schedule II drugs."  The Act required prescribing physicians to file with the state a copy of an official New York State prescription form that included the patient's name and address.  Plaintiffs, filing under pseudonyms, alleged that the Act "by requiring disclosure of the identity of certain patients invades the patient's right of privacy and confidentiality."  The district court allowed the patients to proceed anonymously, observing that "if plaintiffs are required to reveal their identity prior to the adjudication on the merits of their privacy claim, they will already have sustained the injury which by this litigation they seek to avoid."

Wendy M. Rosenberger, "Anonymity in Civil Litigation: The Doe Plaintiff," 57 Notre Dame L. Rev. 580 (1982).  The quote at the end of the passage is derived from footnote 7 in the *Roe v. Ingraham* opinion, which reads in full:

> All of the patient-plaintiffs — the three children and adult of the original complaint and the intervenor cancer patient and migraine sufferer — are identified in each

---

[7] While John Doe in the *New York University* case and the pseudonymous plaintiffs suing OpenAI are each represented by counsel, the Court in this case has stated that employing counsel would not lift Plaintiff's supposed obligation to identify themselves under seal.  The Court has acknowledged Plaintiff's right to represent themselves.  *See* ECF No. 19 at 7 ("Plaintiff has a right to represent himself in this litigation.  *See Iannaccone v. Law*, 142 F.3d 553, 556 (2d Cir. 1998) ('[t]he right to proceed *pro se* in civil actions in federal court is guaranteed by 28 U.S.C. § 1654').")

complaint only by fictitious names ostensibly to protect their identities. This procedure is not explicitly authorized by the federal rules. However, it was given implicit recognition by the United States Supreme Court in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) and *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). The inherent problems which this procedure poses, most notably the possible inability to fix *res judicata* effect, mandate that it be used sparingly. Here, however, if plaintiffs are required to reveal their identity prior to the adjudication on the merits of their privacy claim, they will already have sustained the injury which by this litigation they seek to avoid. *See N.A.A.C.P. v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). Under such circumstances it is permissible to proceed by pseudonym but only if these fictitious names are actually representative of real and specific aggrieved individuals. Plaintiffs' attorneys have represented to the court that these preconditions have been met.

Therefore, it is clear that the Second Circuit's representation in *Do No Harm*, that party names "must" be disclosed to the court, is more of an aspiration than a reflection of reality.[8] Courts, including this Court, have been inconsistent over the years because different cases involve different fact patterns. Usually, anonymity is not really necessary. Sometimes, it really is. Blind adherence to procedure, especially one so inconsistently and arbitrarily enforced, should not trump a party's right to simply continue living. As demonstrated by *Roe v. Wade*, forbidding anonymous litigation across the board inevitably would select against adjudicating some of the most important controversies in our society where the stakes are highest.

### 2. Unlike The Pseudonymous Plaintiffs In *Roe 1 v. City of New York*, Plaintiff Here Requested and Was Granted Permission To Proceed Under A Pseudonym

In ECF No. 15, Magistrate Judge Stein's October Order, the Court cited "*Roe 1 v. City of New York*, No. 20 Civ. 10188 (LLS), 2020 WL 7264563, at *1 (S.D.N.Y. Dec. 7, 2020) (directing plaintiffs seeking to proceed anonymously to 'submit under seal an amended complaint with their real names, signatures, and addresses')." That case is easily distinguished from the present one: the plaintiffs there did not even bother to request permission to proceed

---

[8] Furthermore, disclosure of a party's identity to a court at the outset of litigation, before the defendants have even been served, is not the same as disclosure at the end of litigation for the purpose of issuing judgment.

anonymously.  In this case, Plaintiff did (*see* ECF No. 3).  In the District of Columbia action, that request was granted, except as to the Court.  *Doe v. Federal Republic of Germany*, No. 23-cv-1782 (D.D.C. July 3, 2023).

### 3.     Unlike The Thousands of Numbered John Doe Plaintiffs In *Osrecovery, Inc.*, Plaintiff Here Is A Single Person Threatened By A Malicious State Actor

The October Order also cited "*Osrecovery, Inc.*, 2003 WL 23313, at *3 (requiring that 'plaintiffs file with the Clerk, under seal, the names and addresses of the individual plaintiffs corresponding to each numbered Doe plaintiff')."  ECF No. 15 at 24.  This case is also distinguishable, as it involved a Ponzi scheme with thousands of "John Doe" plaintiff victims—not a single anonymous actor who was being threatened with violence and/or death by at least one foreign government.  The thousands of numbered "John Does" involved in that case caused obvious problems with case management and discovery which are not at issue here as in this case there is only one plaintiff who has consistently communicated with the Court using one e-mail address protected by two-factor authentication.

### 4.     Citations To The Taliban Are Inapposite Because The Taliban Has No History Of Attacking Individual Critics Or United States Government Officials On United States Soil

Judge Boasberg suggested, and Judge Stein reiterated in ECF No. 21 at 19, that because the Taliban had threatened plaintiffs in a case filed in the United States and those plaintiffs had disclosed their identities to the court, so too could Plaintiff here.  *See Sponsor v. Mayorkas*, No. 23-712, 2023 WL 2598685, at *3 (D.D.C. Mar. 22, 2023).  The plaintiffs in Sponsor were "members of a family of Afghan nationals, some of whom remain in hiding in Pakistan."  In order to learn those plaintiffs' true identities, the Taliban—which famously disavows modern technology—would have needed to gain or otherwise employ the skills necessary to hack the CM/ECF federal court system, or to travel to the United States from Afghanistan or Pakistan and physically penetrate a federal courthouse.  It is implausible to suggest that a regime such as the Taliban is capable of either.  It is not, however, implausible to suggest that a regime such as the Russian Federation is so capable.  Russia has already achieved the first task (hacking CM/ECF)

and it is easily capable of the second (sending trained personnel to a physical courthouse to steal files), having already successfully installed one of its many intelligence assets as President of the United States, a man who is now running for re-election in 2024.

> **5.     Citations To Violent Gangs Are Inapposite Because Gangs Have No History Of Hacking CM/ECF Or Stealing Paper Court Documents**

Judge Boasberg's second citation, echoed by Magistrate Judge Stein in ECF No. 21 at 20, is *V.C. v. District of Columbia*, No. 23-1139, ECF No. 5 at 1, 5 (D.D.C. Apr. 27, 2023).  This case concerns incarcerated plaintiffs who were ordered to disclose their true identities to the court despite the risk of physical reprisal.  But the individuals capable of reprisal in that case were their fellow inmates—individuals who, by virtue of their incarceration, were not in any position to hack CM/ECF or physically steal paper files from a federal courthouse well beyond their prison bars.  And while prison gangs can sometimes extend beyond a prison due to the loyalty of released former inmates, there is no history of gangs stealing sealed court documents.

Magistrate Judge Stein cited *M.A. v. Mayorkas*, Civil Action No. 23-1843 (JEB), 2023 WL 5321924, at *1 (D.D.C. July 6, 2023) regarding "gangs, paramilitary groups, or former abusers," who, like prison gangs, have little hope of hacking CM/ECF or stealing sealed papers.

> **6.     Plaintiff Has Alleged A Specific Source Of Endangerment**

Judges Boasberg and Stein both appear to admit that Plaintiff has alleged that there is at least one specific source of endangerment: Vladimir Putin and his murderous regime, which controls the Russian Federation.  This makes Judge Boasberg's citation to *Caldwell v. Obama*, No. 13-1438, ECF No. 4 at 1–2 (D.D.C. Oct. 11, 2013) inapposite.  Judge Boasberg describes Caldwell as "ordering *pro se* plaintiff to file his residential address where plaintiff cited safety concerns but failed to 'alleg[e] any specific source of endangerment'").  By his own logic, that is not the case here.

**D.**     **The Court Has Laid A Procedural Death Trap That No Reasonable Person Could Be Expected To Walk Into**

Magistrate Judge Stein's Report repeatedly describes Plaintiff as an obstinate litigant whose adamant "refusal" to comply with court orders has led to this juncture.  This is a gross mischaracterization, and not Magistrate Judge Stein's first.

As described in Plaintiff's March 29, 2024 letter to the Court (ECF No. 24), Magistrate Judge Stein misquoted and misrepresented the contents of Federal Rule of Civil Procedure ("Rule") 4(c)(1) in a questionable effort to shift the burden for service of process in these circumstances from the Court to Plaintiff.  When confronted about his seemingly deliberate truncation of the Rule, Magistrate Judge Stein claimed that he was alluding to a "basic principle" for which he offered no support, and which obviously does not apply to FSIA cases.  He then conflated Rule 4(m), which he claimed was only about the "*when*" of service, not the "*who*," with Rule 4(c)(1), which references it and is what he actually misrepresented by omitting the fact that his truncated quote ("[t]he plaintiff is responsible for service of a summons and complaint") was conditional.  ECF No. 19 at 7.  By way of example, consider three sentences:

1.  It is Jane's job to buy milk.
2.  It is Jane's job to buy milk on Sundays.
3.  It is Jane's job to buy milk on Sundays when there is too much snow for Bob to buy it himself.

From Sentence 1 to 3, Jane's responsibilities are fewer and fewer.  By Sentence 3, it is clear that it is Bob's general responsibility to buy milk, except in the limited circumstances when A) it is Sunday and B) there is too much snow for Bob to get it himself.  Magistrate Judge Stein argues that Sentence 3 only addresses then "when" of the matter, not the "who."  Of course, this is false.  Omitting every word after "milk" in Sentence 3 changes the indication of *who* is responsible for buying milk most of the time, from Bob to Jane.  This is exactly what Magistrate Judge Stein did with Rule 4(c)(1), and it is difficult to imagine how he did so by accident.

In addition, Magistrate Judge Stein's thinking on this case appears to have evolved over time.  While the Clerk of Court did finally issue the summons documents necessary to serve the

defendants after a considerable and unexplained delay, once they were issued, Judge Stein decided that he would forbid the Clerk of Court from carrying out the necessary procedures under the FSIA to properly serve them. The only way out of this manufactured procedural paradox, according to Magistrate Judge Stein, was for Plaintiff to use the same traditional channels the Court always does to effectively deliver the Russian Federation (and perhaps other interested entities) a roadmap to Plaintiff in the form of their name, home address, and telephone number, thus consenting to their own likely murder.

### 1.    The Court's Traditional Protections Failed and Cannot Be Trusted

As already described above, due to recent events, the crux of the issue is that the Court can no longer be trusted to protect highly sensitive information. The Solarwinds hacking episode, which encompassed CM/ECF among many other government systems, was not some hypothetical. The Russian Federation actually did obtain access to sealed documents. Therefore, no person can trust CM/ECF going forward with highly sensitive information until significant changes are made to the platform. Yet CM/ECF fundamentally works today the same way it did when it was first launched; even an upgrade would be no guarantee of improved data security.

The Court's suggested alternative, paper filing, removes the risk of illicit electronic access but introduces the new risk of incompetence or corruption involving Clerk of Court staff. Regrettably, the Clerk of Court staff have already proven to be incompetent, having missed filings and created numerous duplicate and false filings in this case alone.[9]

---

[9] *See*, *e.g*., ECF No. 24, Plaintiff's letter to the "Hon. Vernon Speede Broderick," which the Clerk of Court erroneously entered onto the docket as a letter to "Judge Vincent L. Broderick." Though minor, this error is yet another example of why Plaintiff cannot entrust their life to the error-prone Clerk of Court staff, which is responsible for maintaining sealed records. A simple mistake about who should or should not have access to a sheet of paper could mean the difference between life or death.

      **2.**      **Before Magistrate Judge Stein Decided To Unlawfully Block Service of Process, He Ruled That Service On Defendants Was Necessary *First***

On October 13, 2023, Magistrate Judge Stein wrote the following in his Opinion and

Order at ECF No. 15:

> [T]his Court finds that it would be inappropriate to decide Plaintiff's motion [for leave to proceed anonymously] in this action at this time, for several reasons. First, as discussed above, Defendants have not yet been served and the Court has denied Plaintiff's motion to effect service through alternative means. Unless and until Plaintiff serves Defendants through the prescribed methods set forth in 28 U.S.C. § 1608(a), this action will not proceed.

*Id.* at 23. He cited three supporting cases with accompanying summaries:

> [T]he Court believes it should resolve Plaintiff's motion with the benefit of Defendants' views rather than on an *ex parte* basis. *See, e.g., Doe v. Weinstein*, 484 F. Supp. 3d 90, 92 (S.D.N.Y. 2020) (before deciding *ex parte* motion for leave to proceed under a pseudonym, court directed plaintiff to serve defendant with the complaint and motion, and directed defendant to respond); *Doe v. Doe*, 20-CV-5329 (KAM)(CLP), 2020 WL 6900002, at *1 (E.D.N.Y. Nov. 24, 2020) (deferring ruling on plaintiff's *ex parte* motion to use a pseudonym until defendant had been given an opportunity to respond); *Doe v. Cnty. of El Dorado*, No. 2:13-CV-01433-KJM, 2013 WL 6230342, at *1 (E.D. Cal. Dec. 2, 2013) (concluding that it was error to decide *ex parte* motion for leave to proceed under a pseudonym without giving defendant the opportunity to oppose and noting that "our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted both sides of a dispute") (quoting *Granny Goose Foods, Inc. v. Teamsters*, 41 U.S. 423, 438-39 (1974)).

*Id.* at 23-24. By November 21, 2023, with Plaintiff having duly provided the requisite USM-94

Hague Convention forms, materials, and associated translations of thereof to the Court in order

to "effect service" in compliance with 28 U.S.C. § 1608(a)(2), Magistrate Judge Stein had

reversed himself, ruling that service would not proceed unless Plaintiff identified himself to the

court first, and thus "decid[ing] Plaintiff's motion" that he had previously ordered first required

service. There is no other way to describe this series of events than a bait and switch—one

described as "error" by one of Magistrate Judge Stein's own citations in ECF No. 15.

    Moreover, Magistrate Judge Stein far overstepped his legal authority in his denials,

committing three major errors. First, as more fully described in Plaintiff's letter docketed at ECF

No. 24, he cited an outdated version of the Federal Rules of Civil Procedure in an effort to

rationalize his erroneous decision.  Second, Magistrate Judge Stein employed the aforementioned lawyer's trick when quoting Rule 4(c)(1): quoting only part of the text and truncating the part that contradicted his argument.  Third, Magistrate Judge Stein repeatedly relied on PDF files posted on the Court's website by the Clerk of Court—directives that have absolutely no force of law or legal authority behind them—in an attempt to expand the "requirements" of the FSIA.  In so doing, he violated the FSIA itself.

Plaintiff refers the Court to the above discussion of ECF No. 24 to best understand how Magistrate Judge Stein twisted a Rule to say, in effect, the opposite of what it actually states. Notably, Magistrate Judge Stein responded in ECF No. 26, his Order dated April 15, 2024, by admitting that he had relied upon an outdated version of the Rule, and by also admitting that he had not quoted the entirety of the relevant passage.  In fact, in cases involving 28 U.S.C. § 1608(a)(3), the FSIA mandates that the "clerk of court," not the plaintiff, is responsible for service: the opposite of what Magistrate Judge Stein represented.  Filings are "to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned."  28 U.S.C. § 1608(a)(3).

As to the PDF files cited by Magistrate Judge Stein on the Court's website—documents never even seen by Congress, let alone voted on—their requirements flagrantly violate the FSIA and Magistrate Judge Stein cites no legal authority whatsoever empowering their mandates.

### 3.   Magistrate Judge Stein Has Persistently Misinterpreted Both Plaintiff and Relevant Law

The one and only reason that the Report recommends dismissal is that "Plaintiff has failed to provide his identity to the Court and has declined to indicate his willingness to do so." Report at 5.  This is a false characterization, and moreover, it is clearly contradicted by the Report itself.  One page prior, the Report notes, "On February 5, 2024, Plaintiff submitted a letter stating he was 'conditionally willing to provide [his] identity, physical address and telephone number to the Court depending upon the robustness of the alternative sealing process proposed.' (Dkt. No. 22)."  Report at 4.  This is correct.  The Court cannot expect a litigant

credibly threatened with death by a state actor to simply offer up their identity without some guarantee of real protection, or to simply give in because some months have passed.

A conditional willingness to disclose such highly sensitive information based on reasonable factors is not the same thing as a total declination.  The only total declination thus far has been Magistrate Judge Stein's (and before him, Chief Judge Boasberg's) declination of willingness to devote any real consideration to an important issue—one that happens to be a matter of life or death.  Instructing a nameless law clerk to conduct some Westlaw searches for a few cases involving "death threats" will not suffice.

While Plaintiff has thus far refused to identify himself to the Court, as discussed above, other plaintiffs in far less dire circumstances have not been subjected to the same requirements. Plaintiff's refusal, however, is in part based on the way that the Court has communicated, or refused to communicate.  This case involves matters that are obviously sensitive, such as the proposed alternative sealing process, and cannot always be posted publicly on the docket.  Yet the Court has taken measures that have in some instances made it difficult, if not impossible, for *pro se* litigants to communicate with the Court.[10]

### i.    Plaintiff Offered To Reveal Their Identity To The Court Provided That The Court Designate Appropriate Measures To Safeguard Highly Sensitive Information

On March 1, 2024, Magistrate Judge Stein's chambers e-mailed Plaintiff instructions for the Court's proposed alternate sealing process.  Without repeating those instructions here, Plaintiff interpreted the e-mail message as having the same weight as a court order, with no room for discussion.  Yet the instructions seemed to completely discount all of the facts that Plaintiff had explained to the Court in previous filings, and ultimately relied on a single paper envelope to shield Plaintiff's identity from the world.

---

[10] District Judge Broderick's apparent prohibition on *pro se* litigants contacting his chambers under any circumstance is inconsistent with the practices of other District Judges, flies in the face of the First Amendment's guarantee of the right to petition the federal government, and is especially problematic here.

### ii.    A Paper Envelope Is Insufficient Protection Against Putin

While paper filing and storage has the advantage of immunity from hacking attempts over the internet, it is still vulnerable to a different type of hacking: social engineering.  Given the Clerk of Court's proven inability to follow instructions properly throughout the duration of this case so far, Plaintiff can simply not afford to trust his life with a records clerk in a known location who may be subject to the effects of carelessness, bribes, or worse.  Placing a piece of paper containing Plaintiff's identity in an envelope marked "sealed" is unlikely to dissuade the Russian Federation from attempting to obtain said envelope once it knows that the envelope exists.  Even placing a USB key containing an encrypted file on an encrypted volume in such an envelope, in lieu of a piece of paper, would not necessarily stop a determined adversary from using threats and blackmail to obtain the necessary encryption key(s).  The best protection Plaintiff can rely on is not disclosing their identity at this stage.  Yet even if there were other suggestions to be made, the Court would have to be willing to hear them, which thus far, based on Magistrate Judge Stein's communications, does not seem to be the case.

### E.    No One Is Prejudiced By Plaintiff Remaining Anonymous

#### 1.    The Public Has No Reasonable Expectation Of Learning Plaintiff's True Identity Given The Harm That Would Result

In cases involving the question of pseudonymous or anonymous filing, the public interest in knowing who is making use of the courts is a key consideration.  Here, the public has never known Plaintiff's true identity.  Judge Boasberg has already effectively ruled, with Magistrate Judge Stein concurring, that it is not a factor here.  *Doe v. Federal Republic of Germany*, No. 23-cv-1782 (D.D.C. July 3, 2023) ("Plaintiff has met his burden to show that his privacy interests outweigh the public's presumptive and substantial interest in learning his identity.")

#### 2.    Defendants Already Know Plaintiff's True Identity And Have Pledged To Keep It Secret

Defendants already know who Plaintiff is, and they already have actual notice of this lawsuit.  Plaintiff's request to remain anonymous to the Court at this stage of the litigation thus

cannot and does not prejudice Defendants.  To learn if Defendants have any further thoughts on this issue, the Court would need to allow service of process to proceed.

### 3.     The Court's Concerns Are At This Stage Purely Hypothetical

*Publicola* outlines a number of reasonable concerns to justify the Court's need to know a plaintiff's identity.  As outlined in ECF No. 20, the *Publicola* rationales are at this stage of litigation hypothetical, except for the judicial conflict check, which Plaintiff has already represented under penalty of perjury would turn up nothing.  There is no issue with judgment preclusion because there have been no prior judgments.  And there is no issue with sanctions because Plaintiff has done nothing sanctionable.

Requiring Plaintiff to disclose their identity now puts the cart before the horse, exposing both Plaintiff and the Court to grave danger for absolutely no reason.

### 4.     Plaintiff Can Prove That He Is Not An Impostor Without Disclosing His True Identity

Reading between the lines, the Court's differential treatment of Plaintiff when compared to other plaintiffs seeking the protection of a pseudonym could be explained by the fact that the Court is skeptical that Plaintiff is actually the true source of the Panama Papers.  Plaintiff is willing to post documents on the docket from any three Panama Papers companies selected at random by the Court from the International Consortium of Investigative Journalists Offshore Leaks website (https://offshoreleaks.icij.org) to demonstrate that Plaintiff actually is the John Doe they claim to be.  Plaintiff can further post internal Mossack Fonseca documents on the docket if the Court deems necessary.

### F.     The Court Has Numerous Options Apart From Dismissal

Although the Report recommends dismissal of this action, the Court has numerous alternatives, all of which are more sensible.

1.      **The Court Could Allow Service of Process To Proceed Under The FSIA and Defendants To Weigh In, As It Initially Ordered**

Before Magistrate Judge Stein backtracked, his October 13, 2023 Opinion and Order (ECF No. 15) correctly assessed the situation: for the Court to properly assess Plaintiff's request for anonymity, Defendants should be served first.  This would achieve several goals.

First, the Court is right to be wary of an anonymous *pro se* litigant, unwilling to clearly identify themselves (though perhaps for good reason), while making grand claims.  Fortunately, there is a solution to such a problem: in the words of former President Ronald Reagan, "trust but verify."  Since Defendants already know Plaintiff's true identity, and already allegedly have actual notice of suit—regardless of whether that is a factor when applying strict adherence to the FSIA—service of process in this case is the best verification method available.

Plaintiff's request for the Court's assistance with service of process, whether via 28 U.S.C. § 1608(a)(2) or (3), costs the Court nearly nothing, and whatever costs are incurred are required to be paid by the Court, not Plaintiff.  Magistrate Judge Stein's April 15, 2024 Order (ECF No. 26) laments that Plaintiff failed to provide "one copy of the required documents for service upon each defendant as well as one copy for the Court's file" with "an envelope addressed to each of the defendants" with "return receipts" and "funds to pay for the costs of postage," among other supposed deficiencies, but there are several problems with his refusal on these grounds.

First, his accounting is inaccurate.  The Court already has a copy of each document for service, and those documents are stored on CM/ECF, so they are already in "the Court's file." *See* ECF No. 25 at 2 ("I and/or the Court have already supplied copies of the necessary documents to mail (*see* ECF Nos. 1, 1-1, 17, 17-1, and 18 at pages 17-53, 55, 57), except for the Notice of Suit, which is attached hereto in English and German versions.").

Second, the list of purported requirements for international service of process are drawn from a PDF file on the Court's website that has no cited legal authority behind it, and worse, directly contradicts the requirements of the FSIA, at least to the extent the Court intends to rely

on 28 U.S.C. § 1608(a)(3).  A case in the Southern District of Florida, where that court similarly

attempted to foist its statutory burden onto a plaintiff, is instructive:

> The Court commences its consideration of the dispatch requirement "where courts
> should always begin the process of legislative interpretation, and where they often
> should end it as well, which is with the words of the statutory provision."  *Harris
> v. Garner*, 216 F.3d 970, 972-73 (11th Cir. 2000) (en banc) (citations omitted).
> Here, the statute directs that the service package is "to be addressed and
> dispatched by the clerk of the court to the head of the ministry of foreign affairs of
> the foreign state concerned."  28 U.S.C. § 1608(a)(3).  By the plain words of the
> statute, the clerk's action of addressing alone does not suffice; the clerk must also
> dispatch the package to the head of the ministry of foreign affairs.  "Dispatch"
> means "to send off or away; — particularly applied to sending off messengers,
> messages, letters, etc., on special business, and implying haste."
> http://www.dictionary.net/dispatch (citing Webster).  In other words, the statute
> charges the clerk with the physical action of sending the service package to the
> head of the ministry of foreign affairs.
>
> In this case, that did not happen; rather, Fly Brazil acted as an intermediary
> between the Clerk's Office and the courier.  Thus, an interested party — not the
> United States Courts' impartial agent — was the last entity to touch the service
> package before the courier delivered the package to its destination.  A primary
> aim of the FSIA seeks "to minimize potential irritants to relations with foreign
> states."  H.R. Rep. 94-1487, reprinted in 1976 U.S.C.C.A.N. 6604, 6609.  Indeed,
> the hierarchical structure of Section 1608(a)'s service provisions reflects
> congressional concern that dealings with foreign countries comply with certain
> protocols.  A party's involvement in the actual dispatch of the service package,
> however modest in nature, conflicts with this concern and with the express words
> of Section 1608(a).  Particularly in view of the requirement for strict compliance
> with Section 1608(a), *see supra*, service in this case was not adequate, and
> Gabon's Motion to Quash should be granted.

*Fly Brazil Group, Inc. v. Government of Gabon*, 709 F. Supp. 2d 1274, 1283 (S.D. Florida 2010).

No reasonable person would believe that as part of its statutory obligation to "dispatch"

FSIA materials pursuant to 28 U.S.C. § 1608(a)(3), thus acting as "the United States Courts'

impartial agent," the Clerk of Court should outsource the addressing of envelopes and the filling

out of related United States Postal Service forms to a *party to the case*.  This directly contradicts

Congressional intent, as evidenced by the statutory text of "to be addressed."

Nowhere does the FSIA state that postage must be pre-paid by the party requesting

service, or paid for separately by the party at all.  This is why the Court charges a filing fee

(which, compounding risk, Plaintiff paid): to cover the cost of routine administrative processes, such as mailing documents, that are associated with the prosecution of a case.[11]  Nor does the FSIA anywhere require "a letter of request addressed to the Clerk of Court" or "an affidavit from a translator stating his or her qualifications and certifying that the translation of the summons and complaint and notice of suit is accurate."  These purported requirements, tacked on by the Clerk of Court of this District presumably to reduce and offset its workload, are simply not necessary for a plaintiff to lodge a valid request for assistance pursuant to 28 U.S.C. § 1608(a)(2) or (3).

The Court also has the option of appointing a special international process server to handle issues relating to service of process, as it has in other cases.  Magistrate Judge Stein invented reasons as to why he viewed this as impossible, but those reasons made no sense.  *See* ECF No. 19 at 9.  Magistrate Judge Stein wrote, "Plaintiff has not indicated that he has located or retained an international process server to forward the USM-94 Forms to the German Central Authorities," and also seemed to believe that there needed to be specific evidence in the record that a given international process server had handled USM-94 Forms specifically in a prior case.

In fact, Plaintiff did "locate" such a firm: the firm mentioned in the citation that Plaintiff provided to the Court, which Magistrate Judge Stein then analyzed: *Rukoro v. Federal Republic of Germany*, No. 1:17-cv-00062 (S.D.N.Y. April 7, 2017).  And, as discussed above, Magistrate Judge Stein's insistence that it is solely Plaintiff's responsibility to effect service under the FSIA is simply wrong, aside from considerations regarding Plaintiff's anonymity and safety which would make retaining such a firm problematic.

In summary, there is no legitimate reason for the Court to deny Plaintiff assistance with service of process, which the Court itself ordered as a prerequisite to moving forward with the case.  Plaintiff fulfilled their statutory obligations in a diligent and timely manner, only to be met

---

[11] Pursuant to 28 U.S.C. § 1914(b), federal courts do not charge parties separately for mailing, for example, First Class Mail notices of rulings, or for mailing other courts copies of the record when cases are appealed or remanded.  Fees to cover FSIA postage have not been approved by the Judicial Conference, and therefore the Court must bear the cost of appropriate postage for its statutory duty, a "simple ministerial task."  *Murphy v. Islamic Republic of Iran*, 778 F. Supp. 2d 70, 73 (D.D.C. 2011) (referring to even more complex procedures under 28 U.S.C. § 1608(a)(4)).

with moving goalposts at every step of the process—not because of Defendants, who have thus far refused to appear, but because of the Court itself.  Once service is complete, the Court can verify that Plaintiff is, in fact, who they claim to be, without knowing Plaintiff's identity.

### 2. The Court Could Work With Plaintiff To Fashion A Reasonably Secure Alternative Sealing Process

There is no such thing as "perfect" security in any context.  Nonetheless, risk mitigation is possible, even in a situation such as this where there are numerous risks of different types that must be addressed.  Plaintiff remains willing to work with the Court via e-mail (but not on the public docket) to fashion an alternative sealing process suitable to the situation.  This would require the Court to comply with the First Amendment and accept e-mail from Plaintiff.

### 3. The Court Could Stay The Action Until After The 2024 Election

One of Plaintiff's main concerns is that the election of Donald J. Trump in 2024 could pose an especially acute threat to their safety if their identity is stored anywhere at all that is accessible by federal judges.  In his first term in office, President Trump appointed numerous judges who presently have access to sealed records.  The re-election of Mr. Trump would remove any check by the Executive Branch on individuals in the judiciary loyal to him.  As an agent of the Russian Federation, Trump could again abuse his office to reveal such information.  Already, he is on trial for abusing his access to classified information.[12]

By staying the case until after the 2024 election, the Court would give Plaintiff the opportunity to re-evaluate the relative risk of disclosing their identity to the Court at that point, which could be substantially different depending upon the victor.

---

[12] To the extent that the federal government has any information regarding Plaintiff's identity at all at this juncture, that information is likely classified, as is the fact of its existence or non-existence.

    **4.**    **Dismissal Is Inappropriate, But Any Dismissal Should Be Without Prejudice**

This case should not be dismissed.  However, if the Court for whatever reason decides that dismissal is the only way forward, dismissal should be without prejudice, and with a clear indication that no decision has been made on the merits of Plaintiff's claims.

## V.    CONCLUSION

For the foregoing reasons, including the unprecedented nature of this case, the Court should reject the April 15, 2024 Report & Recommendation of Magistrate Judge Gary Stein.

Dated: April 29, 2024              Respectfully submitted,

                                    /s/John Doe
                                    John Doe
                                    doevgermanylitigation@protonmail.com